# In the Matter of:

*Liu*

*vs*

### *SignaGen Laboratories*

*Jianzheng Zhou*

*July 2, 2025*



GRIFFIN GROUP
INTERNATIONAL

3200 East Camelback Road, Suite 177
Phoenix, Arizona 85018

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

JESSE LIU,                            ) Case No.
                                      ) 1:24-cv-03289-JKB
                    Plaintiff,        )
                                      )
        -against-                     )
                                      )
SIGNAGEN LABORATORIES, LLC, and       )
JIANZHENG "JEFFREY" ZHOU,             )
Individually,                         )
                                      )
                    Defendants.       )
                                      )

DEPOSITION OF JIANZHENG ZHOU

July 2, 2025
via Zoom videoconference
9:02 a.m. EST

DOREEN SUTTON, RDR, CSR, FAPR
Certified Reporter
Arizona Certificate No. 50076
CA CSR #11144



**Griffin Group International**
**888.529.9990  |  602.264.2230**

Liu vs
SignaGen Laboratories                                    Jianzheng Zhou

2

INDEX

WITNESS                                                    PAGE

JIANZHENG ZHOU

  Examination by Ms. Rosario                                 5

                          EXHIBITS

NUMBER            DESCRIPTION                              PAGE

Exhibit 1         Employee Handbook of SignaGen
                  Laboratories
                  (Bates Defendants 000001-34)      20

Exhibit 2         Email string dated 6/2/22,
                  8/2/22, and 4/21/23               56

Exhibit 3         PayPal transaction IDs
                  (Bates Defendants 000085-92)      59

Exhibit 4         Security footage video
                  (ID 2023_01_04_17_08_25_000)      81

Exhibit 5         Security footage video
                  (ID 2023_01_16_18_16_17_000)      82

Exhibit 6         Text messages
                  (Bates LIU000008)                 87

Exhibit 7         Text messages
                  (Bates LIU000007-8, 12-13)        90

Exhibit 8         Friends with Benefits
                  Agreement, Appendix A
                  (Bates Defendants 000082-84)      94



**Griffin Group International**
**888.529.9990  |  602.264.2230**

Liu vs
SignaGen Laboratories

Jianzheng Zhou

3

EXHIBITS (Continued)

| NUMBER | DESCRIPTION | PAGE |
|--------|-------------|------|
| Exhibit 9 | Affidavit of Jianzheng Zhou (Bates Defendants 000178-179) | 102 |
| Exhibit 10 | Text messages (Bates LIU000011) | 111 |
| Exhibit 11 | Email from Jeffrey Zhou dated 7/24/24 (Bates LIU000010) | 114 |
| Exhibit 12 | Affidavits of Alex Tibbens, Blake Gastley, and Leslie Forcino (Bates Defendants 000224-232) | 118 |
| Exhibit 13 | Rules of Conduct and Discipline (Bates Defendants 40-41) | 130 |

4

DEPOSITION OF JIANZHENG ZHOU


The deposition of JIANZHENG ZHOU was taken

before DOREEN SUTTON, Certified Reporter No. 50076, for

the State of Arizona, on July 2, 2025, via Zoom

videoconference, commencing at the hour of 9:02 a.m.

All parties appeared remotely.


APPEARANCES:

FOR THE PLAINTIFF:

Ms. Pamela Rosario
Ms. Dana Lechleiter
CONSUMER JUSTICE LAW FIRM
72-47 139th Street
Flushing, New York 11367
prosario@consumerjustice.com
dlechleiter@consumerjustice.com


FOR THE DEFENDANTS:

Mr. Andrew M. Kiphart
Mr. Shawn P. Cavenee
REMUS, WEDDLE & CAVENEE
18 West Church Street
Frederick, Maryland 21701
akiphart@rwclawyers.com


ALSO PRESENT:  Ms. Jesse Liu



5

JIANZHENG ZHOU,

called as a witness herein, having been first duly sworn

by the certified reporter, was examined and testified as

follows:


                     EXAMINATION

BY MS. ROSARIO:

Q.   Hello, Mr. Zhou.  How are you?

**A.   Fine.  Fine, thank you.**

Q.   My name is Pamela Rosario and I'm an attorney

for the plaintiff in this case.  I'm here today to learn

more about what you know about the facts surrounding this

case.  I will start with some basic instructions, just a

few things I need you to confirm before we get into the

specific questions.

As you can see, we have a court reporter here

who will be reporting everything that we say in today's

deposition.  Because she can only record verbal

responses, it's really important that you answer with a

verbal response, so head nods and other gestures won't be

recorded.  Okay?

**A.   Yes.**

Q.   This deposition is being conducted under oath,

as you just noticed, and it's important that you answer

each question truthfully or to the best of your ability.

6

Is there any reason you will not be able to testify truthfully or to the best of your ability today?

A. No.

Q. If at any point you do not understand my question please just let me know and I'll try to rephrase or clarify. If you'd like me to repeat the question that's fine, please just ask me to do so.

And if you answer the question, I will assume, however, that you heard and understood the question. Okay?

A. Okay.

Q. If you do not know the answer to the question, you are welcome to answer that you don't know. I may ask if you're able to do so to estimate or approximate, to the best of your knowledge. Okay?

A. Yes.

Q. If at any point you wish to take a break, please let me know. I only ask that any outstanding questions first be answered prior to taking that break.

And lastly, this process works most efficiently and will make things just go faster if you allow me to finish my question before you answer, even if you think you know what I'm going to ask. Likewise, I will do my best to allow you to finish responding before I ask another question. Okay?

7

A.    Uh-huh.

Q.    Can you state your full name for the record.

A.    **My first name is J-I-A-N-Z-H-A-N-G, my last name is Z-H-O-U, and people call me Jeffrey.**

Q.    What is your current address?

A.    **You mean the business address or home address?**

Q.    Your home address.

A.    **It's 9836 Notting Hill Drive, Frederick, Maryland 21704.**

Q.    How long have you lived at that address?

A.    **Maybe three or four years.**

Q.    And where did you live prior to that address?

A.    **In Clarksburg of Maryland.**

Q.    Do you own or rent at your current address?

A.    **I own this.**

Q.    And other than speaking with your attorneys, have you discussed your deposition today with anyone else?

A.    **No.**

Q.    Did you review any documents in preparation for this deposition today?

A.    **Yeah, briefly.  Yes.**

Q.    Which documents?

A.    **The documents shared by our attorney and specifically called -- I don't know, maybe I can share**



8

you -- and I just saw that this morning briefly.

Q. Can you describe that in more detail, maybe there's a title to the document?

A. It says, "To all the parties herein and to other" -- "to other attorneys of record," the title is called this.

Q. Can you describe what the document entails or where --

A. The document is about, I think, the procedures of the deposition, it's phrased like a "Please take note pursuant to the federal," I think it's R and Civil and the number and "Plaintiff and Jesse Liu and through her undersigned attorney of record will depose by oral examination of the corporation" -- "of the corporate designee of the Defendant SignaGen Laboratories, LLC, on what is July 2nd, 2025, at 9:00 o'clock today." (As read.)

Q. Okay. Any other documents reviewed?

A. Yeah, I review other documents forwarded by my attorney, my lawyer.

Q. What were those?

A. I think the -- primarily, just the discovery received from -- from the plaintiff.

Q. Any other documents besides the two that you just mentioned?



9

A.   I think that's all.

Q.   Thank you.  Have you ever been deposed before?

A.   Yes.

Q.   When did that occur?

A.   I think about maybe ten years ago when we have a business litigation with another company.

Q.   And what did that matter entail?

A.   I beg your pardon?

Q.   What were the circumstances surrounding that business litigation?

A.   I cannot remember exactly.  And it's basically is not me, it's my partner, business partner.  So I attended the deposition, but it happens, like, more than ten years ago, so I don't -- I don't know the nature, I cannot remember exactly.

Q.   Okay.  Have you been involved in any other prior legal proceedings?

A.   No.

Q.   Are you familiar with SignaGen Laboratories?

A.   Yeah.  Yes.

Q.   Does the company operate under any other name?

A.   No, I don't think it can be -- sometimes it can be SignaGen Laboratories, LLC, but sometimes as abbreviate to form, we just call it SignaGen Laboratories; basically, the same thing.

10

Q.   Who owns SignaGen?

A.   **There are two owners.**

Q.   Who are those owners?

A.   **Yeah, me and my business partner.**

Q.   What is your business partner's name?

A.   **Thomas and -- first name Thomas and last name Z-H-A-O.**

Q.   Have there ever been other owners of SignaGen?

A.   **I don't think so, no.**

Q.   Are you involved in the company's day-to-day operations?

A.   **Yes, I do.**

Q.   Is Thomas involved in the company's day-to-day operations?

A.   **Yeah, he does as well.**

Q.   Do you oversee any employees?

A.   **Yes.**

Q.   And what percentage of SignaGen do you own?

A.   **70 percent.**

Q.   I'm sorry, was that 70, seven zero?

A.   **Seven zero, yes.**

Q.   And what percent does Thomas own?

A.   **And the last portion, 30 percent.**

Q.   What type of business is SignaGen?

A.   **I believe it should be a category, belongs to a**

11

category called biotechnology.

Q.    Would you say that's the name of your industry?

A.    Yes.

Q.    How long have you owned SignaGen?

A.    I think it's more than 11 or 12 years.

Q.    Have you owned any other businesses since then?

A.    Sorry, there is a -- okay.  No, I don't think so.

Q.    What are your responsibilities as owner?

A.    I'm general partner of this company, and that's -- but we didn't officially appointed a CEO.  But sometimes I can be call the CEO, but I prefer people call me general partner of SignaGen Laboratories.

Q.    So to confirm, you have two titles, general partner and/or CEO?

A.    Yeah.  I prefer general partner because as I said, we didn't -- we never officially appointed a CEO.

Q.    Just for the record, what does CEO stand for?

A.    Chief executive officer.

Q.    Back to my original question; what are your responsibilities as general partner?

A.    So, and I'm owner of this company and my general responsibility in this company is to oversee production of the gene vector, also by -- by talking to customers, by negotiating with customers for a quotation, and to



12

receive order and assign the orders to our vector production team.

Q.   And earlier you stated that you do have employees that report to you.  Which employees are those?

A.   Sorry, I mentioned what?

Q.   That there are employees that report directly to you.  Can you list those employees or positions?

A.   Employee reports to me about what?  I don't understand this question.

Q.   In your corporate structure, I asked earlier if there were employees that reported directly to you and you answered yes, and so who are those employees?

A.   I don't think you ever asked this question.  So yeah, we have a policy, like, open-the-door policy.  If any employees has any issues they can come to my office, report it to me, that's general policy.  But I didn't mention a particular employee and reported to me.  I don't know his name or her name, because I don't know what this employee you are talking about.

Q.   Okay.  Do you have supervisory authority over any employees?

A.   Every employee has their own direct supervisor, so I think that if something wrong, an employee can report it to his direct supervisor first, and then if it cannot be resolved, they can come to me and visit my



13

office all the time.

Q.   And so are you the direct supervisor of any employee at SignaGen?

A.   So we -- I don't think -- I think this question is hard to answer.  So we have three different groups:  A cloning group, a packaging group, and purification group; each group has his own direct supervisors.  I'm not their direct supervisor.

Q.   Thank you.  How many employees does SignaGen have?

A.   Now?

Q.   I'm sorry?

A.   Are you talking about right now, or just -- I don't know.

Q.   Currently.

A.   I don't know what you're talking about.  I'm sorry.

Q.   How many employees does SignaGen currently have?

A.   Okay, 12 employees.

Q.   Does SignaGen currently have contractors that they hire?

A.   We occasionally, sometimes we -- I don't know how to define this, but yes, because we have an ongoing construction for a clean room, we hire a construction team to help us build the space.  I don't know if



14

contract or not, but if -- I think it's a contract company, maybe, yeah.  But you are right, occasionally we hire some contract to do some, like, short-term jobs, yes.

Q.   So you say that you currently have 12 employees. Does the number of employees ever fluctuate?

A.   Yes, like, for a family issue and so a just -- employee just resign just from yesterday, and so right now I think I -- I think right now we should have 11 employees.

Q.   As general partner/CEO, do you have authority to hire employees?

A.   I do.

Q.   Does anyone else have the same authority?

A.   My business partner.

Q.   Do you have authority to determine employee salaries?

A.   Yes.

Q.   Does anyone else have that same authority?

A.   My business partner.

Q.   And do you have authority to terminate employees?

A.   Yes.

Q.   And does anyone else have that same authority?

A.   Yes, my business partner.



15

Q.    Does SignaGen have a human resources department?

A.    No, we don't.

Q.    Who, then, handles the human resources functions at SignaGen?

A.    There are no specific person.  So usually I handle this and my business partner can handle this as well.

Q.    Do you conduct any human-resources-related training for employees?

A.    I do.

Q.    What types of training?

A.    The training include but not limited to, like, so if we hire a new research associate or molecule biologist, so we offer training almost immediately about lab safety.  So we are running our labs at about 50 level-two lab, so the lab safety is number one important, so we overtraining for lab safety.

And also, we overtrain immediately about handbook and regarding our policies, the salaries, and the benefits and all this stuff, and I think it's covered by the handbook of SignaGen.

Q.    So how are these trainings conducted; are they in person?  Online?

A.    In person.

Q.    And how frequently would you say these trainings



16

are conducted?

A.   Safety we overlap with training, like, at least three or four times a year.

And the handbook, including the human-resource-related part and what's offered immediately after the first day and the new employee recorded.  And also, occasionally, so we discuss about the terms in the handbook and we tape just discussing and revising the handbook, make sure that everybody understand the whole terms, all the policies specify in the handbook.

Q.   How often would you say the handbook is updated?

A.   Yeah, the -- I think that we revise it every year.

Q.   Does SignaGen have a formal compensation guideline?

A.   I don't know what -- how to define a formal compensation guideline.  So my -- in nature I used to be a bench scientist, I'm not a human resource, so I don't know how to answer this question.

Q.   What factors are considered in determining a new employee's salary?

A.   Job duty he performs.

Q.   Anything else?

A.   Yeah, I think the first -- whenever we meet



17

someone we post for on a job in indeed.com and specify the range of the salary, so that's basically -- we don't negotiate about a salary per any other factors, including what a degree and he earns and what his experience, because we don't need experience.  The experience is not good for us.  We prefer -- the criteria for us to choose a candidate is to -- we prefer the candidate applicant doesn't have any experience, because their previous experience can have trouble to accept our SOPs.  We find this a lot of many, many times.  And yeah, we post the salary really in a job posting.

Q.   What are the various positions that employees at SignaGen hold?

A.   What was the -- what?  I'm sorry, varied?

Q.   The various positions held by SignaGen employees.

A.   Can you repeat again?  I don't understand.

Q.   Sure.  I'm looking for the titles of all employees at SignaGen; what are the different types of roles held there?

A.   We have right now in terms of the job it performs, we have basically, we have -- I think there's maybe four different title.  So for the entry level, it's just a research associate or molecule biologist.  And usually after two years or three years, based on the



18

evaluation of their performances, so we can be promoted to senior research associate or senior molecule biologist.

And then so after that, it can be further promoted to be staff scientist.  That's one, two, three, four, five -- I think that's basically five titles we have right now.

Q.   Can we go through the responsibilities for each of these titles?  For example, we can start with research associate; what are the responsibilities for that role?

A.   The role is depends.  I think there are no general answer to your question, because it depends, so which team they are working, which department they work at.

So, for example, if they work in the cloning team they're going to design the sequence from the cloning and verify the clone and do midi preparation and maxi preparation.  If they assign to packaging team they're going handle tissue culture, and -- I'm saying that it's no general answer to the question, because the job duty varies a lot and if you work in different department.

Q.   How many departments does SignaGen have?

A.   You mean, how many departments?

Q.   Yes.



19

A.    How many groups?

Q.    Well, you just mentioned departments.  You know, title would vary depending on departments.  So how many departments are at SignaGen?

A.    **Yeah, I just mention earlier, so there's three departments:  Cloning and -- we call it cloning team and packaging team and purification team.**

Q.    So let's go through the titles you just mentioned for each department.  I think you described the research associate position duties, based on each department.  But what about for a molecular biologist, as you mentioned?

A.    **They are going to design and a construction of a vector clone and perform the cloning, molecule cloning, and do the -- the large plasmid need midi and mini and maxi preparation and also perform sequencing, and I think maybe that's -- because I'm not directly charging this team, so I basically, I -- I can't be -- I can be missing something, but basically, these are major job duties.**

Q.    That's okay, to the best of your knowledge, you can answer.

And then for the staff scientist, what would their duties include by department?

A.    **The staff scientist are basically is a designer of the whole project.  And so whenever we receive an**



20

order, so the order go before the staff scientist and he design how to execute, all his staff does the work flow and design the clone and how to make this vector and to meet deadline required by the customer.

MS. ROSARIO:  Thank you.  I'm going to pull up our first exhibit, Exhibit 1, it's from defendant's production 1 through 34.

Can you-all see that?

THE WITNESS:  Yes.

MR. KIPHART:  Yes.

MS. ROSARIO:  So this will be Exhibit 1, for the record.

Q.    BY MS. ROSARIO:  Have you seen this document before, Mr. Zhou?

A.    Yes, this is the handbook of SignaGen Laboratories.

Q.    Did you review it in preparation for today's deposition?

A.    I'm pretty familiar with this, so I didn't review this.

Q.    And can you confirm who drafted the original version of this handbook?

A.    I think so my business partner draft this, but we sent an email to every employee and we discuss this term -- all the terms and then we finalize this handbook,

21

this employee handbook.

Q.   You mentioned earlier that this handbook gets updated every year?

A.   We try, yeah.  Sometimes can be two years, but we try to do that every year, yes.  I think the first version was introduced maybe 2020.

MS. ROSARIO:  To the extent that other versions of this handbook exist from 2022 to 2023, we would ask for a production of that.

THE WITNESS:  We have other version.  It's basically, this is nothing -- it's just several words and maybe a typos and was corrected.  Yeah, we do have the latest version and we can share the latest version.

Q.   BY MS. ROSARIO:  Does this handbook contain language related to performance evaluations?

A.   I think so, yes.

Q.   I'm going to refer to Defendants 13, this is still part of the same exhibit, and I'm just going to zoom in here.

Are you able to read that, Mr. Zhou?

A.   Yes, I can.  Yes.  Do you want me to read this?

Q.   One second, we'll get to that, thank you.

Yes, if you could, please read this paragraph that kind of starts here at "Performance evaluation."

A.   Yeah.  "At SignaGen we communicate to empower



22

and in order to foster more dialogue between team members and managers, the company will conduct periodic performance reviews.  Performance evaluations will be conducted annually and the performance evaluation may vary, depending upon length of the service, the job positions, past performances, changes in the job duties, or recurring performance problems.

"Every effort will be made to perform evaluations on or about your scheduled review date, but be aware that delays may occur.  And during your performance evaluations, your supervisor may review factors such as the quality and quantity of the work you perform, your knowledge of the job, your initiative and your work attitude and your attitude towards others.  In the performance evaluations, I intended to make you aware of your progress, areas for improvement, and objectives or goals for future work performance.

"Favorable performance evaluations do not guarantee increase in salary or promotions.  Salary increase or promotions are solely within the discretion of the company and depend upon many factors, like the company's overall financial situation and the employee's length of the service, the employee's qualifications, and the general economic conditions," et cetera.  (As read.)

Q.   Thank you.  So per your handbook language, how



23

often were performance reviews conducted in 2022?

A.    As you can see in the handbook, we do that, the company do that in a yearly basis.  But inside of the different departments and the supervisor control the pace of the evaluations; can be half a year and it can be -- basically, I only -- I only saw the -- always see the yearly, like, the annual evaluation of the employee.

Q.    Does anyone else aside from the direct supervisors conduct these performance reviews?

A.    I beg your pardon?

Q.    Does anyone else aside from the direct supervisors you just mentioned conduct these performance reviews?

A.    We -- we only have internal guidelines about how often -- how often the supervisor of the different team can review their team members, but we don't have, like, a you must do that in half year, you must do that on a yearly basis, we don't have the such timeline, but usually we do that on the half-year basis.

Q.    And only the direct supervisors conduct these performance reviews?

A.    Yes.

Q.    Do you know how they're conducted; in person or on Zoom?

A.    I think they have the form, the evaluation form.



24

Q.   But between the supervisor and employee, do they meet -- excuse me, I'll start over.

Between the supervisor and the employee, after they fill out this form, do they meet afterwards or at any point during the performance evaluation process?

A.   As I said, I'm not a person who do the different group's internal evaluation, so I cannot answer this question.  But I do see the evaluation forms from their supervisors.

Q.   And --

A.   Meaning that I have no idea how they conduct the evaluation.  It's not my direct responsibility to direct -- to evaluate directly the team members.

Q.   So as general partner of SignaGen who drafted the handbook, what was your intention with having this performance evaluation language included in the handbook?

A.   Yeah, I set up the rules to have the evaluation done every year, so -- and I supposed to receive evaluation form every year, that's -- that's the purpose of the handbook.  But now they conduct the evaluations of the performance of the employee is conducted directly by their supervisors, not me.

Q.   If an employee were to have poor performance, what are some of the consequences, per the evaluation procedure?



25

A.    So we -- I think we have the action of the -- I don't know what it's called, disciplinary action form, and yes, so it can be a -- a -- I think the evaluation result can be used for charge the promotion and the salary adjustment and can be the job assignment and the job duties and such thing like this.

Q.    Could a performance evaluation ever be used to terminate an employee or put them on a performance improvement plan?

A.    To my knowledge, no.

Q.    Does this handbook include language related to employee wages?

A.    I think so, that -- that's definitely important part of the handbook, I think.

Q.    I'm going to move to Defendants 007, same exhibit, it's part of the same document -- actually, I'm going to move down to Defendants 008, still part of Exhibit 1.

Can you just read that first paragraph under "Mandatory paycheck deductions" for the record.

A.    "The company is required by law to make certain deductions from your paycheck each time it is prepared. Among this are your federal, state, and local income taxes and legal required contributions to Social Security, and these deductions are itemized on your



paycheck stub.

"The amount of your tax deduction depends on your earnings on the information you furnish on your W-4 and applicable and state withholding forms regarding the number of exemptions you claim.  If you wish to modify" -- (As read.)

Q.   I'm sorry, just that first paragraph was enough. Thank you.

A.   Uh-huh.

Q.   And does this handbook include a discrimination policy?

A.   Yes, I think -- I think so, yes.

Q.   I'm moving on to Defendants 006, same exhibit.

Are you familiar with this section, Mr. Zhou?

A.   Yes, I am.

Q.   When was this section added to the handbook?

A.   When this -- when this action -- from the initial version, we have this section.

Q.   Can you read this second paragraph here that starts with "SignaGen is committed" and ends with "including supervisors and coworkers"?

A.   Yeah.  "SignaGen is committed to compliance with the Equal Pay Act of 1963, the Civil Rights Act of 1964, and the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, and all



applicable state laws providing equal employment opportunities.

"The commitment applies to everyone involved in the company operation and prohibits unlawful discrimination by and the employees of the company, including the supervisors and coworkers." (As read.)

Q.   Thank you.  So the language you read said SignaGen is committed to compliance with several federal laws which you listed out.  Would you say that's an accurate statement of your company's practices?

A.   Yes.  Yes.

Q.   And you stated earlier, again, that SignaGen currently has 12 employees.  Did SignaGen have 12 employees in 2022?

A.   2022, I need to have a look.  I cannot remember. It happens three years ago.

Q.   Do you recall if SignaGen had 12 employees in 2023?

A.   No, I don't think -- I don't think so, yeah.

Q.   You don't think that you had 12 employees in 2023?

A.   Yes, we never have more than 12 employees.

Q.   So in 2023, do you recall how many employees SignaGen had?

A.   No.



28

Q.    In the drafting of this handbook, why did you and your partner choose to include the federal laws in this section of the handbook?

A.    I think when we make -- when we make this handbook, we just copy a template.  The template say, I think it's reasonable, that's why we use this as part of our handbook.

So we are not legal professionals, we don't hire a lawyer to see this, so it's really for me hard to answer your question.  We don't know, so I think it's reasonable, so I think -- every company, no matter small or big, should have this part included in their handbook.

So as I said, we are -- I used to be a bench scientist, so I'm not legal professionals.  We didn't hire a lawyer to polish the handbook, so we just include it.  I think it's reasonable.

Q.    Understood.  Does this handbook include a harassment policy?

A.    Yes, I think -- yes.  Yes, I think.

Q.    Moving on to Defendants 0017, are you familiar with this harassment policy?

A.    Yes.

Q.    I just scrolled down the same page, 17.  If you could, read this paragraph that begins with "If you believe" and ends with "treated confidentially."

A.    "If you believe that you have been unlawfully harassed, and promptly report the incident to the company.  You will be asked to provide details of the incident, names of individuals involved, and names of any witnesses.

"The supervisors will refer all harassment of the complaints to the company management team.  The company will immediately undertake an effective, thorough, and objective investigation of all this allegations.  All harassment charges will be promptly investigated and treated confidentially." (As read.)

Q.    I'm sorry, can you also read this top portion here, towards the middle of the paragraph, it starts with "The company's anti-harassment policy" to the end of the paragraph, "any of those characteristics."  It's about six lines down.

A.    Yeah, "SignaGen is committed to providing a work environment which encourage mutual respect, promotes respectful and genuine relationships between employees, and is free of unlawful harassment.

"SignaGen prohibits sexual harassment and harassment based on pregnancy, childbirth or related medical conditions, race, religions, creed, color, gender, national origin or ancestry, physical or mental disability, medical conditions, marital status,

registered domestic partner status, age, sexual

orientation, or any other basis protected by the federal,

state, and local law or the ordinance or regulations.

All such harassment is unlawful.

"The company's antiharassment policy applies to

everyone involved in the operation of the company and

prohibits unlawful harassment by any employee of the

company, including supervisors and managers, as well as

vendors, customers, and any other persons.

"We also prohibit harassment based on the

perception that anyone has any other characteristics or

are associated with a person who has or is perceived as

having any of those characteristics."  (As read.)

Q.   And is there specific language in this handbook
related to harassment complaints?

A.   Yeah, I think so.

Q.   Skipping down to Defendants 00030, Mr. Zhou, if
you could, just read this last portion here; it starts
with "If something about your job" and ends with "we
don't know about it" on the next page.

A.   "If something about your job is bothering you or
if you have a question, concern, idea, or problem related
to your work, please discuss it with your immediate
supervisor as soon as possible.

"If for any reason you don't feel comfortable



Liu vs
SignaGen Laboratories

Jianzheng Zhou

31

bringing the matter to your supervisor, feel free to raise this issue with any officer of the company.  We encourage you to come forward and make your concerns known to SignaGen.  We cannot solve a problem if we don't know about it."  (As read.)

Q.   Thank you.  So according to this language, who are considered the officers of the company?

A.   Yeah, me and my business partner.

Q.   Are employees given a list of the officers and told that you would be considered officers of the company?

A.   Yes -- not -- yeah, we discuss who is the supervisor, who is the manager, who is the officer of the company.  Yeah, my business partner and I are the officer of the company.

Q.   And are employees given the contact information of the officers of the company?

A.   They have directly contact of SignaGen in Google drive, yes.

Q.   Earlier where you read -- and I can pull it up if you need -- the harassment policy, a company, a, quote, "company management team" is mentioned.  Who is part of the company management team?

A.   Me and my business partner.

Q.   Can you describe how an investigation under this



32

policy would be conducted at SignaGen?

A.   **We never receive such complaint before, so I cannot tell how.  Basically, so we will do -- find out -- it is depend on what the nature of the complaint.  So if the harassment complaint was reported to us, so we will find out the evidence.  So I think the complaint should have evidence.**

**So we're going to be conduct investigation surrounding the evidence the complaint provides.  So we honest have no case, so there no way I can tell, just general, because we never receive such complaint before.**

Q.   Understood.  So who would have the authority to make a final decision on any actions taken as a result of the investigation?

A.   **The managers of SignaGen, which is me and my business partner.**

Q.   And are you and your business partner trained on handling harassment complaints?

A.   **Actually, we are not legal professionals.  We didn't receive any training about this.**

Q.   Does the handbook contain any policies regarding personal or romantic relationships in the workplace?

A.   **I don't think so.  I don't think so.**

Q.   Still in Exhibit 1, I'm going to move over or scroll up to the Defendants 29, 0029.



33

Are you familiar with this section, Mr. Zhou? It's under Conflicts of Interest.

A.    Yes.

Q.    Can I just ask you to read here -- I don't know if you can see my cursor -- but around what -- well, we can start here, "All employees," down to this section here, "Failure to disclose facts shall constitute grounds for disciplinary action."

A.    "All employees must avoid a situation involving actual and potential conflict of interest, personal or" -- "personal or romantic involvement in" -- "with a competitor, supplier, or subordinate of the employee of SignaGen which impair" -- "impairs the employee's ability to exercise good judgment on behalf of the company creates an actual or potential conflict of interest.

"Supervisor-subordinate a romantic or personal relationships also lead to the supervisory problems and the possible claims of the sexual harassment and moral problems.

"A employee involved in any of the type of relationship or situations described in this policy should immediately and fully disclose the relevant circumstances to their immediate supervisor or any other appropriate supervisor for a determination about whether a potential or actual conflict exists.

"If an actual or potential conflict is determined, SignaGen may take appropriate action according to the circumstances.  Failure to disclose facts shall constitute grounds for disciplinary action."  (As read.)

Q.   Thank you.  So according to this policy, what must the employee do if they become personally or romantically involved in the workplace?

A.   Can you repeat the question again?

Q.   Sure.  According to this policy, what must an employee do if they become personally or romantically involved in the workplace?

A.   Yeah, they should report it to their immediate supervisor.

Q.   And why does SignaGen require such disclosure in the handbook?

A.   Why?  I think it's a general -- it's a general formality for a handbook, a company.  As I said, I'm not legal professional, so...

Q.   What would happen if an employee or supervisor did not disclose this type of relationship?

A.   It never happen before, so there are no what if.  We don't know.  It never happen with SignaGen.

Q.   Well, it states in your handbook, "Failure to disclose facts shall constitute grounds for disciplinary

Liu vs                                                    Jianzheng Zhou
SignaGen Laboratories

35

action."

What type of disciplinary action would that be?

A.    I think we have the disciplinary action listed in the disciplinary rules and misconduct.  So for the disciplinary action, we have a list -- so it's a long list, I cannot remember all of this, but --

Q.    Can you list -- sorry.

A.    But the severest punishment, the discipline action can be termination of the employment.

Q.    Of that long list you just mentioned, can you list just a few of the other disciplinary actions?

A.    It can be an oral -- oral warning and it can be written warnings, it can be termination of the employment; but other than that, I can't remember any of other terms.

Q.    I'm going to stop sharing now.

How does SignaGen determine when an employee is entitled to a promotion or salary increase?

A.    I already stated earlier, so based on the yearly evaluation -- yearly evaluation of the employee's performance; that means the adjustment in salary will be done after the year he works with us.  And also, and the evaluation cannot be used to guarantee a rise of the salary or compensation or benefits.

Q.    And you mentioned earlier about the handbook



36

being provided to an employee.  When does that occur; at the time of hire or shortly after?

A.    **Immediately, the first, day, and they come to us.**

Q.    Are employees required to sign this handbook?

A.    **Yes, after we issue and they make sure they understand all the terms and policies, yeah, they need to sign and make sure they understand the whole process.**

Q.    What method do they use to sign the handbook?

A.    **Method, I think it can be -- what do you mean, method?  They can sign electronic, they can sign in person, and so it depends.**

Q.    So they have the option?

A.    **Yes.  Yes.**

Q.    Are there any employees who have complained of harassment or discrimination at SignaGen in the last three years?

A.    **I don't think so.**

Q.    Are you familiar with ███████ Liu?

A.    **Yes.**

Q.    Do you know this person by any other name?

A.    **She called herself Jesse.  Yeah, that's the only other name I know.  She can -- she can have other names. I don't know.**

Q.    Just for the record, I'll be referring to her as



Ms. Liu moving forward.

        When did you first become aware of Ms. Liu?

    A.    I think in July something, in 2022.  So we post a job on indeed.com and we specified in the post, the job post, saying that email is only way to communicate.  She called us, she called me specifically and asked for -- if she can have interview.  At that time, I think it's happening in July of 2022.

    Q.    What was your response to her request?

    A.    My response was -- what I can recall was I asked her to apply with indeed.com, other than calling us.

    Q.    And did she move forward with applying via indeed.com?

    A.    Yes, she did.

    Q.    Did you have any part in the interview process of Ms. Liu?

    A.    Did I have what?

    Q.    Did you have any part in the interview process of Ms. Liu?

    A.    Can you be more specific; do I have a partner?  You mean who interviewed her is your question; is that right?

    Q.    Yes.

    A.    Yeah, I'm sorry.  I interviewed her, so my business partner interviewed her as well.



38

Q.   Was that in the same interview or were there separate interviews?

A.   **Separate interview.**

Q.   When was Ms. Liu hired?

A.   **You mean the date -- okay, you mean the date when we issue the employment letter or just the date that she accept the letter?**

Q.   The date that you and your partner decided that she would be hired at SignaGen as an employee.

A.   **I don't remember, but it's before August something, before August 24 something.**

Q.   When was her official start date?

A.   **I can't remember, but end of August, beginning of September, I think.**

Q.   What position was she hired for?

A.   **I remember as molecule biologist; I can be wrong, it can be research associate.**

Q.   And who did Ms. Liu report to?

A.   **Report to during her work or just during the hiring process?  I don't understand.**

Q.   When she was hired -- sure.  When she was hired for the role of molecular biologist, who did she directly report to?

A.   **You mean her immediate supervisor; right?**

Q.   That's right.



A.    Yeah, Alex Tibbens.

Q.    Do you recall what Ms. Liu's starting salary was?

A.    I think it specify in the employment letter the base salary is 54,000.

MS. ROSARIO:  Can we go off the record for one second, I just need to switch WiFis.

(The deposition was at recess from 10:02 a.m. to 10:04 a.m.)

MS. ROSARIO:  Okay, we can go back on the record.

Q.    BY MS. ROSARIO:  Who set the salary amount for Ms. Liu?

A.    Who set?  The nature of the job set, because we post the job specifying the salary, the base salary.

Q.    Were there any other molecular biologists employed by SignaGen at the time of Ms. Liu's hire?

A.    I don't think so, because we are small company, we just have 12 people, so we cannot just hire so many people at same time.

Q.    Were there any other molecular biologists employed by SignaGen within a year of Ms. Liu's hire?

A.    Yeah, prior to Ms. Liu's employment with us, we hire molecule biologist, like, three, three years or four years before that.  Yes.

40

Q.   What about within the year after she was hired?

A.   No, we didn't hire molecular biology after that.

Q.   What were Ms. Liu's job duties?

A.   She was assigned to work in the vector packaging team and her job was to handle tissue culture -- to handle tissue cultures and to grow the cells, to subculture the cells; it's a very, very basic lab techniques.  And do transfection per the packaging plan made by her supervisor plan and maintain the cells and harvest the cells.

Q.   Did she have a written job description?

A.   A what?

Q.   A written job description.

A.   Yeah, maybe, maybe his supervisor assign, because -- yeah, he had, because his supervisor made the vector packaging plan and passed the plan to her and she just -- she just did per the vector packaging plan -- I'm sorry, more specifically, his immediate supervisor, Alex Tibbens, and made the packaging forms each week and then pass the forms to the team members.  The team members executes the packaging process per the forms.

Q.   Did her job function require her to work alongside other employees?

A.   We maintain, like, a eight working hours.

Q.   During those working hours, was she required to



41

work alongside other employees?

A.   Yeah, I think they work -- so the initial stage for her, I think, is to receive training, because she never did vector packaging and to make a virus.  So the first initial stage is supposed to receive trainings from that Alex Tibbens and alongside with other new hires.

Q.   Did her job function require her to work alongside you at any point?

A.   Work for, you mean -- can you repeat the question again?

Q.   Did her job function require her to work alongside you at any point during her employment?

A.   I still don't understand.  So yeah, we -- we require all employee to work eight hours day, that's full-time job.

Q.   I'm not asking about hours worked.  I'm asking if as part of her job function, did you and her ever have to work together?

A.   No.  At the time, no.

Q.   During her employment at any point, did you work together with Ms. Liu?

A.   Yes, in the final stage.  Yes.

Q.   Can you describe that in more detail; what did that entail?

A.   I think it specify in the discovery



42

documentations very clearly.  And for the initial stage, she supposed to work in the vector purification -- packaging team.  Soon after the four weeks after she work in the vector packaging team and the supervision of the Alex Tibbens, and Alex came to me and complain her failure to follow the SOPs.  And Alex said this hard, it's hard communicate, maybe this can be language barriers, but I don't believe so.

And he suggest to transfer her to another team because she's not suitable for this job and the cell she grow -- and other people grow the cells very good, very healthy condition.  And my business partner check the cell conditions after receiving the complaint from Alex and we find the cells she made in a big clump, most cells, of course, were dead.

So then, I think, just four weeks after -- just four weeks she start work with Alex Tibbens and she was transferred to purification team, I think maybe in a -- in the beginning of, I don't know, October or November and then she start working on purification team under supervision of Blake Gastley, and -- but it turn out a disaster.

And she cracked the ultracentrifugation tubes during ultracentrifugation, and this is the first time it happened in the lab; we never crack the

Liu vs
SignaGen Laboratories

Jianzheng Zhou

43

ultracentrifugation tubes during the ultracentrifugation. It's super dangerous to other people.  It's super violation of the lab safety, because the ultracentrifugation is running at super high speed, it's 28,000 RPM, so it can be extremely dangerous if the tube cracked.

And additionally, and she lost the sample we made for our customers and this also the first time; they never, ever lost any samples we made for the customer. And the titration she did is ten times higher than the actual titer, they're basically -- it's kind of hard and for her to continue working in the purification team, I think, maybe four weeks later.

And I think we like to give her another chance to work, to deal with the customers, and at that time she start work with me and to deal with customer service; I think it can be either beginning of December, end of November.

Q.   And just to confirm this, you're saying she was on the packaging team at the time of hire for about four weeks; is that correct?

A.   Maybe for the purification, she work in the purification for four weeks, maybe a little bit longer in the packaging team, I cannot remember, but I can find out if you need, but it's all specify in the discovery



44

documents.

Q.    And so the purification team was around four weeks and that was beginning around October or November of 2022; is that correct?

A.    **Approximately, yes.**

Q.    And then at the end of November, maybe beginning of December, you're saying she moved on to customer service alongside you?

A.    **Yes, approximately the time point.**

Q.    And just to confirm, did Ms. Liu's job title change at any point as she was moving through these departments?

A.    **Yeah, we didn't change her job titles.**

Q.    So when she was hired in August of 2022, she was hired specifically for the packaging department; is that correct?

A.    **I think -- so we hire someone and then so to which team she should be assigned to work with is highly depends on which team need people, need, like, a technician to work in.  So at that time, yes, packaging.**

Q.    So were there any other reasons why Ms. Liu had changed departments between August 2022 and December of 2022?

A.    **The reason, no, just -- no, besides what I mentioned, I don't think there are any other reasons.**



Liu vs                                                    Jianzheng Zhou
SignaGen Laboratories

45

Q.    Before the end of November 2022, beginning of December 2022, as you mentioned, when Ms. Liu was then moved to work customer service alongside you, before then, how frequently did you interact with Ms. Liu?

A.    **We are small company, we just have 14 people including the two owners, so I don't often get involved with the plaintiff because I'm not their -- not her direct supervisor.**

Q.    Do you recall what other employees were hired in or around 2022 at SignaGen?

A.    **Yes, and we hire another employee and she started with SignaGen at exactly the same day as the plaintiff started us.**

Q.    Who was that individual?

A.    **You want her name?**

Q.    Yes.

A.    **Her name is called Lauren Strope.**

Q.    What role was Lauren hired for?

A.    **Her job title or just the job duties she performs?**

Q.    The job title.

A.    **I -- I cannot remember.  It should be research associate.**

Q.    Do you recall her starting salary?

A.    **I think it's 54,000.**



Q.    Do you recall what degrees Ms. Strope held?

A.    What?

Q.    Do you recall what the degrees that Lauren Strope held?

A.    I think it's bachelor degree from new -- she was new graduate from University of Maryland, I think.

Q.    Were there any other employees hired in 2022?

A.    Yes, I think another employee is hired, I think month after.  Yes.

Q.    Who is that employee?

A.    I think it's Samuel Jacobs.

Q.    What is his job title?

A.    I think is research associate.

Q.    Do you recall his starting salary?

A.    54,000.

Q.    Do you recall which degree he held?

A.    I think -- I can be wrong, though, so I think it's -- because the job, we post the job a requiring just bachelor degree, bachelor or master.

Q.    Any other employees hired in 2022?

A.    You mean any other employees we hired?

Q.    Yes.

A.    I think maybe, maybe not.  Yeah, maybe there is another one and hired December.

Q.    And who is that?



47

A.    Is Sarah, Sarah Grimm.

Q.    And what was her job title?

A.    I think research associate.

Q.    Do you remember her starting salary?

A.    I think it's 56,000.

Q.    Do you recall which degrees she held?

A.    Master, I think.

Q.    Do you recall a Tyler Shanholtz being hired?

A.    Tyler, yeah.  I forgot Tyler.  Tyler was hired in October, I think.

Q.    What is his job title?

A.    Research associate.

Q.    What was his starting salary?

A.    Fifty-four.

Q.    And do you recall what degrees Tyler held?

A.    I think it's bachelor or master.  Bachelor, should be, yeah.

Q.    And just to confirm, all of the salaries that we've just gone over for these individuals were approved or set by yourself and your business partner?

A.    That's right.

Q.    Was Ms. Liu's performance ever evaluated during her employment at SignaGen?

A.    No.  The time is so short, just a couple week it became valid, so our policy just -- we just talked about

Liu vs
SignaGen Laboratories

Jianzheng Zhou

48

our evaluation policy.

Q.   Is there a specific time of the year that your annual performance evaluations are conducted?

A.   **There's no special time because each employees start with us different time.**

Q.   So earlier you mentioned there were no complaints by other employees regarding Ms. Liu --

A.   **No employees -- a correction is not -- there are no employees complain about the plaintiff's performance; either direct supervisors.**

Q.   Are the supervisors at SignaGen not employees?

A.   **Yeah, they are employees.  I'm sorry.  Okay, in this case, yes.**

Q.   No worries, I just wanted to make sure that I was understanding correctly.

A.   **Okay.**

Q.   So you mentioned earlier that the supervisors/employees had complaints regarding Ms. Liu?

A.   **And their coworkers as well.**

Q.   Were any of these issues or complaints ever documented in any way?

A.   **They just came to my office and spoke with me about her performance and claiming that the plaintiff was not suitable to work in their department.  We don't have any record, we -- but we provide the affidavit of this**



49

complaints.

Q.    Was Ms. Liu made aware of any areas of improvement at any point during her employment?

A.    Can you repeat this question again?

Q.    Sure.  Was Ms. Liu made aware of any areas of improvement during her employment at SignaGen?

A.    Yeah, we try to talk to her and my business partner, I tried to talk to her several times and saying that you need to improve, but otherwise, you have to -- you don't have a lot of choice, and so -- yeah, we -- we did talk to her and ask her to improve, especially for the tissue culture techniques.

Q.    Can you explain what you mean by you let her know she needed to improve and she didn't have any other choice?

A.    Because we just have three, three different groups, and so -- but we prefer not fire anyone, so that's why we gave her chance to transfer from one department to another.  But we only have three different groups, so -- but if she try all these groups without results, so I think maybe the only thing she can do is just leave.  So that's what I'm saying, we don't have a lot of chance to let her try.

Q.    Was anything else discussed between you, Ms. Liu, and Thomas during these conversations about her



50

performance?

A.    She was not listening.  She said I have headache and then she left.  She bounced from the chair and dashed out from the building.

Q.    When did this conversation take place?

A.    I cannot remember exact what time, but it should be after we receive the complaint from Alex, I think from Alex.

Q.    So before she was on the purification team?

A.    That's what I can recall.  I can be wrong, though.

Q.    After you said that Ms. Liu said she had a headache and left, were there any consequences to that or any follow-up?

A.    No, I don't think we -- and then we -- we decide to transfer her to another team so after that, because I don't believe she can handle the tissue culture properly.

Q.    Did Ms. Liu receive a raise during her time at SignaGen?

A.    I think we have discussed this during the handbook -- when I read the handbook.  So the salary adjustments based on year, so must be done after a year and after she started us, so we don't -- we never ever adjust the salary just one or two months after she started us, we never did.  This against our policy.  Our

51

policy is similar, adjustments after a year, after employment working for a year.

Q.   Did Ms. Liu receive a bonus during her employment at SignaGen?

A.   Yes.

Q.   So as part of SignaGen's timekeeping and wage policies that we went over earlier -- and I can pull it up if you'd like -- during Ms. Liu's employment, did SignaGen issue pay stubs to employees?

A.   Pay stubs to employees, so I don't understand this question.  So yeah, we have -- we have payroll, we hire third-party payroll to run payroll monthly so the employee can access their pay stubs by accessing the specific link assigned a payroll company.  Yeah, they did receive the report of the pay stub in the end of the months after they get paid.

Q.   Is there ever a time where an employee would not receive a pay stub?

A.   I don't think so.  So if they didn't received, that means they didn't get paid.  As long as get paid, they should receive the pay stub.  As long they are employee status.  But even the contractors, the situation will be different.  The contractor didn't receive the paycheck and other than just run through payroll.

Q.   During Ms. Liu's employment at SignaGen, did she



52

receive any disciplinary action?

A.    I don't think so.  I don't think -- it just --
we just offer oral warning about this.  But I don't know,
it can be -- it can be part of the disciplinary action,
yes.

Q.    We talked about complaints regarding Ms. Liu's
performance during her employment.  Were there any
complaints that came from employees or supervisors after
her employment had ended?

A.    Yes, I think we receive a complaint about the
insubordination from other supervisors about their team
members after the plaintiff terminate her employment with
us.  Yes.

Q.    And when were those complaints given to you?

A.    They draft form, giving me the detail of the
insubordination, and sometimes it can be failure to meet
a deadline specified by the customer.  They're just minor
things.

Q.    I'm sorry, just to make sure I understand, did
you say they filled out the form to memorialize this
complaint?

A.    I can give you example.  So about one year ago
and the supervisor in the purification team and give me
complaint about the team member, about he failed to run
the Benzonase procedure properly, and he told me orally

by reaching my office.  And then I asked her to give a formal complaint and draft up a form.

Q.   Just to confirm, is this a complaint about Ms. Liu or are you giving an example about another incident?

A.   I said it's one year ago, it's after the plaintiff terminate her employment with us.  You asked me if there are any other complaints coming to me, right, even after she -- after plaintiff left SignaGen, I said yes.

Q.   Correct, and then you went on to give an example.  And so just to confirm, there is a form that was filled out related to a complaint regarding Ms. Liu after her employment ended?

A.   Because -- yeah, because we need to -- we need to issue a written warning to this team member, that's why we need a form.

Q.   Do you still have access to this form?

A.   Yes, I think I can find it out.  I don't know.

MS. ROSARIO:  Counsel, to the extent that this form exists, we'd like to see production if they have not been produced already.

MR. KIPHART:  You got it.

MS. ROSARIO:  Thank you.

Q.   BY MS. ROSARIO:  Earlier -- and I can pull up



54

the handbook -- earlier we went over the harassment policy at SignaGen and we discussed employees reporting any complaints to their supervisors.

According to the handbook, if any employee or if an employee doesn't feel comfortable reporting to their supervisor, what other options do they have?

**A.    The option we have as outline in the handbook, they can report it to me or my business partner directly, yes.**

Q.    And so what if the complaint is about one of the officers of the company?

**A.    Can you repeat the question again?**

Q.    Sure.  What if the complaint is about one of the officers of the company?

**A.    What -- what do you mean, about the officer? What do you mean -- who is officer, me and my business partner; right?**

Q.    Yes.

**A.    We never have such thing happen before, so I don't know.  We don't have such policy in place, I think.**

Q.    You don't have what policy -- oh, you mean -- I understand.

Did Ms. Liu ever complain of sexual harassment during her employment at SignaGen?

**A.    Never.**



55

Q.    I'm sorry, I didn't catch that.

A.    **I said no, she never did, it's never happened.**

Q.    Was Ms. Liu ever suspended while employed at SignaGen?

A.    **No, that's wrong.  That's lie.**

Q.    Was Ms. Liu terminated or did she leave voluntarily?

A.    **She quit voluntarily.**

Q.    On what date are you saying that Ms. Liu quit?

A.    **End of January, 2023.**

Q.    Did she submit a resignation letter?

A.    **Not sure, though.  But my business partner said he met Ms. Liu and then she carried her personal belongings past the lobby, and she -- my business partner asked her to give a resignation letter, but maybe he didn't, maybe he gave -- my business partner cannot locate this letter right now.**

Q.    Did she give you or your business partner a reason for her alleged quitting of her employment?

A.    **You mean if she specified a reason why they quit?**

Q.    That's right.

A.    **She talked to me about her career plan and about pursuing an MBA; that's what I can recall.**

Q.    So did you know that she was going to resign



56

before she resigned?

A.    Yeah, that he talk about -- talk about, yeah, a previous leave, yeah.

Q.    When did you both have this conversation?

A.    I think at the end of -- end of January or beginning of January.  I forgot exactly what time.

Q.    I'm going to be pulling up -- well, how are you doing, Mr. Zhou?  We're at about an hour and a half.

A.    I'm okay, we can continue, I think.

Q.    Okay.  I'm going to pull up what will be Exhibit 2, Defendants binder 4; let me just find it.

Can you see that, Mr. Zhou?  I can zoom in.

A.    Yes.  Yes.

Q.    Have you seen this email before?

A.    Yeah, I sent this email, yes.

Q.    Did you review it in preparation for today's deposition?

A.    I didn't review because I provide this email to my attorney long time ago.

Q.    Can you read aloud who the email is to and just the body of the email?

A.    Email sent to the member of management team of the Kaiser Permanente.

Q.    And can you read the body of the email, please.

A.    Yeah.  "Please help us cancel our previous



57

employee, ██████ Liu's health insurance with Kaiser Permanente effective from April 1st of 2023.  Attached is the KP member cancellation."

Q.    What is the date this email was sent?

A.    The email was sent on April 21st.

Q.    And your testimony is Ms. Liu voluntarily quit towards the end of January 2023.  Why was her health insurance not cancelled until April 21st, 2023?

A.    I think this is the old -- our policy is to gave the former employee one or two months free health insurance coverage so they can adopt a policy called a COBRA or enroll in a new policy.  This policy applies not only to the plaintiff, for the other employees as well, like, so we at least offer one month's --

So health insurance and dental insurance coverage even after the employment was terminated for sometimes to accommodate the insurance billing cycles, because they charge, like, two months or three months. So we have no -- like, for the specific this case, I called Kaiser Permanente first and end of March I called Kaiser, say I've got to -- if we cancel the plaintiff's insurance effective from April 1st what time should we file this application, anytime between -- anytime between April 1st to end of April.

So as I mentioned, this policy applied to all



Liu vs
SignaGen Laboratories

Jianzheng Zhou

58

the employees, such as -- okay -- no, maybe I don't want to mention name -- but we do have documentation showing that other employees, we gave other employees one or two months free coverage even after the employment was terminated.

Q.  So just to confirm, the policy at SignaGen is after an employee is terminated or voluntarily resigns, you offer one or two months of insurance coverage?

A.  Yeah, to either let the former employee enroll from COBRA or a new policy and to accommodate the insurance billing cycles and to gave a sufficient time for the former employee to have a new health insurance in place, because the processing time can be several -- I don't know, can be several weeks.

Q.  And who determines whether it is one or two months under this policy?

A.  We usually talk to -- okay, I think we can give you examples.  For example, so Michelle Park, she quit job in the end of the year of 2023.  So we offered her, I remember, is one month's free coverage.  I talked to her if one month is sufficient enough, she said okay, is sufficient enough.  And then I asked her if it's not we can offer you two.

So I think we can provide cancellation documents as well.  The time to cancel the health and dental



59

insurance cannot just -- just based on the time, so we file application to cancel the insurance to determine the time of the employment being terminated.  That totally two different things.

Q.   After an employee's employment is ended with SignaGen, when are they removed from payroll?

A.    The payroll goes immediately after the employment was terminated.  So we cannot just pay their salary while they not working with us, right, that's common sense, I think.

Q.   So just to confirm, when was Ms. Liu removed from SignaGen's payroll?

A.    From February 1st, 2023, immediately after she quit the job with us.

Q.   I'm going to move on to Exhibit 3, which is part of defendant's production starting at 85.

Have you seen a document like this before, Mr. Zhou, or similar?

A.   Yeah, I did.

Q.   Did you review it in preparation for today's deposition?

A.   Did I what?

Q.   Did you review it in preparation for today's deposition?

A.    Reviewed it before and it's a long time ago and



60

then I handed this transaction to my attorney, but I didn't specifically reviewed it for deposition.

Q.   Understood.  I'm just going to scroll through Defendants 085 to 092 for Mr. Zhou's benefit before I move forward with a question.

Let me know if I'm going too fast, Mr. Zhou.

A.   No, it's perfect.

Q.   Okay, I'll scroll back up.

Can you describe what these documents are that I just scrolled through, for the record?

A.   I think this proof of transaction and sent from us to the plaintiff on July 16th.  The amount of the money was sent to the plaintiff is 3,800 U.S. dollars.

Q.   And who issued this payment to Ms. Liu?

A.   I did.

Q.   And what was the purpose of these payments to Ms. Liu?

A.   If you -- if I answer this question, I need to go back couple months early than that.  So after she quit her job with SignaGen in the end of January, so we start to develop a relationship; I don't know how to define this relationship.  I think that you can help me, maybe, you are legal professionals.

So I sent her some money and in exchange and for a -- I think it's more or less, I think we should define

Liu vs
SignaGen Laboratories

Jianzheng Zhou

61

this kind of relationship as friends with benefits.  But this happened after her termination of the employment, you can see it's January 16th.

Q.   So you're saying --

A.   No, I'm sorry, not January 16th, it's July 16th. It's July 16th.

Q.   Sorry, continue.  Apologies.

A.   It's July 16th, 2023, is after her termination of her employment with SignaGen and it's almost half a year after she terminate her employment with SignaGen.

Q.   Just for clarity, as I scrolled through before there were other dates, if you would like to look at them.

So to confirm, you're saying that these payments were issued as part of a relationship between you and Ms. Liu?

A.   Yeah, because to this -- yeah, you just show me the screen, just show that the transaction happened in June 4th, 2023, so it's about four months after her termination of the employment with SignaGen, and we -- due to the financial hardship, so she asked me -- the plaintiff asked me donation, so in exchange and she can have sex with me, and that's why -- that's how the transaction came from.

But please note the time the transaction is



Liu vs                                                                    Jianzheng Zhou
SignaGen Laboratories

62

June 4th, 2023; it's about four months after her termination with SignaGen Laboratories.

Q.   I'm just going to scroll down.  The payments are out of order, they're not chronological, there's one for February 24th, 2023.

A.   Yeah, this -- I think maybe you can scroll down first to the shopping cart the plaintiff sent me for a jewelry and asked me to buy for her, and one price of the necklace is close to $9,500, and she forced me -- this is -- this is a long story.

So in briefly, in February 23rd, exactly the day before the transaction happened, so we -- the plaintiff and I visit a distillery in Columbia.  So we booked a hotel in Columbia and we stay in the hotel that night. The next day the plaintiff asked me to buy the necklace and initially, I refused.

When I tried to deliver her to her home address, he refused to leave my car.  And I need to work, so it's -- it's so annoying, so yeah I did, I finally -- so he hang out with me in my car for more than several hours, there no way I can work, so I have to -- I was forced to make the transaction, $9,500, to the plaintiff on February 24th, exact the next day when we stay in hotel of Columbia.

That's what happened.  That's the whole story



63

why the money come, because the amount of the money is similar as the price of the necklaces she added shopping cart, asked me to buy in the beginning, I think -- maybe in the middle of February.  I think you can show that as well, the shopping cart she emailed me.

MR. KIPHART:  Pam, I'd like to take a break now, actually.  I have to use the bathroom myself, if that's okay.

MS. ROSARIO:  Sure.

MR. KIPHART:  He's answered that question.

MS. ROSARIO:  I know, Doreen, you wanted to take a break as well.  Do you-all want to take a ten-minute break?

THE WITNESS:  I'm okay.  Fine.

MR. KIPHART:  Ten minutes should be fine.  Thank you.

MS. ROSARIO:  Okay.  I have 10:48 Eastern time, we can be back at 10 --

MR. KIPHART:  11:00.

MS. ROSARIO:  11:00.

(The deposition was at recess from 10:48 a.m. to 11:01 a.m.)

MS. ROSARIO:  Doreen, would you read back the last question and answer.

(The requested portion of the testimony was read



64

as follows:  QUESTION:  I'm just going to scroll down, the payments are out of order, they're not chronological, there's one for February 24th, 2023.

ANSWER:  Yeah, this -- I think maybe you can scroll down first to the shopping cart the plaintiff sent me for a jewelry and asked me to buy for her, and one price of the necklace is close to $9,500, and she forced me -- this is -- this is a long story.

So in briefly, in February 23rd, exactly the day before the transaction happened, so we -- the plaintiff and I visit a distillery in Columbia.  So we booked a hotel in Columbia and we stay in the hotel that night. The next day the plaintiff asked me to buy the necklace and initially, I refused.

When I tried to deliver her to her home address, he refused to leave my car.  And I need to work, so it's -- it's so annoying, so yeah I did, I finally -- so he hang out with me in my car for more than several hours, there no way I can work, so I have to -- I was forced to make the transaction, $9,500, to the plaintiff on February 24th, exact the next day when we stay in hotel of Columbia.

That's what happened.  That's the whole story why the money come, because the amount of the money is similar as the price of the necklaces she added shopping

65

cart, asked me to buy in the beginning, I think -- maybe in the middle of February. I think you can show that as well, the shopping cart she emailed me.)

Q. BY MS. ROSARIO: Mr. Zhou, can you elaborate on when you say you were forced to purchase -- excuse me. When you say you were forced to send that amount, the $9,500, can you elaborate on that?

A. Yes, I can. The story is she asked me to buy a jewelry and I think in the middle of February by sending me a shopping cart, I refused. And it's so expensive to me, the total is about $81,000 and I'm not that rich to afford to buy this jewelry for her. And she sended me a shopping cart and she also send me a WeChat message first in the morning.

And then, so after we stay in the hotel in Columbia, Maryland, next day we supposed to go send her home and I need to go to work, but she claim you must buy this at least necklace for me, and -- because I slept with you. And I said okay, you slept with me and then you force me to buy, like, a necklace up to $10,000, and it's unfair, it's too expensive for me.

And but she said if you don't buy for me or sending me the cash or sending me the money, I will stay in your car and you have no way to leave, you have no way to work. And I said okay, you can go -- you can go

66

ahead, just stay.

And then we stuck in there for a couple hours and finally I give in, so I like to -- I -- I had to wire the money to her and by PayPal, you saw the transaction. So I think in nature I was sexually harassed, other than her.  That's the story.

Q.   And when you say you were stuck in the car, I just want to understand your testimony.  Why did you feel stuck?

A.   She don't want -- she didn't want to leave my car.  I cannot use force to remove her from my car, right, so she stay in my car.  And do I need to drive the car with her to my office?  There no way I can do that, because she was term -- her employment was terminated in end of January, but this happened in the end of February. You saw the date.

So there's no way -- the thing is she claims she won't leave my car if I didn't either buy the necklace for her by driving to Tiffany store in Tyson's Corner or just to send her the cash so that she can buy the necklace.  Otherwise, she refuse to leave my car.

Q.   And just so that I'm clear, why couldn't you drive with her in your car to the office?

A.   Why I cannot, she was not working there anymore. Why should I drive her to my office?  I need to work.



67

She keep talking and shouting to me and in my office.  Do you think I can work?

Q.   But you were in your car; correct?

A.   I'm in my car, she was in my car as well because we share a car, in my car.

Q.   And so you --

A.   I'm sorry, the story is the day before and I send the money to her and so we visit the OSC distillery in a carpool, in my car.  And next day I was supposed to deliver her to her home address and after that, I will go back to my work.  But she refused to leave my car when I stopped -- when I parked in front of her home and kept asking me the donation to pay for the necklace.  That's why I'm saying I was harassed at that time.

Q.   So you felt the option was not available to you to continue driving with her in your car to the office?

A.   As I claimed -- as I said, she keep speaking loudly, she keep shouting to me, and she keep crying to me.  How we can just work in such environment?  So my office is a tiny room, a small room, so we have coworkers and I have my business partners, we have employees.  I don't want to see other people saw that.  I don't want other people see that.  Is that fair?

Q.   It's your testimony.  So that covers that payment.  Can you confirm the reason for the other



68

payments you made?  I can pull them up for you, if you'd like.

A.    Yeah, you can go ahead.

Q.    I'll go through them in chronological order and then you can answer the question.

There's one on February 16th, 2023.  And for the record, this is still Exhibit 3, beginning on Defendants' production 091, February 16th, 2023.

Scrolling up to Defendants 089, this is February 24th, which we've discussed.

087, June 4th, 2023.

July 16th, 2023.  Let me know if you'd like me to stop on any of them.  We've gone over the reason for the payment on February 24th, 2023.

Why were these other payments issued?

A.    Which one?  I think I explained situation for January -- for July 16th.  This is the last time when we meet, so -- and the transaction happened in July 16th is just immediately after we meet, after we stay in a hotel.

Q.    And so why did you issue those payments to Ms. Liu?

A.    Which one?

MR. KIPHART:  Sorry, Ms. Rosario.  Can you be a little bit more clear and specify as to which payment you're talking about?  I'm getting a little confused

about which payment we're talking about at this point.

MS. ROSARIO:  Sure.

Q.   BY MS. ROSARIO:  Let's see, Mr. Zhou, you just described the July 16th payment happening after you and Ms. Liu met.  Why was this payment issued to Ms. Liu, this July 16th, 2023 payment?

A.   Because this is what she asked.  As I mentioned, that after her termination with SignaGen, we developed a special relationship -- you name this, I don't know how to define this relationship, it can be friends with benefits -- and she promised to sleep with me and in return, to ask me to pay donation to -- for her financial hardship, because she cannot find a job and after she left SignaGen.  I think we stay in a hotel --

Q.   And -- sorry, apologies.  Continue.

A.   I think we stay in hotel one day before July 16th and next day, so...

Q.   Okay.  I'll scroll down to the next payment, which would be on Defendants 087, June 4th, 2023.  Why was this payment made to Ms. Liu?

A.   Yeah, after she -- after she realized she has no way to find a job in the short time, she asked me to refer her back to SignaGen; I refused, I think that we cannot.  Then she kept visiting me and through the weekend by going to my office, because she understand I

Liu vs
SignaGen Laboratories                                          Jianzheng Zhou

70

usually need to work during the weekends.  She know exact amount of time I need to work.

She keep visiting me and I think in the beginning of June or after June, June 4th, she came to my office and offer me to -- asked me to either hire her back or make a donation to her so that we can -- she can sleep with me.  I don't know exactly what time we stay together in the hotel, either before June 4th or after June 4th, but the transaction was made in June 4th for that purposes.

But I can find out.  I can find out, because I have all the receipt for the hotels, reservation email.

Q.   This came in, I believe, and then this payment on February 16th, 2023.  What was this payment made for to Ms. Liu?

A.   I think, basically, the same thing, this is the first time we stay together.

MS. ROSARIO:  And you mentioned earlier you may have receipts for hotel stays.

Again, Counsel, to the extent that those exist, we'd like to see production of those receipts.

MR. KIPHART:  You got it.

Q.   BY MS. ROSARIO:  Mr. Zhou, I'm just going to ask some clarifying questions on some other topics we discussed.



71

To confirm, you mentioned that both you and Thomas are involved in the day-to-day operations at SignaGen.  Can you expand a little bit on what that actually entails?

A.   You mean how SignaGen operates under supervision, under management of me and my business partner; is that your question?

Q.   What are your role and Thomas's role in the day-to-day operations of SignaGen?

A.   Okay.  So my role is just to focus on the customer service and taking orders and general invoice and packing slip.  And also, so I'm taking charge of receive orders, receive payments.

My business partner focus more on technical issues like making vectors and analyze the sequence. Yeah, I focus on logistic part, my business partner focus technical part.

Q.   Thank you.  And so I know you testified earlier that you do not have any direct reports.  Who do the supervisors of each of those departments we discussed, who do they report to?

A.   It depends; if the technical related, they report to Tom, to my business partner.  If it's logistic, policy, complaint, they report to me, or my -- or when my business partner -- so we are small company, we just

72

have, like, 12 employees, so it doesn't have a so, like, clear responsibility.  So if something happens, for example, if the complaint -- if they try to complain something about some employee's performance, they can go to both parties, either me or my business partner, it doesn't matter, so can cross sometime.  There's no distinctive, like, separation between a different, like, duties, different responsibilities, they cannot cross. Like Alex can complain to me, he can complain to Tom as well.

    Q.   Understood.  So the departments -- cloning, packaging, and purification -- they do not fall under a specific supervisor?

    A.   Now I think I manage the customer service and purification, Tom manage cloning and packaging.

    Q.   And then really quickly, back on the handbook, you mentioned that it was updated every year.  When the handbook is updated, is a new copy given to the employees every time that it's updated?

    A.   That's true, everybody need to go over and make sure they understand the revised version and thoroughly and then sign, and -- you know, acknowledgment page.

    Q.   Thank you.  You testified earlier that you hired -- you went through several employees that held bachelor's degrees that were hired in 2022 for the



research assistant role.  Do you recall the race or ethnicity of these employees?

A.   Do I recall what?  I'm sorry.

Q.   The race or ethnicity of those employees you mentioned.

A.   Because we hire any employee after we interview them, so definitely we know their race, we know their races, because we meet them in person, yeah.  But that -- that's not nothing to do with hiring process, so we -- we don't hire specific -- any specific race.

Q.   So do you recall the race of those employees you mentioned earlier?  I can list them off.

A.   Yes.  Yeah, of course.  Yes.

Q.   So what race was Lauren Strope?

A.   She's Caucasian.

Q.   What race was Samuel Jacobs?

A.   Samuel Jacobs, I cannot tell.  It should be white, he is white as well.

Q.   What race was Tyler Shanholtz?

A.   I basically cannot tell.  Maybe his race from Spanish and -- I really don't know.  I didn't ask.  I didn't ask.

Q.   And what race was Sarah Grimm?

A.   I think she's white.

Q.   You also testified that Sarah Grimm held a



74

master's degree and had a slightly higher salary, 56,000. Can you explain why her salary was higher for the same position as the others?

A.   Yeah, as I said, the salary was matched and offered per the job duty the employee performs.  And Sarah Grimm had the -- when I interviewed -- when I interviewed Sarah and Sarah claimed her health insurance and dental insurance were being covered by her parents, but she don't need us to buy health and dental insurance, which cost -- which can cost us up to $1,000 per month. So she prefer to be a contractor in this case to have a better salary, that's why we adjusted her salary $2,000 a year than we usually offer, and that's the story.

And but for the plaintiff from work began, we had to buy health insurance and dental insurance for her, which cost us more than 1,000 because she's much older than Sarah.  That's the story.  Different -- different employee status, more or less like a contractor and the employee, so that's different situation.

Q.   So Sarah Grimm was hired as a contractor for SignaGen?

A.   Almost like contractor without insurance; without health insurance, without dental insurance, because she claims she was covered by her parents' insurance.



75

Q.    Do you recall what Ms. Liu's academic background was when she applied to SignaGen?

A.    Yes.  Yes.

Q.    What was that?

A.    She claimed she obtained a Ph.D. degree from China, Ph.D.  Ph.D. means philosophy doctor, a doctor of philosophy.

Q.    Does SignaGen have any employee verification processes regarding a potential hire's background or educational experience?

A.    We are required to conduct a background check and drug test, pre-employment drug test, but there are no educational background check, so we didn't do educational background check.

Q.    Was a background check performed for Ms. Liu?

A.    Yeah, this was -- I remember it was and the drug test was done and the background check was done, but no -- but we didn't do that ourselves, we went to third party.

Q.    Did you retain copies of those background checks and reports?

A.    Yeah, I think we have -- at least what I can be for sure is we have the pre-employment drug test with us, but the --

Q.    Is it --



76

A.   But for the background check, I'm not sure.  I need to go to my office and find out.

MS. ROSARIO:  Again, to the extent that these documents exist, we'd like to see production of any background checks or other onboarding documents.

Q.   BY MS. ROSARIO:  You testified earlier that Ms. Liu's starting salary was $54,000.  Is there a reason that Ms. Liu's salary was the same or lower than less experienced employees?

A.   I think I claimed it before many times, the salary matched the job duties.  She -- the plaintiff performed the job duty exactly the same as Lauren Strope, as Samuel Jacobs, they work in exactly same department, worked side by side, so we don't -- we technically, we don't need a medical doctor's degree or Ph.D. degree, we just need a bachelor's degree.  We specify it very clearly, we don't need a Ph.D. degree.  Your salary is 54, base salary is 54,000.  She accept it, she signed the employment letter.

Q.   Did Ms. Liu ever raise concerns about her salary?

A.   She did.

Q.   What were those concerns?

A.   Her concern is she approached me and sometime after she was transferred to the customer service she



Liu vs                                                                    Jianzheng Zhou
SignaGen Laboratories

77

said okay, I hold a Ph.D. degree, so my salary doesn't match my degrees, my experience.  I think your experience is useless to us, because you had so bad performance doing the very, very basic lab works.  And we don't need a Ph.D.

Plus we never evaluate the Ph.D., I don't know your Ph.D. is true because you obtain from China, everything can be -- can be fake in China.  But that's not important; important she asked us to adjust her salary, so -- because the salary adjustment happened one year later, after you start work with us; that's the policy.  And her request doesn't make any sense to us, with no standing, with no basis.

So she signed the employment letter.  The employment letter specify very clearly that the evaluation, the salary adjustment will be made one year later, after she start with us, but she keep asking salary judgment.  We explained that it doesn't match her degrees, that's not important to us, we have our own policy to follow.  It's specify in both the employment letter and handbook.

Q.   Do you recall which dates Ms. Liu raised these concerns?

A.   I don't, actually.  Should be -- should be end of -- should be beginning of December, or -- yeah, I

78

think it's something -- something December in 2022.

Q.   And to confirm, these concerns were raised directly to you?

A.   Yeah, she talked to me after she transfer to work with me directly in customer service.

Q.   And were her concerns related to her salary? Did they ever involve discrepancies between her and other Caucasian employees specifically?

A.   She mention that why other employees are made her -- like, $2,000 more than her base salary.  I explain the situation to her saying that Sarah's employment is a contractor and without, like, health insurance we need to pay.  And your situation is different, we buy insurance from the first day after she started with us and it cost us, I think it's $1,500 per month to pay.  The insurance is very expensive, health insurance provided by the Kaiser Permanente and the Liberty, like, the dental insurance.

Yeah, I ask her if you want us to give you the same salary we can adjust the salary if you want to give up the insurance.  She said no, no, no, no, please don't, I still want this right now, the salary 54,000; that's exactly what she said.

Q.   So you offered to change her salary depending on the offering of her insurance coverage?



A.    I'm just asking different scenario, that if you like to accept the same salary as Sarah at the same time we cancel the insurance, but she said no.  It's not official offer, though.

Q.    Did you ever tell Ms. Liu that she would be paid back pay to fix this pay disparity?

A.    Can you repeat the question again?  I don't think I understand.

Q.    Sure.  Did you ever tell Ms. Liu that she would be paid back pay to fix the pay disparity that she was raising concerns about?

A.    No, I don't think I ever said that.  That's not -- that's -- the answer is no.

Q.    Did you ever express to Ms. Liu that you favored your Caucasian employees?

A.    That's impossible, because we have 12 employees. The Asian employee is 40 percent of the total, so how we can -- how she claimed I would favor Caucasian employees. We have 12 employees -- so the owner is from Asia, from Asian country, so -- and I'm Asian and my partner's Asian, we have other three people are Asian, so the Asian people account for about 40 percent of the total employees.  So we -- I think -- I have no objection if she say, like, I favor Asian employees over, like, Caucasian employees, that's absolutely wrong.  We didn't



80

favor any employees based on their races.

Q.   Did you ever make statements to Ms. Liu that you believed in, quote, "white supremacy," end quote?

A.   **That's ridiculous, never -- I never said anything about this.  So we have equal opportunities policy put in place and from the first day when we create this company.  No, no such thing, it's never happened.**

Q.   Did you ever express views to Ms. Liu about race or national origin based on someone's name?

A.   **No.  No, never happened.**

Q.   Did you ever tell Ms. Liu that you could tell someone's race based on their name?

A.   **No.**

Q.   During conversations with Ms. Liu, did you ever make comments regarding same-sex relationships?

A.   **Can you repeat again?  I'm sorry.**

Q.   Sure, no worries.  During conversations with Ms. Liu, did you ever make comments regarding same-sex relationships?

A.   **Same-sex relationships?  What do you mean, same -- you mean --**

Q.   Like homosexual relationships, not heterosexual, same gender.

A.   **No.**

Q.   Have you ever had physical contact with Ms. Liu



81

at the SignaGen work site?

A.    I don't think so, unless she approach me and advance to me and touch me -- if you can define physical contact -- yes, and she approached me and touch me sometimes.

Q.    Sure.  Holding hands, hugging, for example?

A.    Yes, and at the very last stage before her termination, maybe in January something.

Q.    January of 2023, just to confirm?

A.    January of 2023 -- I don't remember exactly.  I think we provide some footage, security camera footage which you can refer to about the time.

Q.    Okay.  I am pulling up what will be Exhibit 4, I believe.  Give me a moment, it is video footage, so I have to make sure I have it up.

So I've just pulled up -- I don't believe there's a Bates stamp to this -- but it's from defendant's production, video 2023_01_04_17_08_25 and then it continues.  Those are the main numbers associated, based on the other videos.

It's a rather long video, I'm not going to play the whole thing, just a snippet.  So I'll play the video for you, Mr. Zhou, and then we can discuss.  I'm just going to move forward in time to time stamp one minute, 35 seconds.



82

(Video played.)

Q.   BY MS. ROSARIO:  Were you able to view that okay, Mr. Zhou?

A.   **Yes, I do.**

Q.   Have you seen this video before?

A.   **Yes, I think I provide this security footage to my attorney.**

Q.   Did you review it in preparation for this deposition?

A.   **I don't think I reviewed this after I gave this footage to my attorney.**

Q.   I'm going to show you a second video; this will be Exhibit 5.  Again, there is no Bates stamp, but it's labeled 2023_01_16_18_16_17.

MS. ROSARIO:  Do you-all see when I switch from tabs?

MR. KIPHART:  Yes, or at least I can.

MS. ROSARIO:  Okay, thank you.

Q.   BY MS. ROSARIO:  I'm going to start this video at the time stamp three minutes, 15 seconds.  I'm just going to play for 30 seconds.

(Video played.)

Q.   BY MS. ROSARIO:  Were you able to see that video, Mr. Zhou?

A.   **Yes.**



83

Q.   For the first video -- again, I can pull it up if you like -- can you explain what was going on in the video between you and Ms. Liu?

**A.   I think from beginning, maybe end of November 2022 or beginning of December 2022, the plaintiff was transferred to -- to work with customer service under my direct supervision.  So I think that first footage just show that we work -- I work with the plaintiff and in front of her computer, and that -- that's what I can tell from the first security footage.**

Q.   Did you note the physical contact that was made between you and Ms. Liu in the footage?

**A.   The first one -- the first footage there are no physical contact, I didn't see any physical contact between us.**

Q.   I'm going to replay it again for you.  This is Exhibit 4 again.  It's a little difficult to see when I go into full screen, so it'll be on the top right.

(Video played.)

Q.   BY MS. ROSARIO:  Were you able to see that more clearly, Mr. Zhou?

MR. KIPHART:  Ms. Rosario, you've got to share your screen.

MS. ROSARIO:  Okay.  Can you-all see that?

**THE WITNESS:  Can you amplify the screen?  Can**



84

you jump to specific time point where you said there was

a physical interaction?

Q.   BY MS. ROSARIO:  Yes.  Again, this is Exhibit 4,

we're at time stamp one minute, 35 seconds; let me just

confirm.  Okay.

(Video played.)

THE WITNESS:  Can you make the screen wider or

bigger so that I can see the whole thing?

MS. ROSARIO:  Yes, I can.

THE WITNESS:  Maximize the window screen.

MS. ROSARIO:  I started a little bit before at

1:31.  That's as large as I can get it.

(Video played.)

THE WITNESS:  Yeah, okay.  Okay.  Okay, I tried

to touch the armchair's arm to support my body, that's

what I tried to do, and so -- but I didn't touch her.

But otherwise, she doesn't have any response.  You see

the plaintiff didn't felt being touched, so that's the

so-called physical interaction.  There are no any

interaction, I believe.

Q.   BY MS. ROSARIO:  Did you note the physical

interaction in the second video?

A.   Yes.

Q.   What were the circumstances surrounding that

interaction?



85

A.    I cannot remember what the circumstances was about.  Let me try to hug -- I hug her and she hug me. There are no signs showing she was sexually harassed.

Q.    And so earlier you testified that you and Ms. Liu's relationship began after her employment with SignaGen ended; is that right?

A.    Can you say that again, please?

Q.    Sure.  Earlier you testified that you and Ms. Liu's relationship began after her employment with SignaGen ended; is that right?

A.    Yes, my -- okay, my meant is the nature of the relationship we called friends with benefits start after she quit the job with SignaGen.

Q.    And what was the nature of your relationship before her employment ended with SignaGen?

A.    I don't think we have any -- I don't believe there are any special relationship between us.

And the hug can be, I don't know, maybe she want to leave -- I don't know the nature, but -- but if for whatever reason, you cannot call it sexual harassment.

Q.    Do you recall ever being alone in your office with Ms. Liu on or around January 20th, 2023?

A.    Do I have what?  I'm sorry, I beg your pardon?

Q.    Do you recall being alone in your office with Ms. Liu on or around January 20th, 2023?



86

**A.   In my office -- my office doesn't have a security camera, but we have a security camera in the open office.**

Q.   That wasn't my question; sorry if you didn't hear.

Do you remember being alone in your office --

**A.   Oh, for the recall.  Okay, recall, not recording.  I'm sorry.**

Q.   No worries.

**A.   So ask me that again.**

Q.   Sure.  Well, do you remember being alone in your office with Ms. Liu on or around January 20th, 2023?

**A.   I cannot remember.  I cannot remember, I'm sorry.**

Q.   Do you remember ever exposing yourself to Ms. Liu in your office during her employment at SignaGen?

**A.   No, that was -- that answer is no.**

Q.   Do you recall ever forcing her to touch any part of your body during her employment at SignaGen?

**A.   That's a big lie.  No, that never happened.**

Q.   At any point during Ms. Liu's employment at SignaGen, did you ever threaten to suspend her?

**A.   No, that's a lie, never happened.**

Q.   Do you travel for work at SignaGen often?

**A.   Not often.  Occasionally.**



Liu vs
SignaGen Laboratories

Jianzheng Zhou

87

Q.    When you do travel, do you typically attend these trips alone?

A.    Yes.

Q.    Have you ever asked a SignaGen employee to accompany you on those business trips?

A.    No, never.

Q.    Did you ever ask Ms. Liu to accompany you on a business trip?

A.    No, never.

Q.    I'm going to pull up what will be Exhibit 6, this is part of plaintiff's production LIU 008.

Can you see my screen, Mr. Zhou?

A.    Yes, I can.

Q.    Have you seen these text messages or screen shots of text-message conversation before?

A.    Yes, I did.

Q.    Did you review this in preparation for this deposition?

A.    Yes, I do.

Q.    Obviously, the majority of these text messages are not in English.  Would you mind reading them in their original language for the record and then providing translation?

A.    Yes.

THE STENOGRAPHER:  I'm sorry.  If you're asking

88

him to read it in Chinese, I obviously cannot take that down.

        MS. ROSARIO:  Right.

        THE WITNESS:  Firstly, I can mention the time point message was exchanged, so you can see that it's April 15th, 2023, and it's three months after termination of her employment with SignaGen.  And I can -- I can try to translate into English if you want, but my translation is not -- maybe it's not accurate enough.  I'm not a professional interpreter.

    Q.   BY MS. ROSARIO:  As best you can.

    A.   Yes.  "I'm going to go back to United States this afternoon and planning to visit a distillery in" -- "visit a" -- "a" -- "North Carolina and maybe I will be back Sunday.  And so" -- "and we will going to stay two nights, and if you can go we can book a business tour," and "goodnight."

        But this visit's nothing to do with SignaGen, because -- this is nothing to do with SignaGen, this is going to the distillery.

        She answered, "Okay.  Yeah, we can discuss the details when you come back."

    Q.   Can you read the entire conversation, both --

    A.   And so next I said, "I will" -- "I'm already back, and I'm going to go to the lab and can I call you,"

89

and she said, "Okay.  Yes."  And I call her, but I didn't get -- you know the English right now.

Q.   And the next kind of chat box there?

A.   The next says -- so the first one is, "Good morning, and do you feel better with your eyes," and she said, "Yes, much better."

And I said, "Okay, then I going to pick you up at 3:00 o'clock and get ready before 3:00," she said "okay."

And then I said, "I'm leaving," and then when I parked the car in front of her house I said "I'm here. Here."

Q.   Thank you.  Did you and Ms. Liu ever communicate on any other messaging platform?

A.   Nothing except the WeChat.

Q.   Just to confirm, what we just viewed just now in this exhibit was a screen shot of the WeChat platform?

A.   Yeah, we communicate -- yeah.

Q.   Did your communication ever involve work-related topics?

A.   There's several breaks.  Will you repeat the question again.

Q.   Did your communications involve work-related topics?

A.   Yeah, during her employment at SignaGen, yes.



**But after she quit her job at SignaGen, so it's just a private communication.**

Q.    Did you ever send Ms. Liu WeChat messages regarding sexual topics or regarding your sexual relations?

**A.    During her employment, I think the answer is no.**

Q.    What about after her employment?

**A.    After the employment, I also don't think I did send anything like this content.  I don't recall.**

Q.    I'll be pulling up what will be Exhibit 7, part of plaintiff's production LIU 012.

Can you see that, Mr. Zhou?

**A.    Yes, I can.**

Q.    Again, let me first ask you, have you seen these text messages before?

**A.    Yes.**

Q.    And did you review them in preparation for today's deposition?

**A.    Yes.**

Q.    You did review them in preparation for today's deposition?

**A.    Yes.**

Q.    Sorry.  Okay, got it.  Can you go through these text message boxes and, again, as best you can, translate them for the record for us?



91

A.    From the boxed part, or just the whole part?

Q.    The entire, all of the language that you see on the screen here.

A.    Yeah, I can start from the top of the message happened in April 7th.  The first I asked, "Can we meet Sunday and if we cannot and so you can give me a time."

She answered, "Let's talk about on the phone, over the phone," and I said, "Okay.  Can we have sex before I leave United States?"

She answered, "I'm driving right now."  You know the English, I don't need to.

Then I answered, "I don't understand," because she offer me to have -- to meet before I leave United States.  That's why I said --

Q.    Sorry to interrupt, but can you --

A.    So the top --

(Reporter clarification.)

Q.    BY MS. ROSARIO:  One second, Mr. Zhou --

A.    The last reply and for the first panel is, "I don't understand," the Chinese means I don't understand.

Q.    Can you also read the English portion as well?

A.    For the first panel, you mean?

Q.    Yes, wherever you see English, the English as well.

A.    The mean the panel A; right?



92

Q.   Yes.

A.   The English and she said -- first she said in Chinese "I'm driving."  And then she said, "You know, and but if you want something special, we can talk."

Q.   Are you ready to move forward to panel B?

A.   Yes.  The panel B and the time is March 24th, 2023.  And if I translate into English, I said, "Okay. And I only can listen to" -- "so the recorded voice so when we made love and so failure to feel you and there's no any disrespect.  Although you haven't found the real pleasure to make love, I think your performance is good enough.  And if we make love once more and so your swollen face will be gone."

Q.   You can continue to panel C and D when you're ready.

A.   Then it says, "Honey, what are you doing and why there's no message from you.  How do you feel today?"

Q.   Was that panel C?

A.   I think I refused to -- I refused to answer anything regarded to panel C and panel D because somebody, I think the plaintiff translates -- because I just left a voice to her, but she translate into Chinese by either the software or she did that by herself. There's a lot of inaccuracy.  Until I listen to the recording, I have no way to translate.

Liu vs                                                    Jianzheng Zhou
SignaGen Laboratories

93

Q.   Are you saying that the -- I see there's, like, an audio symbol and it says 18, for example, on the top of panel C; are you saying that the Chinese lettering underneath was added by the plaintiff?

A.   **Yeah, by the plaintiff or by the software or third-party software or just a software associated with WeChat.  But somebody translate into -- my voice into Chinese as lot of things doesn't make any sense.  I think it's a very, very misleading, so I don't think I should give any comments about this, unless I can be okay be gave the chance to listen to the voice I left.**

Q.   Is that common in WeChat software -- sorry, I've never used it -- for voice notes to be automatically translated, in your experience?

A.   **I don't have idea.  You should ask the plaintiff, she offer this document, I think.**

Q.   Well, you also used WeChat; is that right?

A.   **I -- I don't often use WeChat.**

Q.   But you do use it?

A.   **I do use it, but I never have such problem, like -- you see the WeChat message, I seldom -- I usually don't leave a voice mail through the WeChat.  But this is from the voice and the plaintiff translated, she used the software to translate it.  From the translation, I can tell this -- some of the part doesn't make any sense.  It**



94

seems the total disrupted the translation, so that's why I prefer not to give comments about this panel C and panel D.

Q. Understood. And just to confirm, are you saying the plaintiff provided this translation or the WeChat software did?

A. I have no idea. You should ask the plaintiff. She provide the whole thing, the whole documents. I have no idea how she translates my voice into this Chinese verse.

Q. I will be moving on to what will be Exhibit 8, and that is part of defendant's production 082 to 083.

Mr. Zhou, can you see my screen clearly?

A. Yes.

Q. Have you seen this document before?

A. Yes.

Q. Did you review it in preparation for today's deposition?

A. I didn't.

Q. Can you describe what this document is for the record?

A. Yeah. I passed this agreement to my attorney and so I think a lot year, maybe several years, but after we receive the first letter from the plaintiff attorney; but it's not attorney, though.

Q.   Can you describe what the document is?

A.   **Friends with benefits agreement.**

Q.   And what was the purpose of this agreement?

A.   **The agreement to define our relationship after she quit the job with SignaGen.**

Q.   I'm going to scroll down to Defendants 083, just to the signature portion.

A.   **Yes, this my electronic signature.  Yes.**

Q.   That was my next question.  Based on your understanding, is that Ms. Liu's signature?

A.   **Yeah, I think you should ask her, she signed.**

Q.   But based on your understanding, is that Ms. Liu's signature?

A.   **Yes, I think so.**

Q.   Do you know if she signed electronically?

A.   **I don't know.**

Q.   And when was this agreement drafted?

A.   **You see the date, it's December 26th, 2022.**

Q.   Well, just because it was signed on December 26th, 2022, does not mean it was drafted on December 26th, 2022.

Do you know when this agreement was drafted?

A.   **I think it was drafted the same day.**

Q.   Who drafted it?

A.   **I think it's me.**



Q.    Whose idea was it to draft this agreement?

A.    **I cannot remember.**

Q.    As the drafter, do you recall Ms. Liu having a specific amount of time to review the agreement before she allegedly signed?

A.    **I cannot remember.**

Q.    Is this your first time signing this type of agreement?

A.    **Yes.**

Q.    Would you say this agreement suggests the existence of a romantic or personal relationship?

A.    **Her clearly signature.  Yes.**

Q.    So earlier you stated that your personal or romantic relationship with Ms. Liu began after her employment ended; is that right?

A.    **Yes.**

Q.    This agreement seems to have been drafted and signed prior to the ending of her employment.  Is that right?

A.    **Yes.**

Q.    Why was that?

A.    **But there is no -- I don't think we have any romantic relationship at that time, he just -- he just approached me to ask her to raise her salary but I refused, I keep refusing her request.**



And after that she approached me and offer me, like, so if you can give me a -- some financial benefits and I can sleep with you, and then I go, there's no way we can develop a special relationship until you quit the job, until you leave the job.

And that term is for -- for like -- it's -- it's definition, a clarification of our relationship was set up at that date, but the purpose is for the time when she leave his job with SignaGen.  So if you can see the appendix, so there's a --

Q.   Sure.  Just for the record, also included in this exhibit -- apologies -- is Defendants 084.

I'm sorry, Mr. Zhou, were you saying something about the appendix?  I just want to have it up for you.

A.   Yeah, I'm seeing that, yes.

Q.   So what was the reason -- just to confirm, make sure that I'm understanding correctly -- for having this agreement signed about a month, give or take, prior to when you say Ms. Liu resigned from SignaGen?

A.   Because we had a talk and before we signed this agreement on December 26th, she keep asking me salary adjustments, I keep telling her this is against the policy of the SignaGen, there no way I can adjust her salary.  Even, like, as a policy of SignaGen doesn't allow me to.

And secondly, her performance was so bad and -- but she offer me, like, to be my girlfriend so that -- she thought maybe she become my girlfriend, she can get benefit from me.

I said no way we can do that, unless you -- unless we don't work in the same company.  But if you work and stay at SignaGen at the same time and such a relationship, that's not acceptable.  That's my bottom line to not have any romantic relationship or friends-with-benefits relationship with my employees.  That's my bottom line.

So that's why we draft this and for protection, both me and her.  So I specified very clearly the relationship can be develop only after she leave her job.

Q.    And I just want to clarify.  You said "we drafted," but earlier you said that you drafted it.  Can you confirm again who drafted the agreement?

A.    I drafted, but she saw that and without any objection, we sign it.

Q.    So when this agreement was signed in December 26, 2022, was Ms. Liu still employed at SignaGen?

A.    Yes.

Q.    And earlier we discussed the SignaGen handbook and the policy related to romantic or personal



99

relationships.  Was that policy in effect on December 26th, 2022?

A.    Yeah, the policy was in effect at that time. But at that time we don't have any substantial relationship like the sex relationship and romantic relationship.  We don't have such relationship when we sign this agreement.  This agreement just define the relationship after she quit job with SignaGen.

Q.    So according to the policy, was an agreement like this required to be disclosed?

A.    I don't want to disclose this kind of agreement with anyone, but my lawyer said I cannot hide anything, so that's why I passed to my lawyer.  I don't expect my lawyer can disclose to any party involved in this case --

MR. KIPHART:  Jeffrey, I'm just going to stop you.  Don't tell anybody what you and I or you and Shawn have talked about.  Okay?

THE WITNESS:  Okay, I'm sorry.  Yeah.

Yeah, personally, I don't want to disclose this kind of agreement, but I had to.

Q.    BY MS. ROSARIO:  Did you disclose the existence of this agreement to your partner, Thomas?

A.    No, I didn't.

Q.    Did you disclose the existence of this relationship post-January 2023 to Thomas?



100

A.    Yes I did.

Q.    And what was his response?

A.    Yeah, his response is okay, you gonna learn a lesson, so just -- just let the lawyer handle this case. And so I -- I trust you and I think we will prevail; that's what Tom said.

Q.    When did you disclose -- sorry, scratch that.

When did you have this conversation with Thomas?

A.    I cannot remember.  It's after we receive the letter from the plaintiff's attorney.

Q.    Does this agreement exist between yourself and any other employees or affiliates of SignaGen?

A.    I said no, I never signed this agreement before.

Q.    Are you married, Mr. Zhou?

A.    Yes, I am.

Q.    Since when have you been married?

THE WITNESS:  Do I have to tell?

MR. KIPHART:  Answer the question.

THE WITNESS:  I got married in 2009.

Q.    BY MS. ROSARIO:  Are you in an open marriage?

A.    No.

Q.    Does your wife know or have knowledge about the friends with benefits agreement that we have pulled up here?

A.    I think she did.



101

Q.   I'm sorry, you said you think she did?

**A.   I don't think she did.**

Q.   Oh, don't think.

Has your wife ever met Ms. Liu?

**A.   No.**

Q.   To your knowledge, is Ms. Liu married?

**A.   Ms. Liu, who -- okay, that's plaintiff; right?**

Q.   That's right.

**A.   I don't think so, she didn't.**

MS. ROSARIO:  Can we just take a quick, maybe five-minute break, come back around 12:17.  Is that okay?

MR. KIPHART:  Fine.

(The deposition was at recess from 12:12 p.m. to 12:18 p.m.)

Q.   BY MS. ROSARIO:  Mr. Zhou, did Ms. Liu ever communicate any hesitation regarding the relationship?

**A.   What time?  During her employment or after her employment?**

Q.   Well, you said there was no relationship during her employment.  So at any point, did she ever communicate any hesitation regarding the relationship that you and her had?

**A.   Hesitation?  I don't fully understand hesitation.  I don't -- I don't think she did.**

Q.   Did she express a desire to stop the



102

relationship at any point?

A.    No, she came to me, she approached to me.  And I think we share the footage and how many times she came to my office, it's all recorded by security camera.  So if she was sexually harassed, why she came to me, why she approached me, why she advance to my office.  No, that's not -- that's not true.  That's a lie.

And as I said, after investigation, even my business partner believe I was harassed, other than her.

Q.    Okay.  As part of what will be Exhibit 9, I'm putting up part of Defendants' production 178.

Mr. Zhou, can you see my screen?

A.    Yes, I can -- nothing comes up.

Q.    Have you seen this document before?

A.    I didn't hear.

Q.    I'm sorry, can you see it now?

A.    Yes.

Q.    Have you seen this document before?

A.    I'm not sure, though.  Yeah, I think my attorney passed this information to me before, yes.

Q.    And did you review this document in preparation for today's deposition?

A.    I didn't.

Q.    I'm going to Defendants 179.

Mr. Zhou, can you read line 17 here?



A.    Yes, okay.  "Shortly thereafter, claimant again expressed to me her anxiety about" -- okay -- "her anxiety about her income.  Claimant proposed that she should quit SignaGen and pursue a MBA degree, as she had a friend who after obtaining an MBA secure a position with higher salary than the claimant.  I encouraged claimant to pursue a MBA.  Claimant then proposed that we enter a relationship.  I declined the claimant's advance again." (As read.)

Q.    And I'm scrolling to Defendants 181, still part of the same exhibit, Exhibit 9.

Mr. Zhou, can you please read lines 22 and 24.

A.    22, "Regarding the reminder of the claimant's allegation from January 2023, I did not send and/or show claimant any illicit text messages or videos as alleged.  See complaint at chapter eight and nine.

"Further, I either [sic] propositioned, exposed myself, or physically accosted nor threatened claimant as alleged.  See complaint."

And then number 24, "At no point during claimant's employment at SignaGen did claimant and I engage in any sexual conduct.

"Further, at no point in time did I sexually harass, assault, or otherwise discriminate against claimant on basis of her sex or race."  (As read.)

104

Q.   Thank you.  So to confirm, you stated in that affidavit that Ms. Liu is the one who offered to become your girlfriend?

A.   Yes.

Q.   I am pulling up Exhibit 7 again, the text messages.  That will be part of plaintiff's production LIU 007.

Mr. Zhou, can you see my screen well?

A.   Yes.

Q.   Have you ever seen this WeChat box before?

A.   Yes.

Q.   Are you able to translate?  There are no voice notes in this chat box.  Are you able to provide the English translation for the entire conversation?

A.   Yeah, to my best knowledge, yes.

First you see the time is March 20th, 2023, it's about several months after the plaintiff quit the job at SignaGen.

And so let me translate the first.  "Can you be my mistress or lover or just -- I like you."

And the second line is "I going to start 11:30 and then I come back, so can I have a look," and her answer is "Okay, and" -- "wait for some time, I'm going to take some medication to" -- "medicine, it's still swollen."

105

And then I answer, "You are pretty and I'm missing you."  And she said, "I'm going to take some medicines and then I feel better.  Can we meet," and that's it.

Q.   Around March 2023, there are instances in your affidavit where you mention --

(Reporter clarification.)

THE WITNESS:  Okay, I think I want to mention that affidavit --

MR. KIPHART:  Jeffrey, just wait for a question. Just wait for a question.  It's okay.

THE WITNESS:  Okay.

Q.   BY MS. ROSARIO:  So you just read in the WeChat messages a message in which you were asking her to be your girlfriend, which was on or around March 2023.

And in your affidavit, you stated that there were instances where Ms. Liu was the one who was propositioning you to be her girlfriend.  Can you just --

A.   I mean during --

Q.   Mr. Zhou, can you just let me finish the question, please.  Thank you.

Can you just describe the circumstances as to the change in, I guess -- scratch that, I'll start over.

Can you explain the change in why you were declining her, per your affidavit, and then why you

106

decided to ask her to become your girlfriend on or around March 2023?

A.    I think I have mentioned that many times.  In the workplace during her employment, we have no way to become a -- a -- we have no way to enter a relationship.  But this happened only after it -- it's possible only after she quit SignaGen.  And she did, and this message when I asked her to become my girlfriend is March 23rd, which is almost two months after quit the job.

And the story is so you just showed the exhibit -- the exhibit that I wired the money on 23rd, February 23rd, about $9,500.  At that time we broke up.  We broke up.  We don't have any -- we don't have any interactions until March, I think.  The scenario is when I asked can you be my friend is after we broke up in February 24th or 23rd; I don't remember exactly.

So in my affidavit when I said she approached me, offered to be my girlfriend, I declined is because she was still employed at SignaGen at that time.  So there's no any contradictory, it's no -- I don't think it's -- I don't think I need to explain more about this topic, because I offer -- I declined offer because she was employed.  I'm okay to develop a relationship, because she quit the job after she quit the job with SignaGen, that simple.

107

Q.   So you just stated that on February 24th, when you made that payment of $9,500, you were already broken up, or can you confirm what you meant by that?

A.   Yeah, we had a quarrel, we had a strong argument about nature of our relationship after I sent the payment in February 24th, I believe, and then said okay, please -- please don't contact me forever, and it's done. And after that -- so I think we stop communication for some time, maybe several days, maybe several weeks; I forgot exactly.

Then maybe, I don't know, for what reason so we start to communicate again and until you saw the message in March 23rd, but this happened -- once again, it's happened at a time point two months after she quit the job with SignaGen.  So I think we don't have -- she doesn't work with us anymore at that time.

Q.   Just to make sure that I understand, if you're saying that you and Ms. Liu were broken up on or around February 24th, 2023, what date, approximately, would you say your relationship began?

A.   I don't know.  I don't know.  I really don't know.

Q.   When was the last time that you communicated with Ms. Liu?

A.   It would -- what do you mean by communicate; by



Liu vs
SignaGen Laboratories

Jianzheng Zhou

108

WeChat?  By email?  By any kind of communication forms; right?

Q.   Any communication whatsoever.

A.   I think the last one is -- I think it's August something.

Q.   August of which year?

A.   I think it's August of 2023.  And she came to my office not during the weekends at that time.  She tried to delete some documents from my computer at that time.  That's the last time he came to my office.

Q.   You're saying Ms. Liu was in your office on August 2023?

A.   Yeah, I think it was a Friday when the plaintiff came to my office, she tried to -- at that time she already decide to sue us and she tried to delete some evidence saved in my computer.

Q.   How did she gain access to the office, your office?

A.   My office is open all the time.  The building is open during the working hours.  Anyone, included deliveries of FedEx, UPS, they can access to my building, my office anytime.

Q.   Were you present when you say that Ms. Liu arrived at your office on around August 2023?

A.   Yeah, because she can see through from my



109

window.  My window is close to a road, she can definitely see through if I was in my office or not.

Q.   And how did you know that she was there to delete documents, as you say?

MR. KIPHART:  Ms. Rosario, you broke up again.  I didn't catch the first bit of that question.

MS. ROSARIO:  Apologies.

Q.   BY MS. ROSARIO:  How did you know that Ms. Liu was there to delete documents, as you said?

A.   She said okay, because I'm --

Q.   Am I still breaking up?

A.   I can hear you clearly, for me I don't have trouble to hear you.

You said how Ms. Liu came to my office; that's what you said?

Q.   How did you know that she was there to delete documents, as you said?

A.   She came to my office and asked me -- so because after the first -- after the last meeting in, I think, the middle of July, so we reach agreement orally to terminate the relationship for forever and we honor agreement to delete all this information, the communication we have, including the WeChat, so I honor this agreement by deleting my WeChat account.  That's why I cannot provide any -- again, any evidence supporting my

Liu vs                                                          Jianzheng Zhou
SignaGen Laboratories

110

allegation, my -- my setting point by providing WeChat.

She failed to honor this agreement, because -- and then in August came to my office to see if I delete all this, this documents, like, the WeChat message we exchanged on the emails, and so all kind of information. I just show her, like, including her pictures, including -- she sent me, I think, a lot of pictures including of some restricted pictures, like her nudity pictures, and -- but she tried to clean all these pictures as well. I said okay, I opened this folder and let her delete these pictures. But I still have several pictures, I think I passed to my attorney.

Q. So you allowed her to delete some of the pictures, but not all?

A. No. No. No. No. No. She delete all the pictures, but I still have a backup of some of the pictures; not all the pictures, because this is part of agreement. Our agreement is terminate this relationship after we meet last time in the middle of July. So we promised to delete all this private information from our -- from our iPhone, from the computer. And it turn out I did, but the plaintiff didn't, that's why she still keep all this WeChat messages.

Q. And so confirming again, the last time you communicated with Ms. Liu was August of 2023 in that



incident at SignaGen office?

A.    That's what I can remember, yes.

Q.    I'm pulling up what will be Exhibit 10, plaintiff's production LIU 0011, 11.

Can you see my screen, Mr. Zhou?

A.    Yes, I can.

Q.    These, I guess, contact IDs we'll call them, do you see the numbers here in the first panel, the third, and the fourth?

A.    Yeah, my number.

Q.    Is it your testimony today that this is your number associated with these missed calls?

A.    Yes.

Q.    Can you read the dates on the panels that list your number?

A.    It's August 9th, 2024.

Q.    And the other two panels that list your number?

A.    You meant no caller ID panel?

Q.    No, the other two that list your 301 number.

A.    Yeah, April -- it's August, I think it's 18 and 16.

Q.    So earlier you testified that the last time you communicated with Ms. Liu was in August of 2023.  Is there a reason why you didn't mention these calls?

A.    Yeah, I think I forgot these calls.



112

The reason I call her back is I saw a missed call in August, August the 7 and August the 11th, I find out about it several days after.  So I took a screen shot of my iPhone; I can provide this evidence.  But my apology, because I don't think that's the -- I didn't know, because I saw her first missed call, that's the reason I call her back.

Q.    To the extent you can provide the screen shots of those calls, we'd like to see production of that as well.

A.    Yes.

Q.    Did you send any emails to Ms. Liu after her employment ended at SignaGen?

A.    Yes, I think I did.  I forgot exactly what time, but she send me several email.

Q.    Do you have an estimate of around when you sent an email or emails to Ms. Liu after her employment ended?

A.    I think I only -- I cannot remember exactly what time, but after she quit the job at SignaGen and she explained that to me and she want us to hire her back and I said I can't, I definitely cannot, there's no way we can do that, but she still came asking to hire her back.

And so I think it's so annoying, so that's why I refer her to my friends who is running two biotech companies in Rockville and I sent her email saying



113

that -- I -- I -- I -- I'm trying to help her and I sent the email saying that, okay, this is reply from our friend, you can send her your resume directly to -- to, to the employer I recommend.  That's the email we exchange.  I think I -- I think the time point should be -- should be June something, June or July of 2023.

        And I refer her to -- to another biotech companies and after I -- after we have been bothered for, like, a couple months to hire her back.  I definitely declined this request, but I still want to help her by facilitating her job finding by referring her to -- to -- to another two biotech companies in Rockville; that's the email that we exchanged.

    Q.    Any other emails exchanged?

    A.    Yeah, she -- she kept asking us to -- she keep requesting, the thing is -- okay.  She persistently requesting us to come back, but I repeatedly declining her request.  And in this case, and I think in July she still sent us email to work with SignaGen and by attaching her CV.  I think this is -- maybe this is last email from her.  I'm not sure, though.  That happened in July of 2023 and her email attached to her CV to us.

        And from the CV -- from her CV she specified the time point she left SignaGen is January 2023.  And I think you have her CV as well, you have a CV, you have



114

this document provided by my attorney.  I believe this is last email from her.

Q.   But are there any emails from you to her during this time period that you're discussing?

A.   I think I just refer her to -- to two biotech companies.  Then after the case is started, after the case started from August of 2023, and I think I sent her an email blaming her for providing the falsified information about this case; that's -- I believe this is the last email I sent her.

Q.   I'm pulling up what will be Exhibit 11, part of plaintiff's production LIU 010.

Can you see my screen, Mr. Zhou?

A.   Yes, I can.

Q.   Is this the email you were just referring to?

A.   Yeah, I think this is last email I sent to the plaintiff.

Q.   Can you describe the contents of this email for the record?

A.   I just mention I sent her email asking why she lied through the case by fabricating the time points when she left SignaGen from, like, January, end of January to February -- to April, and that totally a lie, because we have so many evidences -- even she admitted that she quit the job on -- she quit the job on 31st of January when

she applied for unemployment benefits from labor department to Maryland.

And I think this case that has no base and no standing and also, I tried to explain to her and that's what she did is -- it's very disturbing and it's -- because we have done so much to her, including, like, recommending her, referring her to other employers, and we don't have to do that.  We don't have to do that.  And including and her bad performance and caused a lot of trouble in the lab, even after she left the SignaGen Laboratories and the customer still complain about the per transduction efficiency about the vector she made.

So this kind of bad thing and I just wanted to -- to inquire why she lie, she made the falsified information in the case.

Q.   To your knowledge, when you sent this email, had Ms. Liu retained an attorney at this point?

A.   I don't know, because I don't believe that, because this is -- this case is handled by the local office of the -- I think it's Maryland EEOC branch, I think, at that time.  I have a lawyer, but I'm not sure.  She change a lot of lawyers.  I'm not sure, though.  I'm not sure at that time.

Q.   So prior to you sending her this email, you had never communicated with anyone, any attorney that was

116

representing Ms. Liu?

A.    I don't directly engage any plaintiff's attorney myself, but I think my lawyer did.

Q.    You just testified that you sent various emails to other companies on behalf of Ms. Liu.  Was there a reason that you continued to do that despite, you know, the performance concerns that you mentioned earlier?

A.    I have mentioned it many times and after she claimed she cannot find a job and she had persistent financial hardship, she asking us to hire her back, we refused.

And then she came to my office during the weekend many, many time and it greatly bother me a lot, it greatly affected my life.  And I think we provided security footage showing that a time, a long time range from May of 2023 until to July until to August 2023 how many times she came to my office during the weekends.  So I personally was bother a lot, so I prefer she find a job.

That's why I think I don't mind offering her a recommendation to other employers so that we can find a job, I will not be bothered.  So that's why I'm saying in nature I was sexually harassed by her.  That's why you can see we provide a lot of security footages and showing that how many times she entered our building, came to my

117

office.

The purpose of her visitation is to do two things.  One thing is ask donation.  The second thing is ask us to hire her back.  That's definitely -- we cannot do that, we cannot hire her back, but we will -- this is so, so annoying, so we have to do something to let her -- to facilitate her chance to find a job.  That's why I referred her to another companies, two companies, actually.  And they are my friends and I think it's the -- it's -- but if he did not succeed it's not my fault.

Q.   Did you speak to any of these prospective employers regarding Ms. Liu's performance while she was employed at SignaGen?

A.   I exchanged by email and never spoke with them.

Q.   Did you communicate via email about Ms. Liu's performance?

A.   What I can say, I think her performance was good, was okay.  But what the point if I refer a former employee to a company and then I said her performance bad, so what the purpose.  I don't see any point.  So if we refer someone we must say someone is good, right, so that's common sense.

But otherwise, how we can avoid being bothered every time, every weekends, and let her come to our



118

building and come to our office and asking donations, asking hire her back.  To avoid this, the only solution is to let her find a job.  That's what I did.

Q.   Are these companies doing similar work as SignaGen, the ones that you referred Ms. Liu to?

A.   Similar, I think it's pretty similar, yes.

Q.   Did any of those prospective employers ever reply to your emails regarding Ms. Liu?

A.   I think one employer reply my email, but didn't mention her.  I guess at that time they didn't have intention to hire anyone.

MS. ROSARIO:  I'm moving on to a new section here with quite a few questions.  Does anyone want a break or short lunch or anything?

THE WITNESS:  I'm okay.  I'm okay.

MR. KIPHART:  I could use the bathroom really quick if we want to keep going.

MS. ROSARIO:  Doreen?

THE STENOGRAPHER:  I'm okay.

MS. ROSARIO:  Let's do it.  It's 12:54; until 1:00, is that enough time?

MR. KIPHART:  Sure.

(The deposition was at recess from 12:54 p.m. to 1:06 p.m.)

Q.   BY MS. ROSARIO:  I'm going to pull up what will



be Exhibit 12, part of defendant's production 224 to 232.

Confirming you can see my screen, Mr. Zhou?

A.   Yes, I can.

Q.   So like I said, this is Exhibit 12, from 224 to 232.  I'm just going to scroll through.  You don't have to read them aloud, but I can give you some time to read them if you'd like.  I'll scroll through and then I can start the questions.

Are you familiar with these documents, Mr. Zhou?

A.   I cannot say I'm familiar, but I did see this documents before.

Q.   Did you review them in preparation for this deposition?

A.   No, I -- I didn't.

Q.   Can you describe the documents?  Not the contents, but just what the documents are?  Let me scroll up to one.

A.   Yeah, this is affidavit, I think, from the plaintiff supervisors and coworkers and to judge her performance in SignaGen Laboratories during her employment with us.

Q.   And just for the record, I just scrolled through affidavits for Blake Gastley, Alex Tibbens, and also Leslie Forcino; is that right?

A.   Forcino, yes.



120

Q.   Forcino, apologies.

Did you assist in drafting any of these affidavits?

A.   I didn't.

Q.   Why were these affidavits drafted by your employees?

A.   Not drafted by employees.  I think our attorney interviewed our employees and meet them in person and then came up with the draft of the affidavit.  These go over all -- they went over all this -- all the words, all the languages, and they draft and signed the name.  I didn't draft this, my employee didn't draft this.

Q.   Why were these affidavits drafted?

A.   How the affidavit was drafted; is this your question?

Q.   Why were they drafted?

A.   Why we drafted, so I don't know why, because maybe you can ask my lawyer what the purpose of affidavit.  I think just to confirm that how bad the performance of plaintiff performed with SignaGen, which is contradictory to her allegations saying that she work in a exceptional, good manner and she is so productive, and just to confirm the plaintiff a liar.  She lied about her performance through the allegation and we confirmed that is contrary to what she claimed.

121

Q.    Did you review these affidavits before they were signed by each employee?

A.    **I didn't review anything, because it's not my affidavit.  I think my employee did review this affidavit before they sign.**

Q.    As part of these affidavits, there is a centrifuge incident which I believe you mentioned earlier.  This incident is mentioned in every affidavit.

Do you recall exactly what occurred with that centrifuge incident, in as simple terms as you can, just so I can understand?

A.    **Yeah, I can remember this, this incidents, yes.**

Q.    Can you describe the centrifuge incident?

A.    **I think it's soon after she was -- the plaintiff was transferred from packaging team to purification team she start to run an ultracentrifugation and for overnight.  And it turned out she cracked the ultracentrifugation tube, which next day morning then she opened the ultracentrifuge.**

**And that incident has never happened before and it can cause a disaster, it can cause, like -- if the imbalance happened during the crack of the tubes, then the ultracentrifuge is running at a super high speed, this can kill people, this can do great harm to the lab members, so this is a severe incident.**

122

Q.   When did this incident occur?

A.   I think it's soon after she was transferred from packaging team to purification team, maybe, I think, beginning of November or just middle of November, that's -- I don't know exactly what time.  That's what I can recall.

The reason why the tube crack is she didn't follow the SOPs.

Q.   This is Leslie Forcino's affidavit.  Give me one second -- actually, I'm going to stop sharing for a second.

Okay, apologies.  I'm going to share the same exhibit.  So this is Alexander Tibbens' affidavit and I'm just scrolling down so that we get to line 17.

Can you please read that aloud.

A.   You mean item 17?

Q.   Yes.

A.   "In January 2023, the claimant improperly loaded the ultracentrifuge, UC, resulting in the samples being lost and destroyed.  As a result, my team was asked to redo the work and given delay, the claimant had failed to balance the UC prior to using it.  I was concerned for the safety of my team and the risk of a catastrophic physical accident."

I think the time point at that too was not



123

right, it's not January 2023, it should be beginning -- beginning either November or December of 2022.  That's what I can -- that's what I can tell.  The time is -- I think it's something wrong.

Q.   You're saying this affidavit was inaccurate?

A.   That's just the time point exactly, but the fact is -- it's a fact.

Q.   And just to confirm, this centrifuge incident that Ms. Tibbens -- excuse me, Alexander Tibbens is describing, that's the same centrifuge incident that you described just a minute ago?

A.   Yes.  One is enough for us.  It can kill people, as I said, so can we accept them, no way.

Q.   Are there records maintained documenting who uses the centrifuge on a given day?

A.   Yes.  We have the user log for the ultracentrifuges, yes.

Q.   We'd like to see production of those logs, to the extent they're available.

A.   I'm not sure, though, because it happened almost two years ago.  I need to find out if the log still available, because the old one did override -- the new one can override the old one.

Q.   As part of your record retention policies, do your records routinely get changed as you get new



124

information or new logs?

A. So if it's electronic records, the older one can be overwritten by the new log due to the storage of the hard drive. If it's just a physical -- physical record log it's can be in there. I said I need to go back to find out.

Q. Okay. To the extent that those logs exist, we'd like to seek production.

So just to confirm, those logs will also list who had access to certain equipment during that time?

A. Yeah, since that I -- I just in charge of the logistic part of the company. For the technical part, I need to go back to talk to my partner and access those logs. I cannot tell yes or no right now.

But the thing is the incident happened, so a lot of people can testify that's the truth.

Q. The affidavit that -- we looked at your affidavit earlier, you stated that Ms. Liu was moved into the customer service role, working alongside you in mid-December 2022; is that correct?

A. That's what I recall the time point, yes.

Q. Do you recall if that was before or after she allegedly signed the friends with benefits agreement?

A. You mean her transfer from -- yeah, so her transfer to customer service happened before that, before



125

the agreement.

Q.   Has the existence of the agreement affected her role at SignaGen in any way?

A.   Can you repeat the question again?  Sorry.

Q.   Did the existence of the agreement affect her role at SignaGen in any way?

A.   No, I don't think so.  The agreement just defined our relationship upon she leave her job at SignaGen, has nothing to do with her employment with SignaGen, so I think it's very, very clear how the agreement says.

Q.   And when we discussed earlier her reassignment between the departments, is there any documentation that shows her reassignment from the purification team to customer service team?

A.   There are no official documents showing that, but we have the production log.  So if she working the packaging team and the packaging form and she should make the packaging form and -- and her initials will be signed on packaging form.

If we do the purification and titration and she will sign the titration form with her initials.  So definitely we can confirm from what time to what time she work in the packaging team and from what time to what time she work in the purification team.



126

Q.   Just to confirm, those are the same logs that we had just previously discussed regarding the centrifuge, or are those different logs?

A.   No, not the same log.

Q.   So you have documentation showing -- or, excuse me, scratch that.

You have logs showing what teams Ms. Liu was working under at any given point during her employment?

A.   Yes, that's true.

MS. ROSARIO:  These logs as well we'd like to see production, to the extent that Mr. Zhou has them in his possession.

THE WITNESS:  Yeah, but I indicated I'm not sure if we can find this log because it happen, like, almost three or four years ago and so the new log can overwrite the old one if it's electronic log.  I don't know the nature of the log is.  I need to find out when I come back to my office, to my lab.

Q.   BY MS. ROSARIO:  Understood.  Were you personally involved in gathering or reviewing the documents that were provided for production in this case?

A.   Responsible; is that what you asked?

Q.   Were you involved in the gathering or the reviewing of those documents?

A.   What documents?



127

Q.    The documents that were provided as part of defendant's production in this case.

A.    **Yeah, I provided some evidence, yes.**

Q.    Who was responsible for providing the employee handbook that was produced as part of this case?

A.    **Yeah, I did.**

Q.    Documents like the employee handbook or other SignaGen documents, where are those documents stored; on a server or local computer?

A.    **Google drive.**

Q.    I'm going to go back to Exhibit 1, Defendants' production 03 -- actually, I'm going to go to 033, same exhibit.

      Can you see my screen, Mr. Zhou?

A.    **Yes, I can.**

Q.    Just for the record, this is page 33 of the handbook.  Can you confirm that?  Can you see that -- I'll zoom in -- the 33 at the bottom right corner of this document?

A.    **Yeah, give me the last page of the document.**

Q.    Is 33 the last page of the document?

A.    **It's not, 34 is last page, but I think the 33 you show just a blank page.**

Q.    Oh, apologies.  It has language on it, I was just pointing you to where the page is numbered on the



128

bottom right.

A.    Okay.

Q.    And now this is page 34, Defendants 034.  Can you just describe what this page is?

A.    **This package is acknowledgment page about handbook, make sure that the employee and -- make sure the employee just goes over all this policies, the benefits and practices and procedures outlined in the handbook, make sure they understand all this terms, and then sign and date it.**

Q.    I just want to direct your attention to the bottom right-hand corner of page 34.  Can you see that clearly?

A.    **Yeah.**

Q.    Would you say that this font on page 34 is different than the font on page 33 that I just showed?

A.    **Can you show me the 33?  I'm sorry.**

Q.    Of course.  I'll just zoom in for you.

A.    **I think the font is same.  I think the font is same with the number, I don't see anything wrong.  Maybe the size is different, it's just a -- I don't see anything's different.**

Q.    I can zoom this one in just as much.  For example, like you said, do you think the font size may be inconsistent with the other pages?



Liu vs
SignaGen Laboratories

Jianzheng Zhou

129

A.　Yeah, it's still likely and this can be editing issues.　But as I said, so we have all this post on a Google drive, so it's still in there.　The font size can be a little bit difference; we don't know that.　As I said, so my background is bench scientist, so I'm not a secretary and I don't know why the size of the font is so important.

Q.　With the original file that you say is on your Google drive, would that file include metadata showing when page 34 was created or modified?

A.　I don't know.　I need to go to Google drive and to have a look, but I don't know.　But this is not exactly the electronic version I shared with my attorney, but my attorney scanned this, I think.

So you can see the punch holes on the side. Scan itself can distort the size of the font, calling it a different size.　I don't know.　I don't see any point where the font difference is important, so I -- I really don't.　Because this you can see the punch hole was also reported on this document, that means our lawyer scanned the documents I passed.

So this -- the scan itself can cause the difference in terms of the size of the font.　But okay, yeah, it seems there's a difference, but I don't know the original document is shows different font size what a

130

scan is. But I think it can be due to the scanner. But once again, so I don't see any point why the font size is important.

Q. I'm going to go back to Exhibit 8, which is the agreement as part of Defendants' production 082 -- excuse me, 083.

Can you see that, Mr. Zhou?

A. Yes.

Q. And now I'm going to go to what will be Exhibit 13, as part of Defendants' production 041. We'll do 040, just so Mr. Zhou has some context.

Have you seen this document before, Mr. Zhou?

A. Yes, I did.

Q. I'm going to scroll to the signature section here. Do you recognize the signature shown on here?

A. Yes, I did.

Q. I'm going to toggle back and forth from Exhibit 13 to Exhibit 8, if you don't mind.

So this is Exhibit 13; take a look at the signature.

Now, if you compare the signature on this page and the signature on Exhibit 13 that I just showed, would you say that they appear nearly identical?

A. You're asking me, or --

Q. I'm sorry, you cut off a little bit. What was



131

your response?

A.    So I'm saying are you asking me about the question about the signature?

Q.    Yes.  I'm asking you based on your review of the documents right now --

A.    I didn't see the --

Q.    We're almost done.  So I'm asking you about what you're viewing in front of you now.  By looking at the signatures on page 83 and page 41 that I've just showed, which is Exhibit 8 and 13 respectively, would you agree that they appear to be nearly identical?  I can toggle back.

A.    Yeah, can you -- can you go back to the discipline action, the signature on the discipline action, the rule of misconduct?

Q.    Of course.

A.    Yeah, they look like a little bit similar, but I don't see anything wrong, it's just -- I think you should ask the plaintiff, your client, so it's her signature.  There's no any issue.  Yeah, even, like, it's a very similar, I don't see any point, because people's signature supposed to be similar, it's -- I don't see anything wrong with this.

Q.    Are you aware of any editing that was used to replicate Ms. Liu's signature in either of those



132

documents?

A.   No, I didn't do anything.  It's still likely the plaintiff just generate an electronic signature based on her real signature, because after she started with SignaGen she's supposed to generate electronic signature so that if she can work with the vendor to verify or, like, if customer want to order with us, we will be asked to join the vendor system.

In this case, the customer service's job is to fill all this applications by -- firstly by in the last page, she's supposed to put her signature or his signature in the bottom line.  I'm not sure, though.

I think we -- what I can recall is I talked to the plaintiff when she worked with customer service to generate electronic signature based on her real signature.  It's still likely an agreement was signed based on electronic signature.  I think from the nature of the signature, you should ask the plaintiff other than ask me.  That's my response.

Q.   When you say the agreement was signed electronically, which agreement are you referring to?

A.   The friends with benefits agreement.

Q.   Similar to the file earlier regarding the handbook, do you possess metadata information or file history for the -- I want to make sure I get correct the

133

name of the document -- the rules of conduct and discipline document as well as the friends with benefits agreement?

**A.    I don't understand.  Can you repeat the question again, please?**

Q.    Do you possess the metadata for these two documents' signatures that I've just showed you, or maybe file history?

**A.    I still don't understand.**

Q.    Earlier we discussed, you know, how you or SignaGen stores your documents on Google drive and maybe that you have access to the metadata or file history of any changes to that document.

Can you say the same for these documents that we've just discussed, the rules of conduct and the friends with benefits agreement?

**A.    Friends of the benefits agreement was not saved in Google drive.  Google drive, anybody can access the Google drive, so are you expecting that I put the agreement into Google drive so that every employee can see this?  No, it's not.**

Q.    I'm not expecting anything, I'm asking you where --

**A.    It's not in the same place; not in the same place.**



134

Q.   When employees of SignaGen provide e-signatures, do you use any kind of e-signature platform or system?

A.   Usually, so the customer -- the employee sign the documents in blue ink and when they handed the handbook or disciplinary action they just sign and gave to me hard copy.  So they usually don't use the electronic signature until they deal with customer, because only the customer service deal with customer directly, especially when customer asks us to join their system, the vendor system, so that they can order us through a PO.

So in this case, whoever did a customer is supposed to have electronic signature.  The electronic signature is based on real signature scanned by a scanner and then -- by scanner and then saved as a picture image.

Q.   Does the company save these signatures or does the employee save their own signature?

A.   I have been doing the customer service myself during the past ten years, until the plaintiff joined the customer service from -- I think, from December 2022. And I have my signature saved in my computer and she was supposed to have her signature saved in her computer so that when she signed it's easier to insert the picture in the bottom of the documentation and when the vendor request from us.

135

MS. ROSARIO:  I am nearing the end of my questions here.  If we could just take a quick, maybe ten-minute break for me to go over my notes and then we can come back.  It's 1:40; shall we say 1:50?

MR. KIPHART:  You got it.

MS. ROSARIO:  Thank you.

(The deposition was at recess from 1:40 p.m. to 1:50 p.m., and Mr. Cavenee exits the proceedings.)

Q.   BY MS. ROSARIO:  Mr. Zhou, are you ready?

A.   **Yeah, I am.**

Q.   Is there anything else that you think is important to understand regarding my client's claims?

A.   **No, I don't think we have anything right now to provide.**

Q.   Is there anything else you think is important to understand regarding the circumstances leading to Ms. Liu's departure from SignaGen?

A.   **Yeah, I think I mentioned many times she wanted to pursue an MBA degree, that's already done.**

Q.   Aside from the documents or records that we've already discussed, are there any other documents or records not yet produced that relate to my client's claims of discrimination or sexual harassment?

A.   **I don't -- I don't know.  I think -- okay, and I think you should ask your client and there is -- I think**

136

there is important documents and your client possessed was not provided -- of course, I have this as well, but I just talked to my lawyer yesterday, and so it's --

MR. KIPHART:  Jeffrey, I'm just going to caution you, don't say anything about our conversations.  All of that is privileged.  You don't want to waive that, I'm advising you not to waive that.  So tread carefully.  Okay?

THE WITNESS:  Okay.  I'm sorry about this.

And then I think you should ask the plaintiff and so about the document.

Q.   BY MS. ROSARIO:  Well, I'm asking you, Mr. Zhou. So just to confirm, are there any other documents or records aside from the ones we've already discussed that have not been produced related to my client's claims of discrimination or sexual harassment?

A.   I don't think -- I don't think I have any other documents.

Q.   Are you aware of any documents that my client may have in her possession related to her claims of discrimination or sexual harassment that have not yet been produced; and what would those documents be?

A.   The document is about a footage of the recording during our last meeting in hotel in middle of July 2023, and she record the whole process, our meeting, and I have



137

copy of this as well.

And she claim this is her -- this our last time and meeting, so she want to keep the memory forever and she suggest to record the whole process.  And she did, but she didn't know how to extract this -- this video.  I think I can help and I can help -- I have a copy and she has another copy showing the whole process; how we enter the hotel, how we leave the hotel.  I think that's very, very important for you, for your team to understand the nature of our relationship.  And this video going to show if she was forced to do anything, if she got sexually harassed.  So ask your client about that.

Q.   So you're saying --

A.   Ask your client about -- ask the client about this footage.

Q.   Just to confirm, you're saying you also have a copy of this footage?

A.   Yes, I do.  But this --

Q.   Has that been turned over?

A.   I feel so embarrassing to even mention that to anyone.

Q.   Has that been part of your production in this case?

A.   It's a lot of breaks, I cannot hear you.

Q.   Sorry.  Has that been turned over as part of

138

your production in this case?

A.    No.   I said I failed to -- it's hard for me to talk to anyone about this, including my attorney.

MS. ROSARIO:  We would like to, as a final request, seek production of this footage that Mr. Zhou is describing.

THE WITNESS:  Your client has original copy of this document.  Why you cannot ask her to gave this document?  It's the same.  She made the document.

MR. KIPHART:  Jeffrey, wait for a question. You're doing fine.

MS. ROSARIO:  Those are all my questions, actually.

Andrew, did you have anything you wanted to ask Mr. Zhou?

MR. KIPHART:  No, I don't think so.

MS. ROSARIO:  I want to thank you for your time today, Mr. Zhou.

Doreen, do you need any spellings or anything else?

THE STENOGRAPHER:  No, just if anyone would like to place an order, I would be happy to take it.

MS. ROSARIO:  Yes, we would.

THE STENOGRAPHER:  Thank you.

MR. KIPHART:  Yeah, we'll need to read and sign.



139

I know that there were a few things that you were asking for spellings about and there are some technical terms that were used that we should probably be sure are all correct.

And yes, we would also like a transcript, obviously.

The other thing that I just wanted to make sure that I'm correct -- are we still on the record or off the record?

THE STENOGRAPHER:  On the record, unless you want me to go off.

MR. KIPHART:  I'm fine going off the record.

(The deposition concluded at 2:02 p.m.)

_____
JIANZHENG ZHOU

140

STATE OF ARIZONA        )
                        ) ss.
COUNTY OF MARICOPA       )

        BE IT KNOWN that the foregoing proceedings were taken before me; that the witness before testifying was duly sworn by me to testify to the whole truth; that the foregoing pages are a full, true, and accurate record of the proceedings, all done to the best of my skill and ability; that the proceedings were taken down by me in shorthand and thereafter reduced to print under my direction.

        I CERTIFY that I am in no way related to any of the parties hereto, nor am I in any way interested in the outcome hereof.


        [X] Review and signature was requested.
            Review and signature was waived.
            Review and signature not required.


        I CERTIFY that I have complied with the ethical obligations set forth in ACJA 7-206(F)(3) and ACJA 7-206 J(1)(g)(1) and (2).
        Dated at Mooresville, North Carolina, this 8th day of July, 2025.



                        /s/ Doreen Sutton
                   DOREEN SUTTON, RDR, CSR, FAPR
                      Certified Reporter
                    Arizona CR No. 50076


            *       *       *       *       *


        I CERTIFY that GRIFFIN & ASSOCIATES, LLC, has complied with the ethical obligations set forth in ACJA 7-206 (J)(1)(g)(1) through (6).


                        /s/ Pamela A. Griffin
                   GRIFFIN & ASSOCIATES, LLC
                   Registered Reporting Firm
                     Arizona RRF No. R1005



**$**

**$1,000**
74:10
**$1,500**
78:15
**$10,000**
65:20
**$2,000**
74:12 78:10
**$54,000**
76:7
**$81,000**
65:11
**$9,500**
62:9,22 64:7,20
65:7 106:12 107:2

**0**

**00030**
30:17
**0011**
111:4
**0017**
28:20
**0029**
32:25
**006**
26:13
**007**
25:15 104:7
**008**
25:17 87:11
**010**
114:12
**012**
90:11
**03**
127:12
**033**
127:12
**034**
128:3
**040**
130:11

**041**
130:10
**082**
94:12 130:5
**083**
94:12 95:6 130:6
**084**
97:12
**085**
60:4
**087**
68:11 69:19
**089**
68:9
**091**
68:8
**092**
60:4

**1**

**1**
20:6,7,11 25:18
32:24 127:11
**1,000**
74:16
**10**
63:18 111:3
**10:02**
39:8
**10:04**
39:9
**10:48**
63:17,21
**11**
11:5 14:9 111:4
114:11
**11:00**
63:19,20
**11:01**
63:22
**11:30**
104:21
**11th**
112:2
**12**
11:5 13:19 14:5

27:13,17,20,22
39:19 72:1 79:16,
19 119:1,4
**12:12**
101:13
**12:17**
101:11
**12:18**
101:14
**12:54**
118:20,23
**13**
21:17 130:10,18,
19,22 131:10
**14**
45:5
**15**
82:20
**15th**
88:6
**16**
111:21
**16th**
60:12 61:3,5,6,8
68:6,8,12,17,18
69:4,6,17 70:14
**17**
28:23 102:25
122:14,16
**178**
102:11
**179**
102:24
**18**
93:2 111:20
**181**
103:10
**1963**
26:23
**1964**
26:23
**1967**
26:24
**1990**
26:25
**1:00**
118:21

**1:06**
118:24
**1:31**
84:12
**1:40**
135:4,7
**1:50**
135:4,8
**1st**
57:2,22,24 59:13

**2**

**2**
56:11
**2009**
100:19
**2020**
21:6
**2022**
21:8 23:1 27:14,15
37:3,8 44:4,14,22,
23 45:1,2,10 46:7,
20 72:25 78:1 83:5
95:18,20,21 98:21
99:2 123:2 124:20
134:20
**2023**
21:8 27:18,21,23
55:10 57:2,7,8
58:19 59:13 61:8,
19 62:1,5 64:3
68:6,8,11,12,14
69:6,19 70:14
81:9,10 85:22,25
86:12 88:6 92:7
99:25 103:14
104:16 105:5,15
106:2 107:19
108:7,12,24
110:25 111:23
113:6,22,24 114:7
116:16 122:18
123:1 136:24
**2023_01_04_17_
08_25**
81:18

**2023_01_16_18_
16_17**
82:14
**2024**
111:16
**2025**
8:16
**20th**
85:22,25 86:12
104:16
**21704**
7:9
**21st**
57:5,8
**22**
103:12,13
**224**
119:1,4
**232**
119:1,5
**23rd**
62:11 64:9 106:8,
11,12,16 107:13
**24**
38:11 103:12,20
**24th**
62:5,23 64:3,21
68:10,14 92:6
106:16 107:1,6,19
**26**
98:21
**26th**
95:18,20,21 97:21
99:2
**28,000**
43:5
**29**
32:25
**2:02**
139:13
**2nd**
8:16

**3**

**3**
59:15 68:7



**3,800**
60:13
**30**
10:23 82:21
**301**
111:19
**31st**
114:25
**33**
127:16,18,21,22
128:16,17
**34**
20:7 127:22 128:3,
12,15 129:10
**35**
81:25 84:4
**3:00**
89:8

**4**

**4**
56:11 81:13 83:17
84:3
**40**
79:17,22
**41**
131:9
**4th**
61:19 62:1 68:11
69:19 70:4,8,9

**5**

**5**
82:13
**50**
15:15
**54**
76:18
**54,000**
39:5 45:25 46:15
76:18 78:22
**56,000**
47:5 74:1

**6**

**6**
87:10

**7**

**7**
90:10 104:5 112:2
**70**
10:19,20
**7th**
91:5

**8**

**8**
94:11 130:4,18
131:10
**83**
131:9
**85**
59:16

**9**

**9**
102:10 103:11
**9836**
7:8
**9:00**
8:16
**9th**
111:16

**A**

**a.m.**
39:8,9 63:21,22
**abbreviate**
9:24
**ability**
5:25 6:2 33:13
**absolutely**
79:25
**academic**
75:1

**accept**
17:9 38:7 76:18
79:2 123:13
**acceptable**
98:8
**access**
51:13 53:18
108:17,21 124:10,
13 133:12,18
**accessing**
51:13
**accident**
122:24
**accommodate**
57:17 58:10
**accompany**
87:5,7
**accosted**
103:18
**account**
79:22 109:24
**accurate**
27:10 88:9
**acknowledgment**
72:22 128:5
**Act**
26:23,24,25
**action**
25:1,2 26:17 33:8
34:2,4 35:1,2,3,5,9
52:1,4 131:14,15
134:5
**actions**
32:13 35:11
**actual**
33:10,15,25 34:1
43:11
**added**
26:16 63:2 64:25
93:4
**additionally**
43:7
**address**
7:5,6,7,10,12,14
62:17 64:15 67:10
**adjust**
50:24 77:9 78:20

97:23
**adjusted**
74:12
**adjustment**
25:5 35:21 77:10,
16
**adjustments**
50:22 51:1 97:22
**admitted**
114:24
**adopt**
57:11
**advance**
81:3 102:6 103:8
**advising**
136:7
**affect**
125:5
**affected**
116:14 125:2
**affidavit**
48:25 104:2 105:6,
9,16,25 106:17
119:18 120:9,14,
19 121:4,8 122:9,
13 123:5 124:17,
18
**affidavits**
119:23 120:3,5,13
121:1,6
**affiliates**
100:12
**afford**
65:12
**afternoon**
88:13
**age**
26:24 30:1
**agree**
131:10
**agreement**
94:22 95:2,3,4,17,
22 96:1,4,8,10,17
97:18,21 98:17,20
99:7,9,11,20,22
100:11,13,23
109:20,22,24

110:2,18 124:23
125:1,2,5,7,11
130:5 132:16,20,
21,22 133:3,16,17,
20
**ahead**
66:1 68:3
**Alex**
39:1 40:18 41:6
42:5,6,13,17 50:7,
8 72:9 119:23
**Alexander**
122:13 123:9
**allegation**
103:14 110:1
120:24
**allegations**
29:10 120:21
**alleged**
55:19 103:15,19
**allegedly**
96:5 124:23
**allowed**
110:13
**alongside**
40:23 41:1,6,8,12
44:8 45:3 124:19
**aloud**
56:20 119:6
122:15
**Americans**
26:25
**amount**
26:2 39:12 60:12
63:1 64:24 65:6
70:2 96:4
**amplify**
83:25
**analyze**
71:15
**ancestry**
29:24
**and/or**
11:15 103:14
**Andrew**
138:14



**annoying**
62:19 64:17
112:23 117:6
**annual**
23:7 48:3
**annually**
22:4
**anti-harassment**
29:14
**antiharassment**
30:5
**anxiety**
103:2,3
**anymore**
66:24 107:16
**anything's**
128:22
**anytime**
57:23 108:22
**apologies**
61:7 69:15 97:12
109:7 120:1
122:12 127:24
**apology**
112:5
**appendix**
97:10,14
**applicable**
26:4 27:1
**applicant**
17:7
**application**
57:23 59:2
**applications**
132:10
**applied**
57:25 75:2 115:1
**applies**
27:3 30:5 57:12
**apply**
37:11
**applying**
37:12
**appointed**
11:11,17
**approach**

81:2
**approached**
76:24 81:4 96:24
97:1 102:2,6
106:17
**approved**
47:19
**approximate**
6:14
**approximately**
44:5,9 107:19
**April**
57:2,5,8,22,24
88:6 91:5 111:20
114:23
**areas**
22:16 49:2,5
**argument**
107:4
**arm**
84:15
**armchair's**
84:15
**arrived**
108:24
**Asia**
79:19
**Asian**
79:17,20,21,24
**asks**
134:9
**assault**
103:24
**assign**
12:1 18:18 40:14
**assigned**
40:4 44:18 51:14
**assignment**
25:5
**assist**
120:2
**assistant**
73:1
**associate**
15:13 17:24 18:2,
10 19:10 38:17
45:23 46:13 47:3,

12
**assume**
6:8
**attached**
57:2 113:22
**attaching**
113:20
**attend**
87:1
**attended**
9:13
**attention**
128:11
**attitude**
22:14
**attorney**
5:10 7:24 8:13,20
56:19 60:1 82:7,11
94:22,24,25
100:10 102:19
110:12 114:1
115:17,25 116:2
120:7 129:13,14
138:3
**attorneys**
7:16 8:5
**audio**
93:2
**August**
38:10,11,13 44:14,
22 108:4,6,7,12,24
110:3,25 111:16,
20,23 112:2 114:7
116:16
**authority**
12:20 14:11,14,16,
19,21,24 32:12
**automatically**
93:13
**avoid**
33:9 117:24 118:2
**aware**
22:10,15 37:2
49:2,5 131:24
136:19

———————
**B**
———————

**bachelor**
46:5,19 47:16
**bachelor's**
72:25 76:16
**back**
11:20 39:10 60:8,
19 63:18,23 67:11
69:23 70:6 72:16
79:6,10 88:12,15,
22,25 101:11
104:22 112:1,7,20,
22 113:9,17
116:10 117:4,5
118:2 124:5,13
126:18 127:11
130:4,17 131:12,
13 135:4
**background**
75:1,9,11,13,14,
15,17,20 76:1,5
129:5
**backup**
110:16
**bad**
77:3 98:1 115:9,13
117:21 120:19
**balance**
122:22
**barriers**
42:8
**base**
39:5,15 76:18
78:10 115:3
**based**
17:25 19:10 29:22
30:10 35:19 50:22
59:1 80:1,9,12
81:20 95:9,12
131:4 132:3,15,17
134:14
**basic**
5:13 40:7 77:4
**basically**
9:11,25 17:2,22
18:6 19:18,19,24

21:11 23:6 32:3
43:11 70:16 73:20
**basis**
23:3,18,19 30:2
77:13 103:25
**Bates**
81:17 82:13
**bathroom**
63:7 118:16
**beg**
9:8 23:10 85:23
**began**
74:14 85:5,9 96:14
107:20
**beginning**
38:13 42:19 43:17
44:3,6 45:1 56:6
63:3 65:1 68:7
70:4 77:25 83:4,5
122:4 123:1,2
**begins**
28:24
**behalf**
33:14 116:5
**believed**
80:3
**belongings**
55:14
**belongs**
10:25
**bench**
16:19 28:13 129:5
**benefit**
60:4 98:4
**benefits**
15:20 35:24 61:1
69:11 85:12 95:2
97:2 100:23 115:1
124:23 128:8
132:22 133:2,16,
17
**Benzonase**
52:25
**big**
28:12 42:14 86:20
**bigger**
84:8



**billing**
57:17 58:11
**binder**
56:11
**biologist**
15:14 17:24 18:3
19:11 38:16,22
39:24
**biologists**
39:16,21
**biology**
40:2
**biotech**
112:24 113:7,12
114:5
**biotechnology**
11:1
**bit**
43:23 68:24 71:3
84:11 109:6 129:4
130:25 131:17
**Blake**
42:21 119:23
**blaming**
114:8
**blank**
127:23
**blue**
134:4
**body**
56:21,24 84:15
86:19
**bonus**
51:3
**book**
88:16
**booked**
62:13 64:11
**bother**
116:13,18
**bothered**
113:8 116:22
117:24
**bothering**
30:21
**bottom**
98:8,11 127:18

128:1,12 132:12
134:24
**bounced**
50:3
**box**
89:3 104:10,13
**boxed**
91:1
**boxes**
90:24
**branch**
115:20
**break**
6:17,19 63:6,12,13
101:11 118:14
135:3
**breaking**
109:11
**breaks**
89:21 137:24
**briefly**
7:22 8:1 62:11
64:9
**bringing**
31:1
**broke**
106:12,13,15
109:5
**broken**
107:2,18
**build**
13:25
**building**
50:4 108:19,21
116:25 118:1
**business**
7:6 9:6,10,12 10:4,
5,24 14:15,20,25
15:6 20:23 31:8,
14,24 32:16,17
37:25 42:12 47:20
49:7 54:8,16
55:12,14,16,18
67:21 71:6,14,16,
23,25 72:5 87:5,8
88:16 102:9
**businesses**

11:6
**buy**
62:8,15 63:3 64:6,
13 65:1,8,12,17,
20,22 66:18,20
74:9,15 78:13

————————

**C**

**call**
7:4 9:24 11:12
19:6 85:20 88:25
89:1 111:7 112:1,
2,6,7
**called**
5:2 7:25 8:6 11:1
25:2 36:22 37:6
45:17 57:11,20
85:12
**caller**
111:18
**calling**
37:11 129:16
**calls**
111:12,24,25
112:9
**camera**
81:11 86:2 102:4
**cancel**
56:25 57:21 58:25
59:2 79:3
**cancellation**
57:3 58:24
**cancelled**
57:8
**candidate**
17:7
**car**
62:18,20 64:16,18
65:24 66:7,11,12,
13,18,21,23 67:3,
4,5,9,11,16 89:11
**career**
55:23
**carefully**
136:7
**Carolina**
88:14

**carpool**
67:9
**carried**
55:13
**cart**
62:7 63:3,5 64:5
65:1,3,10,13
**case**
5:11,13 32:10
48:13 57:19 74:11
99:14 100:4
113:18 114:6,7,9,
21 115:3,15,19
126:21 127:2,5
132:9 134:12
137:23 138:1
**cash**
65:23 66:20
**catastrophic**
122:23
**catch**
55:1 109:6
**category**
10:25 11:1
**Caucasian**
73:15 78:8 79:15,
18,25
**caused**
115:9
**caution**
136:4
**Cavenee**
135:8
**cell**
42:10,13
**cells**
40:6,7,9,10 42:11,
14,15
**centrifuge**
121:7,10,13 123:8,
10,15 126:2
**CEO**
11:11,12,15,17,18
**certified**
5:3
**cetera**
22:24

**chair**
50:3
**chance**
43:14 49:18,23
93:11 117:7
**change**
44:11,13 78:24
105:23,24 115:22
**changed**
44:22 123:25
**chapter**
103:16
**characteristics**
29:15 30:11,13
**charge**
25:4 57:18 71:12
124:11
**charges**
29:10
**charging**
19:17
**chat**
89:3 104:13
**check**
42:12 75:11,13,14,
15,17 76:1
**checks**
75:20 76:5
**Chief**
11:19
**childbirth**
29:22
**China**
75:6 77:7,8
**Chinese**
88:1 91:20 92:3,22
93:3,8 94:9
**choice**
49:10,15
**choose**
17:6 28:2
**chronological**
62:4 64:2 68:4
**circumstances**
9:9 33:23 34:3
84:24 85:1 105:22
135:16



**Civil**
8:11 26:23
**claim**
26:5 65:17 137:2
**claimant**
103:1,3,6,7,15,18,
21,25 122:18,21
**claimant's**
103:8,13,21
**claimed**
67:17 74:7 75:5
76:10 79:18 116:9
120:25
**claiming**
48:23
**claims**
33:18 66:17 74:24
135:12,23 136:15,
20
**clarification**
91:17 97:7 105:7
**clarify**
6:6 98:15
**clarifying**
70:24
**clarity**
61:11
**Clarksburg**
7:13
**clean**
13:24 110:9
**clear**
66:22 68:24 72:2
125:10
**client**
131:19 135:25
136:1,19 137:12,
14 138:7
**client's**
135:12,22 136:15
**clone**
18:17 19:14 20:3
**cloning**
13:6 18:15,17
19:6,14 72:11,15
**close**
62:9 64:7 109:1

**clump**
42:14
**COBRA**
57:12 58:10
**color**
29:23
**Columbia**
62:13,14,24 64:11,
12,22 65:16
**comfortable**
30:25 54:5
**comments**
80:15,18 93:10
94:2
**commitment**
27:3
**committed**
26:20,22 27:8
29:17
**common**
59:10 93:12
117:23
**communicate**
21:25 37:5 42:7
89:13,18 101:16,
21 107:12,25
117:16
**communicated**
107:23 110:25
111:23 115:25
**communication**
89:19 90:2 107:8
108:1,3 109:23
**communications**
89:23
**companies**
112:25 113:8,12
114:6 116:5 117:8
118:4
**company**
9:6,21 11:10,22,23
14:2 22:2,21 23:3
25:21 27:4,5 28:11
29:3,7,8 30:6,8
31:2,7,11,14,15,
17,21,22,23 33:14
34:18 39:18 45:5
51:14 54:11,14

71:25 80:7 98:6
117:20 124:12
134:16
**company's**
10:10,13 22:22
27:10 29:14 30:5
**compare**
130:21
**compensation**
16:15,18 35:24
**competitor**
33:12
**complain**
42:5 48:9 54:23
72:3,9 115:11
**complained**
36:15
**complaint**
32:2,4,5,6,9,11
42:13 50:7 52:10,
21,24 53:2,3,13
54:10,13 71:24
72:3 103:16,19
**complaints**
29:7 30:15 32:18
48:7,18,20 49:1
52:6,8,14 53:8
54:3
**compliance**
26:22 27:8
**computer**
83:9 108:9,16
110:21 127:9
134:21,22
**concern**
30:22 76:24
**concerned**
122:22
**concerns**
31:3 76:20,23
77:23 78:2,6 79:11
116:7
**concluded**
139:13
**condition**
42:12
**conditions**

22:24 29:23,25
42:13
**conduct**
15:8 22:2 23:9,12,
20 24:11,20 32:8
75:11 103:22
133:1,15
**conducted**
5:23 15:22 16:1
22:4 23:1,23 24:21
32:1 48:3
**confidentially**
28:25 29:11
**confirm**
5:14 11:14 20:21
43:19 44:10 47:18
53:3,12 58:6 59:11
61:14 67:25 71:1
78:2 81:9 84:5
89:16 94:4 97:16
98:17 104:1 107:3
120:19,23 123:8
124:9 125:23
126:1 127:17
136:13 137:16
**confirmed**
120:24
**confirming**
110:24 119:2
**conflict**
33:10,15,25 34:1
**Conflicts**
33:2
**confused**
68:25
**consequences**
24:24 50:13
**considered**
16:21 31:7,10
**constitute**
33:7 34:4,25
**construction**
13:24 19:13
**contact**
31:16,18 80:25
81:4 83:11,14
107:7 111:7

**content**
90:9
**contents**
114:18 119:16
**context**
130:11
**continue**
43:12 56:9 61:7
67:16 69:15 92:14
**continued**
116:6
**continues**
81:19
**contract**
14:1,3
**contractor**
51:23 74:11,18,20,
22 78:12
**contractors**
13:20 51:22
**contradictory**
106:20 120:21
**contrary**
120:25
**contributions**
25:24
**control**
23:4
**conversation**
50:5 56:4 87:15
88:23 100:8
104:14
**conversations**
49:25 80:14,17
136:5
**copies**
75:20
**copy**
28:5 72:18 134:6
137:1,6,7,17 138:7
**corner**
66:19 127:18
128:12
**corporate**
8:14 12:10
**corporation**
8:14



**correct**
43:21 44:4,16
53:11 67:3 124:20
132:25 139:4,8

**corrected**
21:12

**correction**
48:8

**correctly**
48:15 97:17

**cost**
74:10,16 78:14

**Counsel**
53:20 70:20

**country**
79:20

**couple**
47:24 60:19 66:2
113:9

**court**
5:16

**coverage**
57:11,16 58:4,8,20
78:25

**covered**
15:20 74:8,24

**covers**
67:24

**coworkers**
26:21 27:6 48:19
67:20 119:19

**crack**
42:25 121:22
122:7

**cracked**
42:23 43:6 121:17

**create**
80:6

**created**
129:10

**creates**
33:15

**creed**
29:23

**criteria**
17:6

**cross**
72:6,8

**crying**
67:18

**culture**
18:19 40:5 49:12
50:17

**cultures**
40:6

**current**
7:5,14

**cursor**
33:5

**customer**
20:4 43:9,16 44:7
45:3 52:17 71:11
72:14 76:25 78:5
83:6 115:11
124:19,25 125:15
132:7,9,14 134:3,
7,8,9,12,18,20

**customers**
11:24,25 30:9
43:8,15

**cut**
130:25

**CV**
113:20,22,23,25

**cycles**
57:17 58:11

———————

**D**

———————

**dangerous**
43:2,5

**dashed**
50:3

**date**
22:9 38:5,6,8,12
55:9 57:4 66:16
95:18 97:8 107:19
128:10

**dates**
61:12 77:22
111:14

**day**
16:6 36:3 41:14
45:12 62:11,15,23

64:9,13,21 65:16
67:7,9 69:16,17
78:14 80:6 95:23
121:18 123:15

**day-to-day**
10:10,13 71:2,9

**days**
107:9 112:3

**dead**
42:15

**deadline**
20:4 52:17

**deal**
43:15,16 134:7,8

**December**
43:17 44:7,22 45:2
46:24 77:25 78:1
83:5 95:18,20,21
97:21 98:21 99:2
123:2 134:20

**decide**
50:15 108:15

**decided**
38:8 106:1

**decision**
32:13

**declined**
103:8 106:18,22
113:10

**declining**
105:25 113:17

**deduction**
26:2

**deductions**
25:20,22,25

**Defendant**
8:15

**defendant's**
20:6 59:16 81:18
94:12 119:1 127:2

**Defendants**
21:17 25:15,17
26:13 28:20 30:17
32:25 56:11 60:4
68:9 69:19 95:6
97:12 102:24
103:10 128:3

**Defendants'**
68:7 102:11
127:11 130:5,10

**define**
13:23 16:17 60:21,
25 69:10 81:3 95:4
99:7

**defined**
125:8

**definition**
97:7

**degree**
17:4 46:5,16,19
74:1 75:5 76:15,
16,17 77:1 103:4
135:19

**degrees**
46:1,3 47:6,15
72:25 77:2,19

**delay**
122:21

**delays**
22:10

**delete**
108:9,15 109:4,9,
16,22 110:3,11,13,
15,20

**deleting**
109:24

**deliver**
62:17 64:15 67:10

**deliveries**
108:21

**dental**
57:15 58:25 74:8,
9,15,23 78:17

**department**
15:1 18:13,22
19:9,11,23 44:15
48:24 49:19 76:13
115:2

**departments**
18:23,24 19:2,3,4,
6 23:4 44:12,22
71:20 72:11
125:13

**departure**
135:17

**depend**
22:21 32:4

**depending**
19:3 22:5 78:24

**depends**
18:11,12 26:2
36:12 44:19 71:22

**depose**
8:13

**deposed**
9:2

**deposition**
5:18,23 7:17,21
8:10 9:13 20:18
39:8 56:17 59:21,
24 60:2 63:21 82:9
87:18 90:18,21
94:18 101:13
102:22 118:23
119:13 135:7
139:13

**describe**
8:2,7 31:25 41:23
60:9 94:20 95:1
105:22 114:18
119:15 121:13
128:4

**describing**
123:10 138:6

**description**
40:11,13

**design**
18:16 19:13 20:2,3

**designee**
8:15

**designer**
19:24

**desire**
101:25

**destroyed**
122:20

**detail**
8:2 41:23 52:15

**details**
29:3 88:22

**determination**
33:24



**determine**
14:16 35:17 59:2

**determined**
34:2

**determines**
58:15

**determining**
16:21

**develop**
60:21 97:4 98:14
106:23

**developed**
69:8

**dialogue**
22:1

**difference**
129:4,18,23,24

**difficult**
83:17

**direct**
12:22,24 13:2,7,8
23:8,11,20 24:12,
13 45:8 48:10
71:19 83:7 128:11

**directly**
12:6,11 19:17
24:13,21 31:18
38:22 54:8 78:3,5
113:3 116:2 134:9

**Disabilities**
26:25

**disability**
29:25

**disaster**
42:22 121:21

**disciplinary**
25:2 33:8 34:4,25
35:2,3,4,5,11 52:1,
4 134:5

**discipline**
35:8 131:14 133:2

**disclose**
33:7,22 34:3,21,25
99:11,14,19,21,24
100:7

**disclosed**
99:10

**disclosure**
34:15

**discovery**
8:22 41:25 43:25

**discrepancies**
78:7

**discretion**
22:20

**discriminate**
103:24

**discrimination**
26:10,24 27:5
36:16 135:23
136:16,21

**discuss**
16:7 20:24 30:23
31:12 81:23 88:21

**discussed**
7:17 49:24 50:20
54:2 68:10 70:25
71:20 98:24
125:12 126:2
133:10,15 135:21
136:14

**discussing**
16:8 114:4

**disparity**
79:6,10

**disrespect**
92:10

**disrupted**
94:1

**distillery**
62:13 64:11 67:8
88:13,20

**distinctive**
72:7

**distort**
129:16

**disturbing**
115:5

**doctor**
75:6

**doctor's**
76:15

**document**
8:3,7,9 20:13

25:16 59:17 93:16
94:15,20 95:1
102:14,18,21
114:1 127:19,20,
21 129:20,25
130:12 133:1,2,13
136:11,23 138:8,9

**documentation**
58:2 125:13 126:5
134:24

**documentations**
42:1

**documented**
48:21

**documenting**
123:14

**documents**
7:20,23,24 8:18,
19,24 44:1 58:24
60:9 76:4,5 94:8
108:9 109:4,9,17
110:4 119:9,11,15,
16 125:16 126:21,
24,25 127:1,7,8
129:21 131:5
132:1 133:11,14
134:4 135:20,21
136:1,13,18,19,22

**documents'**
133:7

**dollars**
60:13

**domestic**
30:1

**donation**
61:22 67:13 69:12
70:6 117:3

**donations**
118:1

**Doreen**
63:11,23 118:18
138:19

**draft**
20:23 52:15 53:2
96:1 98:12 120:9,
11,12

**drafted**
20:21 24:14 95:17,

20,22,23,24 96:17
98:16,17,18 120:5,
7,13,14,16,17

**drafter**
96:3

**drafting**
28:1 120:2

**drive**
7:8 31:19 66:12,
23,25 124:4
127:10 129:3,9,11
133:11,18,19,20

**driving**
66:19 67:16 91:10
92:3

**drug**
75:12,16,23

**due**
61:21 124:3 130:1

**duly**
5:2

**duties**
19:10,19,23 22:6
25:6 40:3 45:19
72:8 76:11

**duty**
16:23 18:21 74:5
76:12

---

**E**

---

**e-signature**
134:2

**e-signatures**
134:1

**earlier**
12:3,10 19:5 21:2
27:12 31:20 35:19,
25 48:6,17 51:7
53:25 54:1 70:18
71:18 72:23 73:12
76:6 85:4,8 96:13
98:16,24 111:22
116:7 121:8
124:18 125:12
132:23 133:10

**early**
60:19

**earnings**
26:3

**earns**
17:4

**easier**
134:23

**Eastern**
63:17

**economic**
22:24

**editing**
129:1 131:24

**educational**
75:10,13

**EEOC**
115:20

**effect**
99:1,3

**effective**
29:8 57:2,22

**efficiency**
115:12

**efficiently**
6:20

**effort**
22:8

**elaborate**
65:4,7

**electronic**
36:11 95:8 124:2
126:16 129:13
132:3,5,15,17
134:7,13

**electronically**
95:15 132:21

**email**
20:24 37:5 56:14,
15,18,20,21,22,24
57:4,5 70:12 108:1
112:15,17,25
113:2,4,13,19,21,
22 114:2,8,10,15,
16,18,20 115:16,
24 117:15,16
118:9

**emailed**
63:5 65:3



**emails**
110:5 112:12,17
113:14 114:3
116:4 118:8

**embarrassing**
137:20

**employed**
39:17,22 55:3
98:21 106:19,23
117:14

**employee**
12:8,17,19,22,23
13:3 14:8,16 16:6
20:24 21:1 23:7
24:1,3,21,23 25:8,
12 30:7 33:12,20
34:7,11,20 35:17
36:1 38:9 41:14
45:11 46:8,10
51:13,17,22 54:4,5
57:1,10 58:7,9,12
73:6 74:5,18,19
75:8 79:17 87:4
117:20 120:12
121:2,4 127:4,7
128:6,7 133:20
134:3,17

**employee's**
16:22 22:22,23
33:13 35:20 59:5
72:4

**employees**
10:16 12:4,6,7,11,
12,15,21 13:9,18,
19 14:5,6,10,12,22
15:9 17:12,16,19
27:5,13,14,17,20,
22,23 29:19 31:9,
16 33:6,9 36:5,15
40:23 41:1 45:9
46:7,20,21 48:4,7,
8,9,11,12 51:9,10
52:8 54:2 57:13
58:1,3 67:21 72:1,
18,24 73:2,4,11
76:9 78:8,9 79:15,
16,18,19,23,24,25
80:1 98:10 100:12
120:6,7,8 134:1

**employer**
113:4 118:9

**employers**
115:7 116:21
117:13 118:7

**employment**
26:24 27:1 35:9,14
38:6 39:4,23
41:12,20 47:23
49:3,6 51:2,4,8,25
52:7,9,12 53:7,14
54:24 55:19 57:16
58:4 59:3,5,8 61:2,
9,10,20 66:14
76:19 77:14,15,20
78:11 85:5,9,15
86:16,19,21 88:7
89:25 90:6,7,8
96:15,18 101:17,
18,20 103:21
106:4 112:13,17
119:21 125:9
126:8

**empower**
21:25

**encourage**
29:18 31:3

**encouraged**
103:6

**end**
29:14 38:13 43:17
44:6 45:1 51:15
55:10 56:5 57:7,
20,24 58:19 60:20
66:15 77:24 80:3
83:4 114:22 135:1

**ended**
52:9 53:14 59:5
85:6,10,15 96:15
112:13,17

**ending**
96:18

**ends**
26:20 28:25 30:19

**engage**
103:22 116:2

**English**
87:21 88:8 89:2

91:11,21,23 92:2,7
104:14

**enroll**
57:12 58:9

**entail**
9:7 41:24

**entails**
8:7 71:4

**enter**
103:8 106:5 137:7

**entered**
116:25

**entire**
88:23 91:2 104:14

**entitled**
35:18

**entry**
17:23

**environment**
29:18 67:19

**equal**
26:23 27:1 80:5

**equipment**
124:10

**estimate**
6:14 112:16

**ethnicity**
73:2,4

**evaluate**
24:13 77:6

**evaluated**
47:22

**evaluation**
18:1 21:24 22:4
23:7,25 24:5,7,8,
12,16,17,19,24
25:3,7 35:20,23
48:1 77:16

**evaluations**
21:15 22:3,9,11,
15,18 23:5 24:20
48:3

**evidence**
32:6,7,9 108:16
109:25 112:4
127:3

**evidences**
114:24

**exact**
50:6 62:23 64:21
70:1

**examination**
5:6 8:14

**examined**
5:3

**examples**
58:18

**exceptional**
120:22

**exchange**
60:24 61:22 113:5

**exchanged**
88:5 110:5 113:13,
14 117:15

**excuse**
24:2 65:5 123:9
126:5 130:5

**execute**
20:2

**executes**
40:21

**executive**
11:19

**exemptions**
26:5

**exercise**
33:14

**exhibit**
20:6,11 21:18
25:16,18 26:13
32:24 56:11 59:15
68:7 81:13 82:13
83:17 84:3 87:10
89:17 90:10 94:11
97:12 102:10
103:11 104:5
106:11 111:3
114:11 119:1,4
122:13 127:11,13
130:4,10,18,19,22
131:10

**exist**
21:8 70:20 76:4
100:11 124:7

**existence**
96:11 99:21,24
125:2,5

**exists**
33:25 53:21

**exits**
135:8

**expand**
71:3

**expect**
99:13

**expecting**
133:19,22

**expensive**
65:10,21 78:16

**experience**
17:4,5,8,9 75:10
77:2 93:14

**experienced**
76:9

**explain**
49:13 74:2 78:10
83:2 105:24
106:21 115:4

**explained**
68:16 77:18
112:20

**exposed**
103:17

**exposing**
86:15

**express**
79:14 80:8 101:25

**expressed**
103:2

**extent**
21:7 53:20 70:20
76:3 112:8 123:19
124:7 126:11

**extract**
137:5

**extremely**
43:5

**eyes**
89:5



**F**

**fabricating**
114:21

**face**
92:13

**facilitate**
117:7

**facilitating**
113:11

**fact**
123:6,7

**factors**
16:21 17:3 22:12,
21

**facts**
5:12 33:7 34:4,25

**failed**
52:24 110:2
122:21 138:2

**failure**
33:7 34:3,24 42:6
52:16 92:9

**fair**
67:23

**fake**
77:8

**fall**
72:12

**falsified**
114:8 115:14

**familiar**
9:19 20:19 26:14
28:20 33:1 36:19
119:9,10

**family**
14:7

**fast**
60:6

**faster**
6:21

**fault**
117:11

**favor**
79:18,24 80:1

**Favorable**
22:18

**favored**
79:14

**February**
59:13 62:5,11,23
63:4 64:3,9,21
65:2,9 66:15 68:6,
8,10,14 70:14
106:12,16 107:1,6,
19 114:23

**federal**
8:11 25:23 27:8
28:2 30:2

**Fedex**
108:21

**feel**
30:25 31:1 54:5
66:8 89:5 92:9,17
105:3 137:20

**felt**
67:15 84:18

**Fifty-four**
47:14

**file**
57:23 59:2 129:8,9
132:23,24 133:8,
12

**fill**
24:4 132:10

**filled**
52:20 53:13

**final**
32:13 41:22 138:4

**finalize**
20:25

**finally**
62:19 64:17 66:3

**financial**
22:22 61:21 69:12
97:2 116:10

**find**
17:9 32:3,6 42:14
43:24 53:19 56:11
69:13,22 70:11
76:2 112:2 116:9,
18,21 117:7 118:3
123:21 124:6

126:14,17

**finding**
113:11

**fine**
5:9 6:7 63:14,15
101:12 138:11
139:12

**finish**
6:22,24 105:20

**fire**
49:17

**firstly**
88:4 132:10

**five-minute**
101:11

**fix**
79:6,10

**flow**
20:2

**fluctuate**
14:6

**focus**
71:10,14,16

**folder**
110:10

**follow**
42:6 77:20 122:8

**follow-up**
50:14

**font**
128:15,16,19,24
129:3,6,16,18,23,
25 130:2

**footage**
81:11,14 82:6,11
83:7,10,12,13
102:3 116:15
136:23 137:15,17
138:5

**footages**
116:24

**force**
65:20 66:11

**forced**
62:9,22 64:7,20
65:5,6 137:11

**forcing**
86:18

**Forcino**
119:24,25 120:1

**Forcino's**
122:9

**forever**
107:7 109:21
137:3

**forgot**
47:9 56:6 107:10
111:25 112:14

**form**
9:24 23:25 24:4,19
25:2 52:15,20
53:2,12,17,18,21
125:18,19,20,22

**formal**
16:15,17 53:2

**formality**
34:18

**forms**
24:8 26:4 40:19,
20,21 108:1

**forward**
31:3 37:1,12 60:5
81:24 92:5

**forwarded**
8:19

**foster**
22:1

**found**
92:10

**fourth**
111:9

**Frederick**
7:8

**free**
29:20 31:1 57:10
58:4,20

**frequently**
15:25 45:4

**Friday**
108:13

**friend**
103:5 106:15
113:3

**friends**
61:1 69:10 85:12
95:2 100:23
112:24 117:9
124:23 132:22
133:2,16,17

**friends-with-
benefits**
98:10

**front**
67:12 83:9 89:11
131:8

**full**
7:2 83:18

**full-time**
41:15

**fully**
33:22 101:23

**function**
40:22 41:7,11,17

**functions**
15:3

**furnish**
26:3

**future**
22:17

**G**

**gain**
108:17

**Gastley**
42:21 119:23

**gathering**
126:20,23

**gave**
49:18 55:16 57:9
58:3,11 82:10
93:11 134:5 138:8

**gender**
29:24 80:23

**gene**
11:24

**general**
11:10,13,14,16,21,
22 12:16 14:11
18:12,20 22:24



24:14 32:11 34:17
71:11

**generate**
132:3,5,15

**genuine**
29:19

**gestures**
5:20

**girlfriend**
98:2,3 104:3
105:15,18 106:1,8,
18

**give**
43:14 52:22,23
53:1,11 55:15,18
58:17 66:3 78:19,
20 81:14 91:6
93:10 94:2 97:2,18
119:6 122:9
127:20

**giving**
52:15 53:4

**goals**
22:17

**good**
17:6 33:14 42:11
89:4 92:11 117:19,
22 120:22

**goodnight**
88:17

**Google**
31:18 127:10
129:3,9,11 133:11,
18,19,20

**graduate**
46:6

**great**
121:24

**greatly**
116:13,14

**Grimm**
47:1 73:23,25
74:6,20

**grounds**
33:7 34:4,25

**group**
13:6,7

**group's**
24:7

**groups**
13:5 19:1 49:17,20

**grow**
40:6 42:11

**guarantee**
22:19 35:23

**guess**
105:23 111:7
118:10

**guideline**
16:16,18

**guidelines**
23:14

---

**H**

**half**
23:5,17 56:8 61:9

**half-year**
23:19

**handbook**
15:19,21 16:4,8,9,
11,12 20:15,22,25
21:1,2,8,14 22:25
23:2 24:15,16,20
25:11,14 26:10,16
28:1,3,5,7,12,15,
17 30:14 32:21
34:16,18,24 35:25
36:5,9 50:21 54:1,
4,7 72:16,18 77:21
98:24 127:5,7,17
128:6,9 132:24
134:5

**handed**
60:1 134:4

**handle**
15:6 18:19 40:5,6
50:17 100:4

**handled**
115:19

**handles**
15:3

**handling**
32:18

**hands**
81:6

**hang**
62:20 64:18

**happen**
34:20,22,23 54:19
126:14

**happened**
42:25 55:2 61:2,18
62:12,25 64:10,23
66:15 68:18 77:10
80:7,10 86:20,23
91:5 106:6 107:13,
14 113:21 121:20,
22 123:20 124:15,
25

**happening**
37:8 69:4

**happy**
138:22

**harass**
103:24

**harassed**
29:2 66:5 67:14
85:3 102:5,9
116:23 137:12

**harassment**
28:18,21 29:6,10,
20,21,22 30:4,7,
10,15 31:21 32:5,
18 33:18 36:16
54:1,23 85:20
135:23 136:16,21

**hard**
13:5 28:9 42:6,7
43:11 124:4 134:6
138:2

**hardship**
61:21 69:13
116:10

**harm**
121:24

**harvest**
40:10

**head**
5:20

**headache**
50:2,13

**health**
57:1,7,10,15
58:12,25 74:7,9,
15,23 78:12,16

**healthy**
42:12

**hear**
86:5 102:15
109:12,13 137:24

**heard**
6:9

**held**
17:15,20 46:1,4,16
47:6,15 72:24
73:25

**hesitation**
101:16,21,23,24

**heterosexual**
80:22

**hide**
99:12

**high**
43:4 121:23

**higher**
43:10 74:1,2 103:6

**highly**
44:18

**Hill**
7:8

**hire**
13:21,24 14:3,12
15:13 28:8,15 36:2
39:17,19,22,24
40:2 43:20 44:17
45:11 51:12 70:5
73:6,10 112:20,22
113:9 116:10
117:4,5 118:2,11

**hire's**
75:9

**hired**
38:4,9,15,21 40:1
44:14,15 45:9,18
46:7,8,20,21,24
47:8,9 72:24,25
74:20

**hires**
41:6

**hiring**
38:20 73:9

**history**
132:25 133:8,12

**hold**
17:13 77:1

**Holding**
81:6

**hole**
129:19

**holes**
129:15

**home**
7:6,7 62:17 64:15
65:17 67:10,12

**homosexual**
80:22

**honest**
32:10

**Honey**
92:16

**honor**
109:21,23 110:2

**hotel**
62:14,24 64:12,22
65:15 68:19 69:14,
16 70:8,19 136:24
137:8

**hotels**
70:12

**hour**
56:8

**hours**
40:24,25 41:14,16
62:21 64:19 66:2
108:20

**house**
89:11

**hug**
85:2,18

**hugging**
81:6

**human**
15:1,3 16:19

**human-resource-
related**
16:5



**human-resources-related**
15:8

---

**I**

---

**ID**
111:18
**idea**
24:11 30:22 93:15 94:7,9 96:1
**identical**
130:23 131:11
**IDS**
111:7
**illicit**
103:15
**image**
134:15
**imbalance**
121:22
**immediately**
15:14,18 16:6 29:8 33:22 36:3 59:7,13 68:19
**impair**
33:13
**impairs**
33:13
**important**
5:19,24 15:16 25:13 77:9,19 129:7,18 130:3 135:12,15 136:1 137:9
**impossible**
79:16
**improperly**
122:18
**improve**
49:9,11,14
**improvement**
22:16 25:9 49:3,6
**inaccuracy**
92:24
**inaccurate**
123:5

**incident**
29:2,4 53:5 111:1 121:7,8,10,13,20, 25 122:1 123:8,10 124:15
**incidents**
121:12
**include**
15:12 19:23 25:11 26:10 28:2,15,17 129:9
**included**
24:16 28:12 97:11 108:20
**including**
16:4 17:3 26:21 27:6 30:8 45:6 109:23 110:6,7,8 115:6,9 138:3
**income**
25:23 103:3
**inconsistent**
128:25
**increase**
22:19,20 35:18
**indeed.com**
17:1 37:4,11,13
**individual**
45:14
**individuals**
29:4 47:19
**industry**
11:2
**information**
26:3 31:16 102:20 109:22 110:5,20 114:9 115:15 124:1 132:24
**initial**
26:18 41:2,5 42:1
**initially**
62:16 64:14
**initials**
125:19,22
**initiative**
22:13
**ink**

134:4
**inquire**
115:14
**insert**
134:23
**inside**
23:3
**instances**
105:5,17
**instructions**
5:13
**insubordination**
52:11,16
**insurance**
57:1,8,11,15,17,22 58:8,11,12 59:1,2 74:7,8,9,15,22,23, 25 78:12,13,15,16, 18,21,25 79:3
**intended**
22:15
**intention**
24:15 118:11
**interact**
45:4
**interaction**
84:2,19,20,22,25
**interactions**
106:14
**interest**
33:2,10,15
**internal**
23:14 24:7
**interpreter**
88:10
**interrupt**
91:15
**interview**
37:7,15,18 38:1,3 73:6
**interviewed**
37:21,24,25 74:6,7 120:8
**interviews**
38:2
**introduced**
21:6

**investigated**
29:11
**investigation**
29:9 31:25 32:8,14 102:8
**invoice**
71:11
**involve**
78:7 89:19,23
**involved**
9:16 10:10,13 27:3 29:4 30:6 33:20 34:8,12 45:6 71:2 99:14 126:20,23
**involvement**
33:11
**involving**
33:9
**iphone**
110:21 112:4
**issue**
14:7 31:2 36:6 38:6 51:9 53:16 68:20 131:20
**issued**
60:14 61:15 68:15 69:5
**issues**
12:15 48:20 71:15 129:2
**item**
122:16
**itemized**
25:25

---

**J**

---

**J-I-A-N-Z-H-A-N-G**
7:3
**Jacobs**
46:11 73:16,17 76:13
**January**
55:10 56:5,6 57:7 60:20 61:3,5 66:15 68:17 81:8,9,10 85:22,25 86:12

103:14 113:24 114:22,25 122:18 123:1
**Jeffrey**
7:4 99:15 105:10 136:4 138:10
**Jesse**
8:12 36:22
**jewelry**
62:8 64:6 65:9,12
**JIANZHENG**
5:1 139:18

███████
36:19 57:1
**job**
16:23 17:1,11,21 18:21 19:19 22:5, 6,13 25:5,6 30:19, 21 37:4 39:14,15 40:3,5,11,13,22 41:7,11,15,17 42:10 44:10,13 45:19,21 46:12,18 47:2,11 58:19 59:14 60:20 69:13, 22 74:5 76:11,12 85:13 90:1 95:5 97:5,9 98:14 99:8 104:17 106:9,24 107:15 112:19 113:11 114:25 116:9,19,22 117:7 118:3 125:8 132:9
**jobs**
14:3
**join**
132:8 134:9
**joined**
134:19
**judge**
119:19
**judgment**
33:14 77:18
**July**
8:16 37:3,8 60:12 61:5,6,8 68:12,17, 18 69:4,6,17 109:20 110:19



113:6,18,22
116:16 136:24

**jump**
84:1

**June**
61:19 62:1 68:11
69:19 70:4,8,9
113:6

---

**K**

**Kaiser**
56:23 57:1,20,21
78:17

**kill**
121:24 123:12

**kind**
21:24 43:11 61:1
89:3 99:11,20
108:1 110:5
115:13 134:2

**KIPHART**
20:10 53:23 63:6,
10,15,19 68:23
70:22 82:17 83:22
99:15 100:18
101:12 105:10
109:5 118:16,22
135:5 136:4
138:10,16,25
139:12

**knowledge**
6:15 19:20 22:13
25:10 100:22
101:6 104:15
115:16

**KP**
57:3

---

**L**

**lab**
15:15,16,17 40:7
42:25 43:3 77:4
88:25 115:10
121:24 126:18

**labeled**
82:14

**labor**
115:1

**Laboratories**
8:15 9:19,23,25
11:13 20:16 62:2
115:11 119:20

**labs**
15:15

**language**
21:15 22:25 24:16
25:11 27:7 30:14
31:6 42:7 87:22
91:2 127:24

**languages**
120:11

**large**
19:15 84:12

**lastly**
6:20

**latest**
21:13

**Lauren**
45:17,18 46:3
73:14 76:12

**law**
25:21 30:3

**laws**
27:1,9 28:2

**lawyer**
8:20 28:9,15
99:12,13,14 100:4
115:21 116:3
120:18 129:20
136:3

**lawyers**
115:22

**lead**
33:17

**leading**
135:16

**learn**
5:11 100:3

**leave**
49:22 55:6 56:3
62:18 64:16 65:24
66:10,18,21 67:11
85:19 91:9,13

93:22 97:5,9 98:14
125:8 137:8

**leaving**
89:10

**left**
50:3,13 53:9 69:14
92:22 93:11
113:24 114:22
115:10

**legal**
9:17 25:24 28:8,14
32:19 34:19 60:23

**length**
22:5,23

**Leslie**
119:24 122:9

**lesson**
100:4

**letter**
38:6,7 39:4 55:11,
15,17 76:19 77:14,
15,21 94:24
100:10

**lettering**
93:3

**level**
17:23

**level-two**
15:16

**liar**
120:23

**Liberty**
78:17

**lie**
55:5 86:20,23
102:7 114:23
115:14

**lied**
114:21 120:23

**life**
116:14

**Likewise**
6:23

**limited**
15:12

**lines**
29:16 103:12

**link**
51:14

**list**
12:7 31:9 35:5,6,7,
10,11 73:12
111:14,17,19
124:9

**listed**
27:9 35:3

**listen**
92:8,24 93:11

**listening**
50:2

**litigation**
9:6,10

**Liu**
8:12 36:19 37:1,2,
16,19 38:4,18
39:13 41:21 44:21
45:2,4 48:7,18
49:2,5,25 50:12,18
51:3 53:4,13 54:23
55:3,6,9,13 57:6
59:11 60:14,17
61:16 68:21 69:5,
20 70:15 75:15
76:20 77:22 79:5,
9,14 80:2,8,11,14,
18,25 83:3,12
85:22,25 86:12,16
87:7,11 89:13
90:3,11 96:3,14
97:19 98:21 101:4,
6,7,15 104:2,7
105:17 107:18,24
108:11,23 109:8,
14 110:25 111:4,
23 112:12,17
114:12 115:17
116:1,5 118:5,8
124:18 126:7

**Liu's**
39:2,17,22,23 40:3
44:10 47:22 51:8,
25 52:6 57:1 75:1
76:7,8 85:5,9
86:21 95:10,13
117:13,16 131:25
135:17

**live**
7:12

**lived**
7:10

**LLC**
8:15 9:23

**loaded**
122:18

**lobby**
55:14

**local**
25:23 30:3 115:19
127:9

**locate**
55:17

**log**
123:16,21 124:3,5
125:17 126:4,14,
15,16,17

**logistic**
71:16,23 124:12

**logs**
123:18 124:1,7,9,
14 126:1,3,7,10

**long**
7:10 11:4 35:5,10
51:20,21 56:19
59:25 62:10 64:8
81:21 116:15

**longer**
43:23

**looked**
124:17

**lost**
43:7,9 122:20

**lot**
17:10 18:21 49:10,
23 92:24 93:8
94:23 110:7 115:9,
22 116:13,18,24
124:15 137:24

**loudly**
67:18

**love**
92:9,11,12

**lover**
104:20



**lower**
76:8

**lunch**
118:14

_____

**M**

_____

**made**
22:8 40:9,15,19
42:14 43:8,9 49:2,
5 68:1 69:20 70:9,
14 77:16 78:9
83:11 92:9 107:2
115:12,14 138:9

**mail**
93:22

**main**
81:19

**maintain**
40:9,24

**maintained**
123:14

**major**
19:19

**majority**
87:20

**make**
6:21 16:9 20:3
22:15 25:21 28:4
31:3 32:13 36:6,8
41:4 48:14 52:19
62:22 64:20 70:6
72:20 77:12 80:2,
15,18 81:15 84:7
92:11,12 93:8,25
97:16 107:17
125:18 128:6,9
132:25 139:7

**making**
71:15

**manage**
72:14,15

**management**
29:7 31:22,23
56:22 71:6

**manager**
31:13

**managers**
22:2 30:8 32:15

**Mandatory**
25:20

**manner**
120:22

**March**
57:20 92:6 104:16
105:5,15 106:2,8,
14 107:13

**marital**
29:25

**marriage**
100:20

**married**
100:14,16,19
101:6

**Maryland**
7:9,13 46:6 65:16
115:2,20

**master**
46:19 47:7,16

**master's**
74:1

**match**
77:2,18

**matched**
74:4 76:11

**matter**
9:7 28:11 31:1
72:6

**maxi**
18:18 19:16

**Maximize**
84:10

**MBA**
55:24 103:4,5,7
135:19

**Meaning**
24:11

**means**
35:21 51:20 75:6
91:20 129:20

**meant**
85:11 107:3
111:18

**medical**
29:23,25 76:15

**medication**
104:24

**medicine**
104:24

**medicines**
105:3

**meet**
16:25 20:4 24:2,4
52:16 68:18,19
73:8 91:5,13 105:3
110:19 120:8

**meeting**
109:19 136:24,25
137:3

**member**
52:24 53:16 56:22
57:3

**members**
22:1 23:16 24:13
40:20 52:12
121:25

**memorialize**
52:20

**memory**
137:3

**mental**
29:24

**mention**
12:17 19:5 58:2
78:9 88:4 105:6,8
111:24 114:20
118:10 137:20

**mentioned**
8:25 12:5 19:2,9,
12 21:2 23:12
31:22 35:10,25
44:25 45:2 48:6,17
57:25 69:7 70:18
71:1 72:17 73:5,12
106:3 116:7,8
121:7,8 135:18

**message**
65:13 88:5 90:24
91:4 92:17 93:21
105:14 106:7
107:12 110:4

**messages**
87:14,20 90:3,15
103:15 104:6
105:14 110:23

**messaging**
89:14

**met**
55:13 69:5 101:4

**metadata**
129:9 132:24
133:6,12

**method**
36:9,10,11

**Michelle**
58:18

**mid-december**
124:20

**middle**
29:13 63:4 65:2,9
109:20 110:19
122:4 136:24

**midi**
18:17 19:15

**mind**
87:21 116:20
130:18

**mini**
19:15

**minor**
52:17

**minute**
81:24 84:4 123:11

**minutes**
63:15 82:20

**misconduct**
35:4 131:15

**misleading**
93:9

**missed**
111:12 112:1,6

**missing**
19:18 105:2

**mistress**
104:20

**modified**
129:10

**modify**
26:6

**molecular**
19:11 38:22 39:16,
21 40:2

**molecule**
15:13 17:24 18:2
19:14 38:16 39:24

**moment**
81:14

**money**
60:13,24 63:1
64:24 65:23 66:4
67:8 106:11

**month**
46:9 58:21 74:10
78:15 97:18

**month's**
57:14 58:20

**monthly**
51:12

**months**
50:24 51:16 57:10,
18 58:4,8,16 60:19
61:19 62:1 88:6
104:17 106:9
107:14 113:9

**moral**
33:18

**morning**
8:1 65:14 89:5
121:18

**move**
25:15,17 32:24
37:12 59:15 60:5
81:24 92:5

**moved**
44:7 45:3 124:18

**moving**
26:13 28:20 37:1
44:11 94:11
118:12

**mutual**
29:18



**N**

**names**
29:4 36:23
**national**
29:24 80:9
**nature**
9:14 16:18 32:4
39:14 66:5 85:11,
14,19 107:5
116:23 126:17
132:17 137:10
**nearing**
135:1
**necklace**
62:9,15 64:7,13
65:18,20 66:18,21
67:13
**necklaces**
63:2 64:25
**needed**
49:14
**negotiate**
17:3
**negotiating**
11:25
**night**
62:14 64:12
**nights**
88:16
**nods**
5:20
**North**
88:14
**note**
8:10 61:25 83:11
84:21
**notes**
93:13 104:13
135:3
**noticed**
5:24
**Notting**
7:8
**November**
42:19 43:18 44:3,6

45:1 83:4 122:4
123:2
**nudity**
110:8
**number**
8:12 14:6 15:16
26:5 103:20
111:10,12,15,17,
19 128:20
**numbered**
127:25
**numbers**
81:19 111:8

**O**

**oath**
5:23
**objection**
79:23 98:19
**objective**
29:9
**objectives**
22:16
**obtain**
77:7
**obtained**
75:5
**obtaining**
103:5
**occasionally**
13:22 14:2 16:7
86:25
**occur**
9:4 22:10 36:1
122:1
**occurred**
121:9
**October**
42:19 44:3 47:10
**offer**
15:14 52:3 57:14
58:8,23 70:5 74:13
79:4 91:13 93:16
97:1 98:2 106:22
**offered**
16:5 58:19 74:5

78:24 104:2
106:18
**offering**
78:25 116:20
**office**
12:15 13:1 48:22
53:1 66:13,23,25
67:1,16,20 69:25
70:5 76:2 85:21,24
86:1,3,6,12,16
102:4,6 108:8,10,
11,14,17,18,19,22,
24 109:2,14,18
110:3 111:1
115:20 116:12,17
117:1 118:1
126:18
**officer**
11:19 31:2,13,14
54:15,16
**officers**
31:7,9,10,17
54:11,14
**official**
38:12 79:4 125:16
**officially**
11:11,17
**older**
74:16 124:2
**onboarding**
76:5
**ongoing**
13:23
**Online**
15:23
**open**
86:3 100:20
108:19,20
**open-the-door**
12:14
**opened**
110:10 121:19
**operate**
9:21
**operates**
71:5
**operation**

27:4 30:6
**operations**
10:11,14 71:2,9
**opportunities**
27:2 80:5
**option**
36:13 54:7 67:15
**options**
54:6
**oral**
8:13 35:12 52:3
**orally**
52:25 109:20
**order**
12:1 20:1 22:1
62:4 64:2 68:4
132:7 134:10
138:22
**orders**
12:1 71:11,13
**ordinance**
30:3
**orientation**
30:2
**origin**
29:24 80:9
**original**
11:20 20:21 87:22
129:8,25 138:7
**OSC**
67:8
**outline**
54:7
**outlined**
128:8
**outstanding**
6:18
**overlap**
16:2
**overnight**
121:17
**override**
123:22,23
**oversee**
10:16 11:23
**overtrain**

15:18
**overtraining**
15:17
**overwrite**
126:15
**overwritten**
124:3
**owned**
11:4,6
**owner**
11:9,22 79:19
**owners**
10:2,3,8 45:6
**owns**
10:1

**P**

**p.m.**
101:13,14 118:23,
24 135:7,8 139:13
**pace**
23:4
**package**
128:5
**packaging**
13:6 18:18 19:7
40:4,8,16,17,19,21
41:4 42:3,4 43:20,
24 44:15,20 72:12,
15 121:15 122:3
125:18,19,20,24
**packing**
71:12
**pages**
128:25
**paid**
51:16,20 79:5,10
**Pam**
63:6
**Pamela**
5:10
**panel**
91:19,22,25 92:5,
6,14,18,20 93:3
94:2,3 111:8,18



**panels**
111:14,17

**paragraph**
21:23 25:19 26:7,
19 28:24 29:13,15

**pardon**
9:8 23:10 85:23

**parents**
74:8

**parents'**
74:24

**Park**
58:18

**parked**
67:12 89:11

**part**
16:5 21:18 25:14,
16,17 28:6,12
31:23 37:15,18
41:17 51:6 52:4
59:15 61:15 71:16,
17 86:18 87:11
90:10 91:1 93:25
94:12 102:10,11
103:10 104:6
110:17 114:11
119:1 121:6
123:24 124:12
127:1,5 130:5,10
137:22,25

**parties**
8:4 72:5

**partner**
9:12 10:4 11:10,
13,15,16,21 14:15,
20,25 15:6 20:23
24:14 28:2 30:1
31:8,14,24 32:16,
17 37:20,25 38:8
42:12 47:20 49:8
54:8,17 55:12,14,
16,18 71:7,14,16,
23,25 72:5 99:22
102:9 124:13

**partner's**
10:5 79:20

**partner/ceo**
14:11

**partners**
67:21

**party**
75:19 99:14

**pass**
40:20

**passed**
40:16 94:22 99:13
102:20 110:12
129:21

**past**
22:6 55:14 134:19

**pay**
26:23 51:9,10,13,
15,18,21 59:8
67:13 69:12 78:13,
15 79:6,10

**paycheck**
25:20,22 26:1
51:24

**payment**
60:14 67:25 68:14,
24 69:1,4,5,6,18,
20 70:13,14 107:2,
5

**payments**
60:16 61:14 62:3
64:2 68:1,15,20
71:13

**Paypal**
66:4

**payroll**
51:11,12,14,24
59:6,7,12

**people**
7:4 11:12 39:19,20
42:11 43:2 44:19
45:5 67:22,23
79:21,22 121:24
123:12 124:16

**people's**
131:21

**perceived**
30:12

**percent**
10:19,22,23 79:17,
22

**percentage**
10:18

**perception**
30:11

**perfect**
60:7

**perform**
19:14,16 22:8,13

**performance**
21:15,24 22:3,4,7,
11,15,17,18 23:1,
9,12,21 24:5,16,
21,23 25:7,8 35:21
47:22 48:3,9,23
50:1 52:7 72:4
77:3 92:11 98:1
115:9 116:7
117:13,17,18,20
119:20 120:20,24

**performances**
18:1 22:6

**performed**
75:15 76:12
120:20

**performs**
16:23 17:22 45:20
74:5

**period**
114:4

**periodic**
22:2

**Permanente**
56:23 57:2,20
78:17

**persistent**
116:9

**persistently**
113:16

**person**
15:5,23,24 23:23
24:6 30:12 36:12,
21 73:8 120:8

**personal**
32:22 33:10,11,16
55:13 96:11,13
98:25

**personally**
34:7,11 99:19

116:18 126:20

**persons**
30:9

**Ph.d.**
75:5,6 76:15,17
77:1,5,6,7

**philosophy**
75:6,7

**phone**
91:7,8

**phrased**
8:10

**physical**
29:24 80:25 81:3
83:11,14 84:2,19,
21 122:24 124:4

**physically**
103:18

**pick**
89:7

**picture**
134:15,23

**pictures**
110:6,7,8,9,10,11,
12,14,16,17

**place**
50:5 54:20 58:13
80:6 133:24,25
138:22

**plaintiff**
5:11 8:12,23 45:7,
13 48:23 52:12
53:7,9 57:13
60:12,13 61:22
62:7,12,15,22
64:5,10,13,20
74:14 76:11 83:5,8
84:18 92:21 93:4,
5,16,23 94:5,7,24
101:7 104:17
108:13 110:22
114:17 119:19
120:20,23 121:14
131:19 132:3,14,
18 134:19 136:10

**plaintiff's**
48:9 57:21 87:11
90:11 100:10

104:6 111:4
114:12 116:2

**plan**
25:9 40:8,9,16,17
55:23

**planning**
88:13

**plasmid**
19:15

**platform**
89:14,17 134:2

**play**
81:21,22 82:21

**played**
82:1,22 83:19
84:6,13

**pleasure**
92:11

**PO**
134:11

**point**
6:4,17 24:5 41:8,
12,20 44:9,11 49:3
69:1 84:1 86:21
88:5 101:20 102:1
103:20,23 107:14
110:1 113:5,24
115:17 117:19,21
122:25 123:6
124:21 126:8
129:17 130:2
131:21

**pointing**
127:25

**points**
114:21

**policies**
15:19 16:10 32:21
36:7 51:7 123:24
128:7

**policy**
12:14,16 26:11
28:18,21 29:14
30:5 31:21 32:1
33:21 34:6,10
47:25 48:1 50:25
51:1 54:2,20,21
57:9,11,12,25



58:6,10,16 71:24
77:12,20 80:6
97:23,24 98:25
99:1,3,9

**polish**
28:15

**poor**
24:23

**portion**
10:23 29:12 30:18
63:25 91:21 95:7

**position**
19:10 38:15 74:3
103:5

**positions**
12:7 17:12,15 22:6

**possess**
132:24 133:6

**possessed**
136:1

**possession**
126:12 136:20

**post**
17:1,10 37:3,4,5
39:15 46:18 129:2

**post-january**
99:25

**posting**
17:11

**potential**
33:10,15,25 34:1
75:9

**practices**
27:10 128:8

**pre-employment**
75:12,23

**prefer**
11:12,16 17:6,7
49:17 74:11 94:2
116:18

**pregnancy**
29:22

**preparation**
7:20 18:17,18
19:16 20:17 56:16
59:20,23 82:8
87:17 90:17,20

94:17 102:21
119:12

**prepared**
25:22

**present**
108:23

**pretty**
20:19 105:1 118:6

**prevail**
100:5

**previous**
17:8 56:3,25

**previously**
126:2

**price**
62:8 63:2 64:7,25

**primarily**
8:22

**prior**
6:19 7:12 9:16
39:23 96:18 97:18
115:24 122:22

**private**
90:2 110:20

**privileged**
136:6

**problem**
30:22 31:4 93:20

**problems**
22:7 33:17,19

**procedure**
24:25 52:25

**procedures**
8:9 128:8

**proceedings**
9:17 135:8

**process**
6:20 24:5 36:8
37:15,18 38:20
40:21 73:9 136:25
137:4,7

**processes**
75:9

**processing**
58:13

**produced**
53:22 127:5

135:22 136:15,22

**production**
11:23 12:2 20:7
21:9 53:21 59:16
68:8 70:21 76:4
81:18 87:11 90:11
94:12 102:11
104:6 111:4 112:9
114:12 119:1
123:18 124:8
125:17 126:11,21
127:2,12 130:5,10
137:22 138:1,5

**productive**
120:22

**professional**
34:19 88:10

**professionals**
28:8,14 32:19
60:23

**progress**
22:16

**prohibit**
30:10

**prohibits**
27:4 29:21 30:7

**project**
19:25

**promised**
69:11 110:20

**promoted**
18:1,5

**promotes**
29:18

**promotion**
25:4 35:18

**promotions**
22:19,20

**promptly**
29:2,10

**proof**
60:11

**properly**
50:17 52:25

**proposed**
103:3,7

**propositioned**
103:17

**propositioning**
105:18

**prospective**
117:12 118:7

**protected**
30:2

**protection**
98:12

**provide**
29:3 48:25 56:18
58:24 81:11 82:6
94:8 104:13
109:25 112:4,8
116:24 134:1
135:14

**provided**
36:1 78:16 94:5
114:1 116:14
126:21 127:1,3
136:2

**providing**
27:1 29:17 87:22
110:1 114:8 127:4

**pull**
20:5 31:20 51:7
53:25 56:10 68:1
83:1 87:10 118:25

**pulled**
81:16 100:23

**pulling**
56:7 81:13 90:10
104:5 111:3
114:11

**punch**
129:15,19

**punishment**
35:8

**purchase**
65:5

**purification**
13:6 19:7 42:2,18,
20 43:12,22,23
44:2 50:9 52:23
72:12,15 121:15
122:3 125:14,21,
25

**purpose**
24:19 60:16 95:3
97:8 117:2,21
120:18

**purposes**
70:10

**pursuant**
8:11

**pursue**
103:4,7 135:19

**pursuing**
55:24

**put**
25:8 80:6 132:11
133:19

**putting**
102:11

---

**Q**

---

**qualifications**
22:23

**quality**
22:12

**quantity**
22:12

**quarrel**
107:4

**question**
5:25 6:5,6,8,9,12,
22,25 11:20 12:9,
13 13:4 16:20
18:12,20 24:8
28:10 30:22 34:9
37:21 41:10 49:4
51:11 54:12 60:5,
18 63:10,24 64:1
68:5 71:7 79:7
86:4 89:22 95:9
100:18 105:10,11,
21 109:6 120:15
125:4 131:3 133:4
138:10

**questions**
5:15 6:18 70:24
118:13 119:8
135:2 138:12



**quick**
101:10 118:17
135:2

**quickly**
72:16

**quit**
55:8,9,21 57:6
58:18 59:14 60:19
85:13 90:1 95:5
97:4 99:8 103:4
104:17 106:7,9,24
107:14 112:19
114:24,25

**quitting**
55:19

**quotation**
11:25

**quote**
31:22 80:3

---

**R**

---

**race**
29:23 73:1,4,7,10,
11,14,16,19,20,23
80:8,12 103:25

**races**
73:8 80:1

**raise**
31:2 50:18 76:20
96:24

**raised**
77:22 78:2

**raising**
79:11

**range**
17:2 116:15

**reach**
109:20

**reaching**
53:1

**read**
8:17 21:20,21,23
22:24 25:19 26:6,
19 27:6,7 28:24
29:11,12 30:13,18
31:5,20 33:4 34:5
50:21 56:20,24

63:23,25 88:1,23
91:21 102:25
103:9,12,25
105:13 111:14
119:6 122:15
138:25

**reading**
87:21

**ready**
89:8 92:5,15 135:9

**real**
92:10 132:4,15
134:14

**realized**
69:21

**reason**
6:1 30:25 44:24
55:19,20 67:25
68:13 76:7 85:20
97:16 107:11
111:24 112:1,7
116:6 122:7

**reasonable**
28:6,11,16

**reasons**
44:21,25

**reassignment**
125:12,14

**recall**
27:17,23 37:10
39:2 45:9,24 46:1,
3,14,16 47:6,8,15
50:10 55:24 73:1,
3,11 75:1 77:22
85:21,24 86:7,18
90:9 96:3 121:9
122:6 124:21,22
132:13

**receipt**
70:12

**receipts**
70:19,21

**receive**
12:1 19:25 24:18
32:2,11,20 41:3,5
50:7,18 51:3,15,
18,21,23 52:1,10
71:13 94:24 100:9

**received**
8:23 51:19

**receiving**
42:13

**recess**
39:8 63:21 101:13
118:23 135:7

**recognize**
130:15

**recommend**
113:4

**recommendation**
116:21

**recommending**
115:7

**record**
5:18 7:2 8:5,13
11:18 20:12 25:20
36:25 39:6,11
48:25 60:10 68:7
87:22 90:25 94:21
97:11 114:19
119:22 123:24
124:4 127:16
136:25 137:4
139:8,9,10,12

**recorded**
5:21 16:7 92:8
102:4

**recording**
86:8 92:25 136:23

**records**
123:14,25 124:2
135:20,22 136:14

**recurring**
22:7

**redo**
122:21

**refer**
21:17 29:6 69:23
81:12 112:24
113:7 114:5
117:19,22

**referred**
117:8 118:5

**referring**
36:25 113:11
114:15 115:7

132:21

**refuse**
66:21

**refused**
62:16,18 64:14,16
65:10 67:11 69:23
92:19 96:25
116:11

**refusing**
96:25

**regarded**
92:20

**registered**
30:1

**regulations**
30:3

**relate**
135:22

**related**
21:15 25:11 29:22
30:15,22 53:13
71:22 78:6 98:25
136:15,20

**relations**
90:5

**relationship**
33:21 34:21 60:21,
22 61:1,15 69:9,10
85:5,9,12,14,17
95:4 96:11,14,23
97:4,7 98:8,9,10,
14 99:5,6,8,25
101:16,19,21
102:1 103:8 106:5,
23 107:5,20
109:21 110:18
125:8 137:10

**relationships**
29:19 32:22 33:17
80:15,19,20,22
99:1

**relevant**
33:22

**religions**
29:23

**remember**
9:11,15 27:15
35:6,14 38:10,13,

16 43:24 45:22
47:4 50:6 58:20
75:16 81:10 85:1
86:6,11,13,15
96:2,6 100:9
106:16 111:2
112:18 121:12

**reminder**
103:13

**remove**
66:11

**removed**
59:6,11

**rent**
7:14

**repeat**
6:6 17:17 34:9
41:9 49:4 54:12
79:7 80:16 89:21
125:4 133:4

**repeatedly**
113:17

**rephrase**
6:5

**replay**
83:16

**replicate**
131:25

**reply**
91:19 113:2 118:8,
9

**report**
12:4,6,16,24 29:2
34:13 38:18,19,23
51:15 54:8 71:21,
23,24

**reported**
12:11,17 32:5
129:20

**reporter**
5:3,16 91:17 105:7

**reporting**
5:17 54:2,5

**reports**
12:8 71:19 75:21

**representing**
116:1



**request**
37:9 77:12 96:25
113:10,18 134:25
138:5

**requested**
63:25

**requesting**
113:16,17

**require**
34:15 40:22 41:7,
11,14

**required**
20:4 25:21,24 36:5
40:25 75:11 99:10

**requiring**
46:18

**research**
15:13 17:24 18:2,9
19:10 38:17 45:22
46:13 47:3,12 73:1

**reservation**
70:12

**resign**
14:8 55:25

**resignation**
55:11,15

**resigned**
56:1 97:19

**resigns**
58:7

**resolved**
12:25

**resource**
16:19

**resources**
15:1,3

**respect**
29:18

**respectful**
29:19

**responding**
6:24

**response**
5:20 37:9,10 84:17
100:2,3 131:1
132:19

**responses**
5:19

**responsibilities**
11:9,21 18:8,10
72:8

**responsibility**
11:23 24:12 72:2

**responsible**
126:22 127:4

**restricted**
110:8

**result**
25:4 32:13 122:20

**resulting**
122:19

**results**
49:21

**resume**
113:3

**retain**
75:20

**retained**
115:17

**retention**
123:24

**return**
69:12

**review**
7:20 8:19 20:17,20
22:9,11 23:16
56:16,18 59:20,23
82:8 87:17 90:17,
20 94:17 96:4
102:21 119:12
121:1,3,4 131:4

**reviewed**
8:18 59:25 60:2
82:10

**reviewing**
126:20,24

**reviews**
22:3 23:1,9,13,21

**revise**
16:13

**revised**
72:21

**revising**
16:9

**rich**
65:11

**ridiculous**
80:4

**right-hand**
128:12

**Rights**
26:23

**rise**
35:23

**risk**
122:23

**road**
109:1

**Rockville**
112:25 113:12

**role**
18:10,11 38:22
45:18 71:8,10 73:1
124:19 125:3,6

**roles**
17:20

**romantic**
32:22 33:11,16
96:11,14,23 98:9,
25 99:5

**romantically**
34:8,11

**room**
13:24 67:20

**Rosario**
5:7,10 20:5,11,13
21:7,14 39:6,10,12
53:20,24,25 63:9,
11,17,20,23 65:4
68:23 69:2,3
70:18,23 76:3,6
82:2,15,18,19,23
83:20,22,24 84:3,
9,11,21 88:3,11
91:18 99:21
100:20 101:10,15
105:13 109:5,7,8
118:12,18,20,25
126:10,19 135:1,6,
9 136:12 138:4,12,

17,23

**routinely**
123:25

**RPM**
43:5

**rule**
131:15

**rules**
24:17 35:4 133:1,
15

**run**
51:12,24 52:24
121:16

**running**
15:15 43:4 112:24
121:23

---

**S**

---

**safety**
15:15,16,17 16:2
43:3 122:23

**salaries**
14:17 15:19 47:18

**salary**
16:22 17:2,3,11
22:19 25:5 35:18,
21,24 39:2,5,12,15
45:24 46:14 47:4,
13 50:21,24 59:9
74:1,2,4,12 76:7,8,
11,17,18,21 77:1,
10,16,18 78:6,10,
20,22,24 79:2
96:24 97:21,24
103:6

**same-sex**
80:15,18,20

**sample**
43:7

**samples**
43:9 122:19

**Samuel**
46:11 73:16,17
76:13

**Sarah**
47:1 73:23,25
74:6,7,17,20 79:2

**Sarah's**
78:11

**save**
134:16,17

**saved**
108:16 133:17
134:15,21,22

**scan**
129:16,22 130:1

**scanned**
129:14,20 134:14

**scanner**
130:1 134:14,15

**scenario**
79:1 106:14

**scheduled**
22:9

**scientist**
16:19 18:5 19:22,
24 20:1 28:14
129:5

**scratch**
100:7 105:23
126:6

**screen**
61:18 83:18,23,25
84:7,10 87:12,14
89:17 91:3 94:13
102:12 104:8
111:5 112:3,8
114:13 119:2
127:14

**scroll**
32:25 60:3,8 62:3,
6 64:1,5 69:18
95:6 119:5,7,16
130:14

**scrolled**
28:23 60:10 61:11
119:22

**scrolling**
68:9 103:10
122:14

**seconds**
81:25 82:20,21
84:4

**secretary**
129:6



**section**
26:14,16,18 28:3
33:1,6 118:12
130:14

**secure**
103:5

**security**
25:25 81:11 82:6
83:10 86:2 102:4
116:15,24

**seek**
124:8 138:5

**seldom**
93:21

**send**
65:6,13,16 66:20
67:8 90:3,9 103:14
112:12,15 113:3

**sended**
65:12

**sending**
65:9,23 115:24

**senior**
18:2

**sense**
59:10 77:12 93:8,
25 117:23

**separate**
38:2,3

**separation**
72:7

**September**
38:14

**sequence**
18:16 71:15

**sequencing**
19:16

**server**
127:9

**service**
22:5,23 43:16 44:8
45:3 71:11 72:14
76:25 78:5 83:6
124:19,25 125:15
132:14 134:8,18,
20

**service's**

132:9

**set**
24:17 39:12,14
47:20 97:7

**setting**
110:1

**severe**
121:25

**severest**
35:8

**sex**
61:23 91:8 99:5
103:25

**sexual**
29:21 30:1 33:18
54:23 85:20 90:4
103:22 135:23
136:16,21

**sexually**
66:5 85:3 102:5
103:23 116:23
137:11

**Shanholtz**
47:8 73:19

**share**
7:25 21:13 67:5
83:22 102:3
122:12

**shared**
7:24 129:13

**sharing**
35:16 122:10

**Shawn**
99:16

**shopping**
62:7 63:2,5 64:5,
25 65:3,10,13

**short**
47:24 69:22
118:14

**short-term**
14:3

**shortly**
36:2 103:1

**shot**
89:17 112:3

**shots**
87:15 112:8

**shouting**
67:1,18

**show**
61:17,18 63:4 65:2
82:12 83:8 103:14
110:6 127:23
128:17 137:10

**showed**
106:10 128:16
130:22 131:9
133:7

**showing**
58:2 85:3 116:15,
24 125:16 126:5,7
129:9 137:7

**shown**
130:15

**shows**
125:14 129:25

**sic**
103:17

**side**
76:14 129:15

**sign**
36:5,8,9,11 72:22
98:19 99:7 121:5
125:22 128:10
134:3,5 138:25

**Signagen**
8:15 9:19,23,24
10:1,8,18,24 11:4,
13 13:3,9,18,20
15:1,4,21 16:15
17:13,15,19 18:23
19:4 20:15 21:25
24:14 26:20,22
27:8,12,13,17,24
29:17,21 31:4,18
32:1,15 33:13
34:2,15,23 35:17
36:16 38:9 39:17,
22 45:10,12 47:23
48:11 49:6 50:19
51:4,9,25 53:9
54:2,24 55:4 58:6
59:6 60:20 61:9,

10,20 62:2 69:8,
14,23 71:3,5,9
74:21 75:2,8 81:1
85:6,10,13,15
86:16,19,22,24
87:4 88:7,18,19
89:25 90:1 95:5
97:9,19,23,24
98:7,22,24 99:8
100:12 103:4,21
104:18 106:7,19,
25 107:15 111:1
112:13,19 113:19,
24 114:22 115:10
117:14 118:5
119:20 120:20
125:3,6,9,10 127:8
132:5 133:11
134:1 135:17

**Signagen's**
51:6 59:12

**signature**
95:7,8,10,13 96:12
130:14,15,20,21,
22 131:3,14,19,22,
25 132:3,4,5,11,
12,15,16,17,18
134:7,13,14,17,21,
22

**signatures**
131:9 133:7
134:16

**signed**
76:18 77:14 95:11,
15,19 96:5,18
97:18,20 98:20
100:13 120:11
121:2 124:23
125:19 132:16,20
134:23

**signing**
96:7

**signs**
85:3

**similar**
51:1 59:18 63:2
64:25 118:4,6
131:17,21,22
132:23

**simple**
106:25 121:10

**site**
81:1

**situation**
22:22 33:9 51:22
68:16 74:19 78:11,
13

**situations**
33:21

**size**
128:21,24 129:3,6,
16,17,23,25 130:2

**Skipping**
30:17

**sleep**
69:11 70:7 97:3

**slept**
65:18,19

**slightly**
74:1

**slip**
71:12

**small**
28:11 39:18 45:5
67:20 71:25

**snippet**
81:22

**so-called**
84:19

**Social**
25:24

**software**
92:23 93:5,6,12,24
94:6

**solely**
22:20

**solution**
118:2

**solve**
31:4

**someone's**
80:9,12

**SOPS**
17:9 42:6 122:8

**space**
13:25



**Spanish**
  73:21
**speak**
  117:12
**speaking**
  7:16 67:17
**special**
  48:4 69:9 85:17
  92:4 97:4
**specific**
  5:15 15:5 30:14
  37:20 48:2 51:14
  57:19 72:13 73:10
  84:1 96:4
**specifically**
  7:25 37:6 40:18
  44:15 60:2 78:8
**speed**
  43:4 121:23
**spellings**
  138:19 139:2
**spoke**
  48:22 117:15
**staff**
  18:5 19:22,24
  20:1,2
**stage**
  41:2,5,22 42:1
  81:7
**stamp**
  81:17,24 82:13,20
  84:4
**stand**
  11:18
**standing**
  77:13 115:4
**start**
  5:13 18:9 24:2
  33:6 38:12 42:17,
  20 43:16 48:5
  60:20 77:11,17
  82:19 85:12 91:4
  104:21 105:23
  107:12 119:8
  121:16
**started**
  45:12,13 50:23,25
  78:14 84:11 114:6,

7 132:4
**starting**
  39:2 45:24 46:14
  47:4,13 59:16 76:7
**starts**
  21:24 26:20 29:13
  30:18
**state**
  7:2 25:23 26:4
  27:1 30:3
**stated**
  12:3 27:12 35:19
  96:13 104:1
  105:16 107:1
  124:18
**statement**
  27:10
**statements**
  80:2
**states**
  34:24 88:12 91:9,
  14
**status**
  29:25 30:1 51:22
  74:18
**stay**
  62:14,23 64:12,21
  65:15,23 66:1,12
  68:19 69:14,16
  70:7,17 88:15 98:7
**stays**
  70:19
**STENOGRAPHE**
**R**
  87:25 118:19
  138:21,24 139:10
**stop**
  35:16 68:13 99:15
  101:25 107:8
  122:10
**stopped**
  67:12
**storage**
  124:3
**store**
  66:19
**stored**

127:8
**stores**
  133:11
**story**
  62:10,25 64:8,23
  65:8 66:6 67:7
  74:13,17 106:10
**strong**
  107:4
**Strope**
  45:17 46:1,4 73:14
  76:12
**structure**
  12:10
**stub**
  26:1 51:15,18,21
**stubs**
  51:9,10,13
**stuck**
  66:2,7,9
**stuff**
  15:20
**subculture**
  40:7
**submit**
  55:11
**subordinate**
  33:12
**substantial**
  99:4
**succeed**
  117:10
**sue**
  108:15
**sufficient**
  58:11,21,22
**suggest**
  42:9 137:4
**suggests**
  96:10
**suitable**
  42:10 48:24
**Sunday**
  88:15 91:6
**super**
  43:2,4 121:23

**supervision**
  42:4,21 71:6 83:7
**supervisor**
  12:22,24 13:2,8
  22:11 23:4,15
  24:1,3 30:24 31:1,
  13 33:23,24 34:14,
  20 38:24 40:9,14,
  15,18 45:8 52:23
  54:6 72:13
**Supervisor-**
**subordinate**
  33:16
**supervisors**
  13:7 23:9,12,20
  24:9,22 26:21 27:6
  29:6 30:8 48:10,11
  52:8,11 54:3 71:20
  119:19
**supervisors/**
**employees**
  48:18
**supervisory**
  12:20 33:17
**supplier**
  33:12
**support**
  84:15
**supporting**
  109:25
**supposed**
  24:18 41:5 42:2
  65:16 67:9 131:22
  132:5,11 134:13,
  22
**supremacy**
  80:3
**surrounding**
  5:12 9:9 32:9
  84:24
**suspend**
  86:22
**suspended**
  55:3
**switch**
  39:7 82:15
**swollen**
  92:13 104:25

**sworn**
  5:2
**symbol**
  93:2
**system**
  132:8 134:2,10

---
**T**
---

**tabs**
  82:16
**taking**
  6:19 71:11,12
**talk**
  49:7,8,11 56:2
  58:17 91:7 92:4
  97:20 124:13
  138:3
**talked**
  47:25 52:6 55:23
  58:20 78:4 99:17
  132:13 136:3
**talking**
  11:24 12:19 13:13,
  16 67:1 68:25 69:1
**tape**
  16:8
**tax**
  26:2
**taxes**
  25:24
**team**
  12:2 13:25 18:13,
  16,18 19:6,7,18
  22:1 23:15,16
  24:13 29:7 31:22,
  23 40:5,20 42:3,4,
  9,18,20 43:12,20,
  24 44:2,18,19
  50:9,16 52:11,23,
  24 53:16 56:22
  121:15 122:3,20,
  23 125:14,15,18,
  24,25 137:9
**teams**
  126:7
**technical**
  71:14,17,22



Liu vs
SignaGen Laboratories

Jianzheng Zhou

124:12 139:2

**technically**
76:14

**technician**
44:20

**techniques**
40:8 49:12

**telling**
97:22

**template**
28:5

**ten**
9:5,14 43:10 63:15
134:19

**ten-minute**
63:12 135:3

**term**
20:25 66:14 97:6

**terminate**
14:21 25:8 52:12
53:7 61:10 109:21
110:18

**terminated**
55:6 57:16 58:5,7
59:3,8 66:14

**termination**
35:9,13 61:2,8,20
62:2 69:8 81:8
88:6

**terms**
16:8,10 17:21
20:25 35:15 36:7
121:10 128:9
129:23 139:2

**test**
75:12,17,23

**testified**
5:3 71:18 72:23
73:25 76:6 85:4,8
111:22 116:4

**testify**
6:2 124:16

**testimony**
57:6 63:25 66:8
67:24 111:11

**text**
87:14,20 90:15,24

103:15 104:5

**text-message**
87:15

**thing**
9:25 25:6 49:21
54:19 66:17 70:16
80:7 81:22 84:8
94:8 113:16
115:13 117:3
124:15 139:7

**things**
5:14 6:21 52:18
59:4 93:8 117:3
139:1

**third-party**
51:12 93:6

**Thomas**
10:6,13,22 49:25
71:2 99:22,25
100:8

**Thomas's**
71:8

**thought**
98:3

**threaten**
86:22

**threatened**
103:18

**Tibbens**
39:1 40:19 41:6
42:5,17 119:23
123:9

**Tibbens'**
122:13

**Tiffany**
66:19

**time**
13:1 25:22 36:2
37:7 39:17,20
41:19 42:24 43:8,
15,20 44:9,20
47:24 48:2,4,5
50:6,18 51:17
56:6,19 57:22
58:11,13,25 59:1,
3,25 61:25 63:17
67:14 68:17 69:22
70:2,7,17 72:19

79:2 81:12,24
82:20 84:1,4 88:4
91:6 92:6 96:4,7,
23 97:8 98:7 99:3,
4 101:17 103:23
104:16,23 106:12,
19 107:9,14,16,23
108:8,9,10,14,19
110:19,24 111:22
112:14,19 113:5,
24 114:4,21
115:21,23 116:13,
15 117:25 118:10,
21 119:6 122:5,25
123:3,6 124:10,21
125:23,24,25
137:2 138:17

**timekeeping**
51:6

**timeline**
23:18

**times**
16:3 17:10 43:10
49:8 76:10 102:3
106:3 116:8,17,25
135:18

**tiny**
67:20

**tissue**
18:19 40:5,6 49:12
50:17

**titer**
43:11

**title**
8:3,5 17:23 19:3
44:10 45:19,21
46:12 47:2,11

**titles**
11:14 17:18 18:6,9
19:8 44:13

**titration**
43:10 125:21,22

**today**
5:11 6:2 7:17,21
8:16 92:17 111:11
138:18

**today's**
5:17 20:17 56:16

59:20,23 90:18,20
94:17 102:22

**toggle**
130:17 131:11

**told**
31:10 52:25

**Tom**
71:23 72:9,15
100:6

**top**
29:12 83:18 91:4,
16 93:2

**topic**
106:22

**topics**
70:24 89:20,24
90:4

**total**
65:11 79:17,22
94:1

**totally**
59:3 114:23

**touch**
81:3,4 84:15,16
86:18

**touched**
84:18

**tour**
88:16

**trained**
32:17

**training**
15:9,11,12,14 16:2
32:20 41:3

**trainings**
15:22,25 41:5

**transaction**
60:1,11 61:18,24,
25 62:12,22 64:10,
20 66:4 68:18 70:9

**transcript**
139:5

**transduction**
115:12

**transfection**
40:8

**transfer**
42:9 49:18 50:16
78:4 124:24,25

**transferred**
42:18 76:25 83:6
121:15 122:2

**translate**
88:8 90:24 92:7,
22,25 93:7,24
104:12,19

**translated**
93:14,23

**translates**
92:21 94:9

**translation**
87:23 88:8 93:24
94:1,5 104:14

**travel**
86:24 87:1

**tread**
136:7

**treated**
28:25 29:11

**trip**
87:8

**trips**
87:2,5

**trouble**
17:9 109:13
115:10

**true**
72:20 77:7 102:7
126:9

**trust**
100:5

**truth**
124:16

**truthfully**
5:25 6:2

**tube**
43:5 121:18 122:7

**tubes**
42:23 43:1 121:22

**turn**
42:21 110:21

**turned**
121:17 137:19,25



**Tyler**
47:8,9,15 73:19
**type**
10:24 33:20 34:21
35:2 96:7
**types**
15:11 17:19
**typically**
87:1
**typos**
21:12
**Tyson's**
66:19

———————————

**U**

———————————

**U.S.**
60:13
**UC**
122:19,22
**Uh-huh**
7:1 26:9
**ultracentrifugation**
42:23,24 43:1,4
121:16,18
**ultracentrifuge**
121:19,23 122:19
**ultracentrifuges**
123:17
**underneath**
93:4
**undersigned**
8:13
**understand**
6:4 12:9 16:10
17:17 36:7,8 38:20
41:13 51:10 52:19
54:22 66:8 69:25
72:21 79:8 91:12,
20 101:23 107:17
121:11 128:9
133:4,9 135:12,16
137:9
**understanding**
48:15 95:10,12
97:17
**understood**

6:9 28:17 32:12
60:3 72:11 94:4
126:19
**undertake**
29:8
**unemployment**
115:1
**unfair**
65:21
**United**
88:12 91:9,13
**University**
46:6
**unlawful**
27:4 29:20 30:4,7
**unlawfully**
29:1
**updated**
16:12 21:3 72:17,
18,19
**UPS**
108:21
**useless**
77:3
**user**
123:16

———————————

**V**

———————————

**valid**
47:25
**varied**
17:14
**varies**
18:21
**vary**
19:3 22:5
**vector**
11:24 12:1 19:14
20:3 40:4,16,17
41:4 42:2,4 115:12
**vectors**
71:15
**vendor**
132:6,8 134:10,24
**vendors**
30:9

**verbal**
5:18,20
**verification**
75:8
**verify**
18:17 132:6
**verse**
94:10
**version**
20:22 21:6,10,13
26:18 72:21
129:13
**versions**
21:7
**video**
81:14,18,21,22
82:1,5,12,19,22,24
83:1,3,19 84:6,13,
22 137:5,10
**videos**
81:20 103:15
**view**
82:2
**viewed**
89:16
**viewing**
131:8
**views**
80:8
**violation**
43:3
**virus**
41:4
**visit**
12:25 62:13 64:11
67:8 88:13,14
**visit's**
88:18
**visitation**
117:2
**visiting**
69:24 70:3
**voice**
92:8,22 93:7,11,
13,22,23 94:9
104:12

**voluntarily**
55:7,8 57:6 58:7

———————————

**W**

———————————

**W-4**
26:3
**wage**
51:6
**wages**
25:12
**wait**
104:23 105:10,11
138:10
**waive**
136:6,7
**wanted**
48:14 63:11
115:13 135:18
138:14 139:7
**warning**
35:12 52:3 53:16
**warnings**
35:13
**Wechat**
65:13 89:15,17
90:3 93:7,12,17,
18,21,22 94:5
104:10 105:13
108:1 109:23,24
110:1,4,23
**week**
40:19 47:24
**weekend**
69:25 116:13
**weekends**
70:1 108:8 116:17
117:25
**weeks**
42:3,16,17 43:13,
21,23 44:3 58:14
107:9
**whatsoever**
108:3
**white**
73:18,24 80:3
**wider**

84:7
**wife**
100:22 101:4
**Wifis**
39:7
**window**
84:10 109:1
**wire**
66:3
**wired**
106:11
**withholding**
26:4
**witnesses**
29:5
**words**
21:11 120:10
**work**
18:13,15,21 20:2
22:12,14,17 29:17
30:23 38:19 40:4,
22 41:1,2,7,9,11,
14,18,20 42:2,3,17
43:15,16,22 44:18,
20 45:3 48:24
62:18,21 64:16,19
65:17,25 66:25
67:2,11,19 70:1,2
74:14 76:13 77:11
78:5 81:1 83:6,8
86:24 98:6,7
107:16 113:19
118:4 120:21
122:21 125:24,25
132:6
**work-related**
89:19,23
**worked**
41:16 76:14
132:14
**working**
18:13 40:24,25
42:20 43:12 51:2
59:9 66:24 108:20
124:19 125:17
126:8
**workplace**
32:22 34:8,12



106:4

**works**
6:20 35:22 77:4

**worries**
48:14 80:17 86:9

**written**
35:13 40:11,13
53:16

**wrong**
12:23 38:17 46:17
50:10 55:5 79:25
123:4 128:20
131:18,23

---

**Y**

---

**year**
16:3,14 21:3,5
23:5,17 24:18,19
35:22 39:22 40:1
48:2 50:22 51:1,2
52:22 53:6 58:19
61:10 72:17 74:13
77:11,16 94:23
108:6

**yearly**
23:3,7,18 35:19,20

**years**
7:11 9:5,14 11:5
17:25 21:4 27:16
36:17 39:24,25
94:23 123:21
126:15 134:19

**yesterday**
14:8 136:3

**you-all**
20:8 63:12 82:15
83:24

---

**Z**

---

**Z-H-A-O**
10:7

**Z-H-O-U**
7:4

**Zhou**
5:1,8 20:14 21:20
26:14 30:17 33:1

56:8,12 59:18 60:6
65:4 69:3 70:23
81:23 82:3,24
83:21 87:12 90:12
91:18 94:13 97:13
100:14 101:15
102:12,25 103:12
104:8 105:20
111:5 114:13
119:2,9 126:11
127:14 130:7,11,
12 135:9 136:12
138:5,15,18
139:18

**Zhou's**
60:4

**zoom**
21:19 23:24 56:12
127:18 128:18,23

